UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                    :    Chapter 11

READING BROADCASTING, INC.               :

            Debtor                       :    Bankruptcy No. 05-26563bif

.................................................

MEMORANDUM

.................................................

Three related motions are now pending in this chapter 11 case.  First, the

chapter 11 trustee, George L. Miller, filed a motion "establishing procedures for the sale

of station assets . . . approving certain bidding procedures [and] approving the assumption

and assignment of executory contracts."  Second, the chapter 11 trustee filed a motion

seeking approval of a proposed amended chapter 11 disclosure statement under 11 U.S.C.

§ 1125 and Fed. R. Bankr. P. 3017.  This disclosure statement concerns a proffered

chapter 11 plan of liquidation, through which the trustee intends to sell the television

station assets referred to in the first motion.  Third, creditor Philadelphia Television

Network, Inc. ("PTN"), filed its own chapter 11 plan and it moves for the approval of its

accompanying disclosure statement.[1]  Under this proposed amended plan, PTN would pay

all allowed claims and administrative expenses in full, eliminate all current shareholder

interests, and become the sole shareholder of the reorganized debtor.  Confirmation of

PTN's plan would preclude the trustee from selling the station assets.

Various objections were filed to these three motions and hearings were

held.  All parties in interest were afforded the opportunity to present evidence and argue

---

[1]With the appointment of a chapter 11 trustee "any party in interest . . . may file a
[chapter 11] plan" and seek confirmation.  11 U.S.C. § 1121(c).

their respective positions.  Moreover, the two plan proponents were given further opportunity to amend their proposed disclosure statements in light of the objections and comments made by parties in interest at the hearing, and consistent with their oral responses to those objections.  They have done so.  Thus, I shall consider whether to approve their disclosure statements, as recently amended.

Before addressing the relief sought by the chapter 11 trustee and by PTN in these three motions, I shall summarize the relevant legal principles.

## I.

### A.

The climax of a chapter 11 case is the confirmation process.  As part of that process, creditors and interest holders whose rights would be impaired are entitled to vote on any proposed plan.  By virtue of 11 U.S.C. § 1125(b),[2] no plan may be submitted to these parties unless they receive a court approved disclosure statement.  See, e.g., Kirk v. Texaco, Inc., 82 B.R. 678, 681 (S.D.N.Y. 1988).  A disclosure statement may only be

---

[2]This subsection provides:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.  The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

approved after notice and hearing, Fed. R. Bankr. P. 3017(a), and then only if it includes

"adequate information."  11 U.S.C. § 1125(b); accord, e.g., Matter of Texas Extrusion

Corp., 844 F.2d 1142, 1157 (5th Cir. 1988).  The phrase "adequate information" is

defined by statute.  It means:

> [I]nformation of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records,
> that would enable a hypothetical reasonable investor typical
> of holders of claims or interests of the relevant class to make
> an informed judgment about the plan, but adequate
> information need not include such information about any
> other possible or proposed plan. . . .

11 U.S.C. § 1125(a)(1).[3]

 Only classes of creditors or interest holders that are impaired, as defined by

section 1124, may vote for or against a proposed chapter 11 plan.  11 U.S.C. § 1126(f).[4]

Thus, it is understood that the general purpose of the disclosure statement is to provide

sufficient information to enable impaired classes of creditors and interest holders to make

an informed judgment about the proposed plan and determine whether to vote in favor of

or against it.  See, e.g., Century Glove, Inc. v. First American Bank of New York, 860

F.2d 94, 100 (3d Cir. 1988); Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d

414, 417 (3d Cir.), cert. denied, 488 U.S. 967 (1988); In re River Village Associates, 181

---

[3]This definition was amended by the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005, Pub. L. 109-8.  The amendment applies, however, to cases commenced
on or after October 17, 2005.  The instant chapter 11 petition was filed on October 7, 2005.
Thus, the text quotes the older definition.
  In addition, section 1125(f)(1) was amended in October 2005 to allow a small
business case to proceed to confirmation without a disclosure statement.  That amendment is also
inapplicable to this bankruptcy case.

[4]A class that receives no distribution under a plan is deemed to have voted against
the plan.  11 U.S.C. § 1126(g).

B.R. 795, 804 (E.D. Pa. 1995); In re Monroe Well Service, Inc., 80 B.R. 324, 330 (Bankr.

E.D. Pa. 1987); 7 Collier on Bankruptcy, ¶ 1125.02 (15th ed. rev. 2007).

The general language of the statute and its surrounding legislative history

make clear that "[t]he determination of what is adequate information is subjective and

made on a case by case basis.  This determination is largely within the discretion of the

bankruptcy court."  Matter of Texas Extrusion Corp., 844 F.2d at 1157; see H.R. Rep. No.

595, 95th Cong, 1st Sess., 408-409 (1977):

> Precisely what constitutes adequate information in any
> particular instance will develop on a case-by-case basis.
> Courts will take a practical approach as to what is necessary
> under the circumstances of each case, such as the cost of
> preparation of the statements, the need for relative speed in
> solicitation and confirmation, and, of course, the need for
> investor protection.

An early Bankruptcy Code decision produced general categories of

information that should often be addressed within a disclosure statement.  In re

Metrocraft Pub. Services, Inc., 39 B.R. 567 (Bankr. N.D. Ga. 1984).[5]  Nonetheless, it is

---

[5]The bankruptcy court detailed the normal topics for inclusion in a disclosure
statement as follows:

> Relevant factors for evaluating the adequacy of a disclosure
> statement may include: (1) the events which led to the filing of a
> bankruptcy petition; (2) a description of the available assets and
> their value; (3) the anticipated future of the company; (4) the
> source of information stated in the disclosure statement; (5) a
> disclaimer; (6) the present condition of the debtor while in Chapter
> 11; (7) the scheduled claims; (8) the estimated return to creditors
> under a Chapter 7 liquidation; (9) the accounting method utilized
> to produce financial information and the name of the accountants
> responsible for such information; (10) the future management of
> the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the
> estimated administrative expenses, including attorneys' and
> accountants' fees; (13) the collectibility of accounts receivable;

(continued...)

understood that certain categories of information that may be necessary in one case may be omitted in another; no one list of categories will apply in every case.  See, e.g., In re United States Brass Corp., 194 B.R. 420, 425 (Bankr. E.D. Tex. 1996); In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

Generally, "the adequacy of disclosure is dependent upon various factors including: the size and complexity of the chapter 11 case, the type of plan proposed, the type of creditors and claims impaired by the proposed plan, and the access by impaired creditors to relevant information from other sources."  In re Monroe Well Service, Inc., 80 B.R. at 330; see also 11 U.S.C. § 1125(a)(1).  Nonetheless, three issues are typically important to unsecured creditors and should be clearly disclosed:

> [A] proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.

In re Ferretti, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).

---

[5](...continued)
(14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

In re Metrocraft Pub. Services, Inc., 39 B.R. at 568.

B.

The amended disclosure statement submitted by the chapter 11 trustee

involves the sale of assets of the debtor.  The statutory authority to sell assets as part of

the chapter 11 confirmation process is found in 11 U.S.C. §§ 1123(a)(5)(D) and

1123(b)(4), which state:

> (a) Notwithstanding any otherwise applicable nonbankruptcy
> law, a plan shall–
> ***
> (5) provide adequate means for the plan's
> implementation, such as–
> ***
> (D) sale of all or any part of the property of the
> estate, either subject to or free of any lien, or the
> distribution of all or any part of the property of
> the estate among those having an interest in
> such property of the estate. . . .
> ***
> (b) Subject to subsection (a) of this section, a plan may–
> ***
> (4) provide for the sale of all or substantially all
> of the property of the estate, and the distribution
> of the proceeds of such sale among holders of
> claims or interests. . . .

Prior to confirmation, a bankruptcy fiduciary (i.e., trustee or chapter 11

debtors in possession exercising a trustee's power by virtue of section 1107(a), see, e.g.,

In re Ames Department Stores, Inc., 287 B.R. 112, 118 n.10 (Bankr. S.D.N.Y. 2002)),

may sell property of the bankruptcy estate pursuant to 11 U.S.C. § 363(b)(1).  Section

363(b)(1) allows a trustee to sell property of the estate outside the ordinary course of

business, subject to court approval.  See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.,

788 F.2d 143, 147 (3d Cir. 1986); In re WFDR, Inc., 10 B.R. 109 (Bankr. N.D. Ga. 1981)

(court reviews the sale of a radio station by the chapter 11 debtor).  The determining

6

standard for a motion to sell under section 363 is often referred to as the "business judgment test." See, e.g., In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) ("In evaluating whether a sound business purpose justifies the use, sale or lease of property under Section 363(b), courts consider a variety of factors, which essentially represent a 'business judgment test.'"); In re United Healthcare System, Inc., 1997 WL 176574, at *4 (D.N.J. 1997); In re Tom's Foods Inc., 2005 WL 3022022, at *2 (Bankr. M.D. Ga. 2005); In re Global Crossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003); 3 Collier on Bankruptcy, ¶ 363.02[1][f] (15th ed. rev. 2007).

The exercise of sound business judgment requires that the method of sale be reasonable and that the purchaser act in good faith and pay fair value. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149-50; In re United Healthcare System, Inc., 1997 WL 176574, at *4. Fair value can be a function of appraised value. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149. It can also be achieved at an auction properly marketed and conducted. See id.

Typically, when the bankruptcy trustee intends to liquidate estate assets, sound business judgment involves acceptance of the highest bid. See In re Landscape Properties, Inc., 100 B.R. 445, 447 (Bankr. E.D. Ark. 1988); In re Flannery, 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981). In limited circumstances, however, it may be reasonable to accept a somewhat lower offer if the latter involves less risk. See In re Bakalis, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); see also In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 517 (Bankr. N.D. Ala. 2002) ("The First Circuit, as does this Court, acknowledged that the 'highest bid is not always the best bid.'") (quoting In re Gil-Bern Industries, Inc., 526 F.2d 627, 629 (1st Cir. 1975)).

Trustees will often seek authority to sell estate property under section

363(b)(1) in conjunction with approval of bidding procedures prior to the actual sale.

See, e.g., In re Muma Services, Inc., 2003 WL 21146741, at *1 (D. Del. 2003); In re

Polycel Liquidation, Inc., 2006 WL 4452982, at *2 (Bankr. D.N.J. 2006); 2004 Norton

Annual Survey of Bankruptcy Law, Part III, Section E ("It is not uncommon for a debtor

to establish bidding procedures and seek court approval of those procedures prior to

selecting the high bidder and seeking court approval of a § 363 sale. . . .").  In general,

bidding procedures "are designed to: (i) maximize the purchase price of the assets sold;

(ii) level the playing field for other potential bidders; (iii) provide protections to a stalking

horse; and (iv) provide order to the process."  ABI, Pushing the Envelope in Liquidation

of the Estate, § II (D) (Southeast Bankruptcy Workshop, July 28-31, 2004).

Because a bankruptcy court can approve a sale under section 363(b)(1) only

if it is undertaken in good faith, see In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d

at 149-50 ("[W]e hold that when a bankruptcy court authorizes a sale of assets pursuant to

section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the

purchaser."), auction bid procedures that chill competitive bidding will prevent the sale

from receiving court approval.  See also In re LCCH Liquidating Corp.,

276 B.R. 106, 108 (Bankr. W.D. Va. 2001):

> The Board of the Hospital proposed to the Court that it be
> allowed to sell its operating assets to a new entity representing
> in effect a joint venture between itself and a larger regional
> healthcare organization known as Mountain States Health
> Alliance.  Under this proposal some of the members of the
> Hospital's existing Board would become board members of
> the new entity and the Lee County community would have a
> continuing voice in the operation of the facility.  This
> proposal was approved by the Court, subject, however, to
> bidding procedures which would allow other potential

acquirers of the Hospital to come to the table.  It is fair to say
that the bidding procedures originally proposed by the Debtor
would have tended to discourage the participation of other
potential bidders, but as a result of objections raised by the
United States Trustee and the Unsecured Creditors Committee
as well as concerns expressed by the Court, the procedures
ultimately approved were opened up significantly.

Bidding procedures will vary, depending upon the type of assets to be sold,

whether there is an initial purchase offer accepted subject to competing bids (referred to

as a "stalking horse"), and the method of sale.  There are, however, some aspects of the

bidding process that are commonly addressed when court approval is sought:

Typical provisions found in a bidding procedures order
include: (i) the deadline to make a qualified offer; (ii) the
definition of a qualified offer including specific terms, proof
of financial ability, and deposit requirements; (iii) description
of the stalking horse's offer; (iv) information regarding due
diligence; (v) date of the sale hearing (i.e., auction); (vi)
protections for a stalking horse, including break-up fee,
topping fee, minimum overbid and incremental bidding
requirements, and reimbursement of expenses related to due
diligence; (vii) provisions relating to potential credit bids
under §§ 363(k), 1129(b)(2)(A)(ii); (viii) statement of the
court's jurisdiction to determine disputes arising from the
bidding procedures or the auction; (ix) an outside closing
date; (x) a provision requiring that all bids remain open until
the successful bid is approved and the sale is closed; and (xi)
a provision that additional bidding procedures may be
announced at the sale hearing, or after.

ABI, Pushing the Envelope in Liquidation of the Estate, § II (E) (Southeast Bankruptcy

Workshop, July 28-31, 2004).

Bankruptcy court review of bidding procedures made in conjunction with

authorization of a trustee's motion to sell estate property under section 362(b)(1), which

review is designed to insure that the successful bidder is acting in good faith, is not

considered advisory.  See generally  In re LCCH Liquidating Corp., 276 B.R. at 108; cf.

Surrick v. Killion, 449 F.3d 520 (3d Cir. 2006) (discussing declaratory judgments);

Step-Saver Data Systems, Inc. v. Wyse Technology, 912 F.2d 643 (3d Cir. 1990) (same).

The trustee in this contested matter is not proceeding, however, under
section 363(b)(1).  He seeks to sell the debtor's television station assets via auction, with
the sale approved only as part of the confirmation process.  See generally In re Azabu
Buildings Company, Ltd., 2007 WL 1964306 (Bankr. D. Haw. 2007).  As noted earlier,
sections 1123(a)(5)(D) and 1123(b)(4) permit chapter 11 plans to provide for the sale of
some or all of bankruptcy estate property.  See In re FCX, Inc., 853 F.2d 1149, 1154-55
(4th Cir. 1988).  Indeed, some courts have suggested that the authority to sell as part of
the confirmation process is broader and subject to less restriction than a sale under section
363(b)(1), since the confirmation process is ultimately subject to creditor voting and
approval.  See id., 853 F.2d at 1154-55; Kuney, Misinterpreting Bankruptcy Code Section
363(f) and Undermining the Chapter 11 Process, 76 Am. Bankr. L.J. 235 (Spring, 2002).

Although not required, the chapter 11 trustee in this instance is seeking
advance approval of the bidding procedures he intends to use as part of the confirmation
process.  Insofar as the disclosure statement is concerned, adequate information regarding
the material aspects of the trustee's proposed sale process should be provided to all voting
entities, so that they may make a reasoned choice whether to support the trustee's plan.  In
addition though, the trustee implicitly seeks court approval of these bidding procedures to
insure that his plan has been proposed in "good faith and not by any means forbidden by
law" as required by 11 U.S.C. § 1129(a)(3).  See In re Abbotts Dairies of Pennsylvania,
Inc., 788 F.2d at 150.  Thus, I may consider his request for approval and the objections
made thereto.  As will be discussed below, however, it is premature to consider his

request to approve the assumption and assignment of leases and executory contracts,

except as that issue is implicated in the question of "adequate information" under section

1125.


II.


I begin first with the trustee's motion concerning bidding procedures, as the

outcome may affect the adequacy of information provided by him in his proposed second

amended disclosure statement.  The bidding procedures that the chapter 11 trustee seeks

to use at an open auction are summarized as follows:

There will be no breakup or termination fee for any bidder, as there is no

stalking-horse bid outstanding; all bidders must sign a confidentiality agreement in order

to receive pertinent business and financial information about the debtor's television

station; all bidders must submit their bids by a date certain using a "model Asset Purchase

Agreement"[6] marked to show changes to the template, identifying the offer price and the

specific assets to be purchased at that price; all bidders must present satisfactory evidence

to the trustee of their financial ability to complete the sale and to perform under all

executory contracts and leases that the bidder wishes the trustee to assume and assign to it

under 11 U.S.C. § 365.[7]

---

[6]An amended model asset purchase agreement is attached to the trustee's
proposed first amended plan of liquidation.

[7]Technically, as assumption of a lease or executory contract would occur as part of
the confirmation process, the relevant statutory provision is section 1123(b)(2).

In addition, all bids must contain a purchase price of at least $12 million in value to the bankruptcy estate; all bidders must deposit $200,000 at least five business days prior to the auction; and all bids must be free of all financing and due diligence contingencies.  Trustee's Motion, ¶¶ 16(i)-(iv).

At the hearing, the trustee offered evidence that he intends to have the auction sale occur at the confirmation hearing.  Moreover, his proposed minimum bid is based upon the amount needed to pay anticipated chapter 11 administrative expenses due on the effective date of his proposed plan (i.e., attorneys' fees), plus the allowed secured claims of two creditors, leaving about $600,000 in reserve to pay general unsecured creditors.  Ex. T-1.[8]

In addition to these bidding terms, the trustee proposes to hold an open auction if he receives at least two qualifying bids, with the highest written bid serving as the opening auction bid and any subsequent auction bids made in increments of at least $100,000 in cash or equivalent value.  At the conclusion of the auction, the trustee shall select the "highest or otherwise best offer" as the winning bid.  The underbidder has the option to register its bid and become the winning bidder if the selected bidder does not "consummate the sale" of the purchased assets.  Id., ¶¶ 16(v)-(vi).  The trustee is obligated to return all deposits within five business days after the auction to all qualified

---

[8]The trustee's estimate of funds available to pay unsecured creditors is not clear and, as will be mentioned below, should be amplified in the context of his disclosure statement.

12

bidders, except for the winning bidder (whose deposit serves as a credit against the purchase price) and the registered underbidder. Id., ¶ 16(vii).[9]

Furthermore, the trustee reserves the right to postpone the bidding deadlines and auction for up to 45 days from the date originally established if in his "business judgment" he deems it appropriate. Id., ¶ 16(ix). He also reserves the right to seek court approval for the adoption of "additional rules for the conduct of the Auction not inconsistent with the Bidding Procedures." Id., ¶ 16(viii).

Finally, the trustee also proposes to provide written notice to all creditors, parties in interest, the United States trustee and "all known interested bidders" of the bidding procedures and the auction date. He intends to publish in the Philadelphia Inquirer newspaper a notice of the proposed sale, with such notice appearing at least ten days prior to the bid deadline. Id., ¶¶ 18-19.

In addition to these proposed bidding procedures, the trustee's motion seeks court approval under 11 U.S.C. § 365(a) to "assume and assign certain [executory] contracts to . . . Winning Bidder." Id., ¶ 20.[10] Actually, the trustee's motion also mentions leases as well as executory contracts in paragraphs 22 and 25.

The motion, ¶ 22, states that "schedules 1.1(c) and 1.1(e) to the APA . . . provide the full list of executory contracts and unexpired leases" and "[s]ection 1.3(d) of the APA contemplates that the Winning Bidder will take an assignment of certain Real

---

[9]Although not stated, presumably the underbidder would receive back its deposit if the winning bidder completes the asset purchase or would receive a credit against the underbid if the winning bidder did not consummate the sale.

[10]Again, assumption and assignment are permitted by section 1123(b)(2) when part of a confirmed plan.

Property Leases and Business Contracts, to be determined by the Winning Bidder as identified on Schedule 1.3(d) of the APA. . . ."  Upon review, schedule 1.3(d) of the amended asset purchase agreement is blank, containing the statement "to be provided by buyer."  This is consistent with the testimony at the hearing, which represented that the trustee will attempt to assume and assign only those executory contracts and leases desired by the purchaser.  Furthermore, the purchaser would have no liability to cure any delinquencies in those contracts or leases.  The buyer would only have the obligation of future performance; the bankruptcy estate would be responsible to pay all cure amounts.

Section 1.1(c) simply states: "Fee simple interest in Land and Buildings located thereon–1729 North 11th Street, Reading, PA."  Schedule 1.1(e) lists 18 "business contracts."  Exhibit B to the motion, however, lists 17 lease agreements all stating that the "cure amount" is $0.  See Motion, ¶ 25.

Also relevant is that the trustee does not anticipate any significant asset purchase offers until he has tested his new digital signal transmission system.  This is a novel design and will not be tested completely for a few weeks.  Thereafter, the trustee may need 60 days to market his station and allow prospective bidders to exercise due diligence.

SOT, Inc. objects to the trustee's motion as a party to two leases with the debtor.  One lease, the "Analog Lease" was entered into prepetition and allegedly is delinquent in the amount of $68,068.32.  The second lease, the "Digital Lease," was purportedly entered into postpetition and SOT contends that it is not subject to assumption or rejection under section 365, and has a postpetition delinquency of $12,000.

14

SOT requests that the trustee's motion regarding the auction sale of the debtor's television station assets be approved only to the extent consistent with its objection.

Since the trustee acknowledges that assumption and assignment of leases and executory contracts are dependent upon the successful auction bidder (if any), and that the bankruptcy estate will pay all required cure amounts, it would be advisory to presently determine the amount of any cure delinquency under section 1123(b)(2) in the context of this bidding procedures motion.

Nonetheless, the issues posed by SOT's objection are justiciable as they concern the trustee's amended disclosure statement. They will be discussed below.

Crown Castle USA, Inc., raises an objection similar to that of SOT. It asserts that it entered into a postpetition lease with the trustee, and that the trustee is currently delinquent in payments in the amount of $15,973.33. Crown Castle requests that any assumption and assignment of its lease be conditioned upon payment of all delinquent amounts owed, coupled with the assignees demonstrating adequate assurance of future performance. This objection will also be considered in conjunction with the trustee's disclosure statement.

Finally, PTN raises different objections. First, it contends that no auction should be permitted because there is no basis to conclude that the $12 million minimum bid will be offered. Second, it contends that its proposed chapter 11 reorganization plan is superior to the trustee's, rendering any auction process irrelevant and a waste of estate resources. Third, it challenges the trustee's bidding procedures in seeking to qualify bidders, establishing a minimum bid and an initial $200,000 deposit (which is

15

mischaracterized by PTN as non-refundable).  Last, it argues that the issue of assumption of contracts and leases should be divorced from the bidding process.

I find PTN's objections unpersuasive, except for its assertion that disputes involving assumption and assignment of executory contracts and leases are premature. As noted earlier, procedures establishing bid deposits, qualifying bidders, and minimum bids are fairly common auction procedures and are well within the trustee's discretion to establish.  Furthermore, the trustee has concluded that if the assets of the debtor cannot garner a $12 million offer, confirmation of his liquidating plan is unlikely and of little value to general unsecured creditors.  In addition, the trustee's open auction proposal allows for the possibility, if the bids exceed $12 million, of some distribution to shareholders.

Finally, as will be discussed in connection with PTN's disclosure statement, PTN's plan has certain risks associated with its funding.  It would be inappropriate to preclude creditors and shareholders from the opportunity to decide which plan, if any, they will support.

Accordingly, there is no basis for my disapproving the trustee's desired bidding procedures.  However, I agree with PTN, for reasons mentioned earlier, that it is inappropriate for me to address lease and contract assumption issues under section 1123(b)(2) prior to the auction, except as they involve disclosure of adequate information.

III.


The chapter 11 trustee's proposed amended plan, dated July 25, 2007, states

that it "provides for the liquidation and conversion of all of the Debtor's

assets to cash and the distribution of the net proceeds therefrom to holders of Claims

(and, if proceeds remain after paying all Claims in full, then to holders of Equity

Interests). . . ." Amended Plan, at 6.  Thus, the chapter 11 trustee proposes to sell all of

the station assets at auction.  He then intends to prosecute certain causes of action,

intending to distribute the proceeds of sale of any successful litigation recovery largely as

a chapter 7 trustee would do under 11 U.S.C. § 726.

Under the trustee's proposed plan, the allowed secured claim of Gladstone

would be paid in full on the effective date.  The allowed secured claim of HLM

Communications would be paid 95% on the plan effective date.  Allowed administrative

expense claims would be paid in full on the effective date.  Other priority creditors would

then be paid in full (although the trustee does not believe there are any other priority

claims).  Allowed unsecured claims would be paid pro rata.  And, if unsecured creditors

are repaid in full with interest, shareholders would then receive the residue, pro rata,

subject to any offset for debts owed to the debtor.  (The trustee's plan states that he does

not anticipate any dividend to shareholders.)

As noted above, the trustee is seeking no less than $12 million from the sale

of the station assets.  The sale, which will involve a transfer of the station license, is

conditioned upon FCC approval.  Such approval will not be sought prior to the auction.

Thus, the trustee's proposed plan contemplates that the auction sale will be approved with

17

a confirmation order, FCC approval of the license transfer will then yield a sale closing date, and after the sale is closed there will be a plan effective date involving distribution to creditors.  The trustee proposes to continue to operate the debtor and run its television station after confirmation, pending FCC approval of the license transfer.  After the effective date, the trustee intends to become the plan administrator, prosecute any pending litigation and object to claims, and then distribute funds.

Thus, whether there is a plan effective date is dependent upon there being a successful auction sale and FCC approval of the license transfer.  The trustee also conditions a plan effective date upon having sufficient funds to pay all administrative, secured and priority claims in full (except for HLM's claim, which is paid only 95%).  If those conditions are not met, the plan is nullified, and the trustee may either continue to operate the station and seek another sale, convert the case to chapter 7, or seek some other form of reorganization.

On September 5, 2007, the trustee filed a second amended disclosure statement.  Before addressing specific objections made by certain creditors, there are certain aspects of this amended disclosure statement that need to be modified.

First, on page 7, the trustee states that he anticipates that FCC review of the license transfer will take from 2 to 12 months from the filing of the application for approval.  He does not anticipate that any auction sale could occur prior to November 2007.  In exhibit E to his disclosure statement, he opines that his cost assumptions are based upon 6 months to close the sale of station assets.  Yet on page 25 of his latest disclosure statement, he estimates a December 28, 2007 effective date for his plan.  This

effective date is inconsistent with his estimate of FCC approval and is misleading to creditors, at it implies an earlier distribution date than is likely.

Similarly, the trustee's latest disclosure statement reveals his intent to operate the debtor after confirmation. If the plan effective date is realistically much later than December 28, 2007, does that affect his estimate of administrative expenses made in the disclosure statement? If so, those estimates must be adjusted, as the greater the administrative expenses that will be paid from the proceeds of sale, the lower the distribution to creditors.

The trustee should also make clear that any auction is dependent upon the successful testing of the debtor's new DTS system. Such testing is not expected to be completed until later in September 2007.

As SOT pointed out, the trustee entered into certain contracts or leases postpetition. Such contracts and leases are not subject to rejection under section 365.[11] See In re Merry-Go-Round Enterprises, Inc., 180 F.3d 149, 159-160 (4th Cir. 1999); In re Cannonsburg Environmental Associates, Ltd., 72 F.3d 1260, 1265-66 (6th Cir. 1996); In re Dant & Russell, Inc., 853 F.2d 700, 706 (9th Cir. 1988). Breach of a postpetition contract or lease results in an administrative expense that is a first priority and must be paid in full as part of the confirmation process. See generally In re Merry-Go-Round Enterprises, Inc., 180 F.3d at 155-56 n.3; In re Mushroom Transp. Co., Inc., 78 B.R. 754, 761 (Bankr. E.D. Pa.1987); 4 Collier on Bankruptcy, ¶ 503/06[6][a] (15th ed. rev. 2007).

---

[11]Rejection under section 365 results in a prepetition unsecured claim.

19

On pages 9-11 of the second amended disclosure statement, the trustee provides estimates for distribution to each class under his proposed plan.  There is no good faith estimate for administrative expenses arising from postpetition leases and contracts.  There should be such an estimate, unless the trustee discloses in good faith that all such leases and contracts are current in payments, and that any successful bidder must assume performance under those contracts or leases.  As the proposed plan is contingent upon funds sufficient to pay these administrative expenses, creditors are entitled to have this information and to analyze for themselves the risks inherent in the trustee's plan proposal.

In addition, the trustee estimates a 14% dividend to unsecured creditors.  This estimate appears to be based upon allowed unsecured claims of about $21 million and an anticipated $3 million in available funds from the sale of the station assets plus recovery from litigation.  The trustee should include in the disclosure statement an estimate of how much of this $3 million would be derived from the proceeds of litigation, and when such litigation would likely conclude.  In Exhibit E to the disclosure statement, the trustee states that the liquidation value of this litigation is $0.  This liquidation estimate should be explained if the trustee believes that his pending adversary proceedings have value in his proposed chapter 11 plan.

As PTN's proof of claim in the amount of $20 million represents the vast majority of the unsecured creditor class, the trustee should also reveal to creditors whether he intends to object to that claim and, if so, his estimate of the likely allowance

20

of PTN's claim.[12]  Obviously, the percentage distribution to creditors would increase

significantly if PTN's allowed claim were materially less than $20 million.

Finally, the trustee's proposed plan contains an injunction against creditors.

As the trustee has proposed a liquidating plan for the corporate debtor, the debtor may not

be able to obtain a discharge injunction under 11 U.S.C. § 1141(d)(3).  See Teamsters

Pension Trust Fund of Philadelphia and Vicinity v. Malone Realty Co., 82 B.R. 346,

348-349 (E.D. Pa. 1988); 8 Collier on Bankruptcy, ¶ 1141.05[4] (15th ed. rev. 2007).

Unless the trustee takes the position that the debtor will receive a chapter 11 discharge, he

should delete the injunction provision from his proposed plan as well as its description

from his disclosure statement.  He can, if he desires, disclose to creditors that section

1141(a) provides that the terms of a confirmed plan are binding upon creditors and parties

in interest.

PTN has filed objections to the trustee's second amended disclosure

statement.  To the extent that PTN takes issue with the trustee's intended bidding

procedures, those bidding procedures are fairly disclosed and fall within the trustee's

business judgment.  Those creditors who conclude that the trustee will not obtain the best

value for the station assets can vote against the plan, and/or object to confirmation.

PTN argues that the trustee's estimate of expenses in his latest disclosure

statement does not fairly reflect that there will be additional operating expenses when the

DTS system is operational.  If so, the trustee's estimate should be adjusted.  If not, the

trustee should so state.  Similarly, if, as PTN contends, a good faith estimate of

---

[12]Present shareholders support the trustee's plan over that proposed by PTN.  They
believe that PTN's proof of claim is inflated.  Probably, they believe that their ability to receive
any dividend is dependent upon a successful challenge to that claim.

professional fees payable as of the anticipated plan effective date would be considerably higher than currently disclosed, the higher estimate is required.

PTN's complaint about understating arrearage obligations involving postpetition contracts and leases echoes those made by Crown Castle, and were addressed earlier. PTN's other objections are not persuasive as they would not materially assist creditors and shareholders in deciding whether to support the trustee's proposed plan. Some may be of concern to prospective bidders, but such entities can obtain necessary information from the trustee as part of due diligence.

The trustee's second amended disclosure statement now addresses the concerns posed by Irvin Cohen, Helene Associates, L.P. and SOT, Inc. and so need not be further amended. Nonetheless, the trustee must further amend his disclosure statement as detailed above before approval and dissemination to parties in interest is allowed. He will be afforded an opportunity to do so.


IV.


Finally, I turn to PTN's request to approve its proposed amended disclosure statement and the objections lodged thereto.

The amended plan proffered by PTN calls for this creditor to pay in full the allowed secured claim of Gladstone, as well as all allowed unsecured claims (except PTN's own claim) with interest at 6% on the effective date of its plan. Moreover, the plan proposes to pay all administrative expenses in full as of the effective date. The secured claim of HLM would be paid 95% on the effective date. All leases and executory

22

contracts assumed by the reorganized debtor at confirmation would be paid pursuant to contract terms and any arrearages cured on the effective date of the plan.[13]

The proposed plan further provides that all shareholder interests in the debtor will be extinguished and PTN (or its nominee), as plan proponent, would hold all newly issued shares in the reorganized debtor. The only exception is if existing shareholders tender a competing bid for the newly issued shares. This bid is due 21 days prior to the confirmation hearing. Moreover, "[o]nly proposals for 100% of the equity interests of the Reorganized Debtor shall be acceptable under this Plan. A competing offer for a new equity contribution to the Reorganized Debtor must provide all allowed claims, including the unsecured claim of PTN, with better treatment than all creditors are receiving under the PTN Plan." Amended Plan, at 22.

PTN estimates that it will need between $10,200,000 and $12,045,000 to fund its plan. As will be discussed below, PTN intends to borrow some or all of the necessary funds.

PTN's proposed amended plan has certain pre-conditions, both to confirmation and to the occurrence of the effective date of the plan. The conditions precedent to confirmation are: (1) the digital transmission system of the debtor is operational; (2) there is a funding commitment from PTN's lender in a sufficient amount to meet plan obligations; and (3) a confirmation order satisfactory to PTN is entered.

---

[13]While this appears to be PTN's intent, I note that Section XII of the proposed amended plan refers only to executory contracts but not leases. There also are typographical errors in the proposed plan that PTN may wish to correct and a blank on page 25 that should be filled.

The preconditions for an effective date of the plan, which occurs only after confirmation, are as follows:

<u>Conditions Precedent to Effective Date</u>

1. FCC approval of assignment to PTN of debtor's operating licenses;
2. transfer of control of debtor and its operations to PTN or its designee;
3. the reorganized debtor has a corporate structure that is acceptable to PTN;
4. all necessary authorizations are received;
5. all required documents are signed; and
6. all old corporate stock is cancelled and new shares are issued to PTN or its designee.

Between the date PTN's plan is confirmed and the effective date, PTN proposes that the chapter 11 trustee will continue to operate the debtor, and provide PTN with monthly reports.  On the effective date, all pending causes of action or claims of the debtor would vest in the reorganized debtor.  PTN's plan allows for at least 12 months between the confirmation date and the effective date of the plan, with PTN empowered to seek an extension of the effective date.  Finally, if the effective date conditions are not met, PTN has no obligation to fund its plan.

Having reviewed the proposed amended disclosure statement and the objections thereto, I conclude that PTN also has not provided adequate information as required by section 1125 and must further amend its disclosure statement.

First, while PTN informs that it intends to enter into a loan agreement with Wells Fargo Foothill as a central component for plan funding, it must also disclose how much it proposes to borrow, under what terms and whether it has a loan commitment.  It should also inform what leases and executory contracts it intends to assume or reject

under section 1123(b)(2).[14]  And, as postpetition contracts and leases cannot be rejected, it should address how it intends to treat parties to those contracts under its plan.

Second, PTN should clarify its computation of the minimum amount needed to fund its plan, given its intended treatment of contracts and leases under section 1123(b)(2).  Also, since PTN suggests in its objections to the trustee's disclosure statement that the fair market value of the debtor's assets does not exceed $12 million, creditors should be informed whether PTN's proposed plan funding will come from any source other than Wells Fargo Foothill.  If not, creditors may be skeptical of PTN's implied loan-to-value ratio.

Third, PTN reveals in its amended disclosure statement that it "reserves the right to revoke or withdraw [its] Plan at any time prior to the Effective Date" without any financial consequences.  Amended Disclosure Statement, at 35.  PTN does not disclose, although it should, that the effective date may not occur for at least 12 months, during which time creditors will not be paid.  Nor does it mention all the preconditions to the effective date described in the plan.[15]  Creditors should be able to evaluate the risk that no effective date would take place under PTN's plan and therefore they would not receive any payments.

Fourth, given its ability to withdraw its plan after confirmation and prior to the effective date, PTN should clarify who is financially responsible for the debtor's

---

[14]This should address the limited objection of Crown Castle USA Inc.

[15]Thus, the use of the word "shortly" at page 4, line 3, should be deleted.  PTN is not committing itself to have an effective date simply upon FCC approval of the transfer of the debtor's license.

operations after the confirmation date and prior to the effective date.[16]  In addition, PTN

should reveal whether the trustee has agreed to continue his services after confirmation

and what would occur if the trustee declined to do so.

Fifth, PTN should clearly inform creditors that it, as the plan proponent,

would be the beneficiary of all litigation involving the bankruptcy trustee pending as of

the date of confirmation.[17]

I do not agree with the joint objection of Mr. Parker and Partel, Inc. that

PTN should include in its disclosure statement additional information regarding

prepetition litigation between the debtor and PTN, or that PTN should not classify its

unsecured claim separately from other creditors.

PTN holds at least an $8,000,000 interlocutory prepetition award against the

debtor, and PTN's plan calls for it to receive no dividend on this unsecured claim.  Class

8, consisting only of PTN's claim, even if overvalued, will be presumed to vote against

the plan.  11 U.S.C. § 1126(g).  And PTN has the option to accept less favorable

treatment than other unsecured creditors.  See 11 U.S.C. § 1123(a)(4); see In re Orlando

Investors, L.P., 103 B.R. 593, 597 (Bankr. E.D. Pa. 1989) ("While section 1123(a)(4)

---

[16]Section V of the amended disclosure statement, at 30-31, appears only to address
PTN's obligations as of the plan effective date but not before.  If PTN anticipates that the
debtor's operating income will be sufficient to meet all post-confirmation operating expenses, it
should reveal any contingency plans if expenses exceed revenues, given PTN's ability to
withdraw its plan prior to the effective date, and given PTN's belief that operating expenses will
increase upon implementation of the new digital transmission system.

[17]If the litigation concludes after the effective date, the reorganized debtor would
receive any recovery.  If the litigation concludes prior to the effective date, PTN could use any
recovery to fund its plan obligations.  The objection of SOT, Inc. regarding an alleged claim
against Mr. Maslow is addressed by the language presently on page 22 of the amended disclosure
statement and is also immaterial given that PTN would be the beneficiary of such a claim.

mandates equality within classes, see Matter of Jersey City Medical Center, 817 F.2d 1055, 1061 (3d Cir.1987), it does so with the caveat: "unless the holder of a particular claim or interest agrees to less favorable treatment.").[18]

While there may be confirmation issues involving PTN's claim under section 1129(b)(2)(C), and if a competing offer for the stock in the reorganized entity is made, those issues can be deferred at this time.  Creditors will not be concerned with the amount of PTN's asserted claim under PTN's plan; they primarily need adequate information about the amount they will receive under the plan, when they will receive their distribution, and the likelihood that the plan will be consummated.

Mr. Parker and Partel, Inc. also complain that PTN's plan allows the plan proponent to credit bid its unsecured claim in violation of 11 U.S.C. §§ 363(k), 1129(b)(2)(A)(ii).  I do not interpret PTN's proposed plan as using its purported claim as consideration in lieu of cash.  Such a proposed plan (with the possible exception of competing bids from shareholders) would be unchanged if PTN held an allowed claim for $1.

The amended disclosure statement, at page 30, does state that existing shareholders have the right to compete with PTN for the shares that will be issued in the reorganized debtor.  Although the proposed plan sets forth the procedures for such competitive bidding, as Mr. Parker and Partel, Inc. observe, the amended disclosure statement does not.  This oversight should be corrected.

---

[18]Thus the trustee's earlier objection regarding a plan classification issue, if not withdrawn, need not be addressed.

27

Finally, to the extent the objections of the chapter 11 trustee to PTN's amended disclosure statement have not already been addressed by that creditor's amendment, or by the discussion above, I do not sustain them, with one exception. The trustee asserts that PTN's plan improperly precludes him from objecting to creditor claims after confirmation. To the extent that all allowed claims will be paid in full by PTN, the plan proponent, rather than the trustee, may be the proper party to assert claims objections to determine their allowance. PTN, however, may not have standing to object until either the effective date of the plan has occurred or PTN is prepared to waive any outstanding preconditions.

Thus, PTN should disclose to creditors whether it intends for the trustee to object to claims prior to the effective date of its plan or whether it intends to raise objections only after the effective date.

## V.

There are two proposed chapter 11 plans in this case. The chapter 11 trustee proposes to sell the debtor's station assets at auction, conditioned upon a minimum bid, conditioned upon FCC approval of the license transfer, implicitly conditioned upon a successful DTS system, and conditioned upon the administrative, priority and secured claims being paid in full (except for HML) and with some measurable distribution to unsecured creditors. Shareholders may receive a dividend in the event of a surplus.

PTN, which purports to hold the largest unsecured claim, proposes a plan that will pay all allowed claims in full, with interest, and eliminate all outstanding shares

of stock.  PTN (or its nominee) will hold all the shares issued by the reorganized debtor.

Existing shareholders can try to outbid PTN.  This plan though is conditioned upon PTN

obtaining sufficient funding, as well as upon the successful implementation of the DTS

system and FCC approval of its license transfer.

   Creditors and interest holders will be afforded the opportunity to decide

which plan, if either, they will support.  But such support can be sought only by giving

these parties in interest adequate information of the risks involved in both plans.

Therefore, the trustee and PTN will be afforded fourteen days to make the modifications

in their disclosure statements detailed in this memorandum.  Upon the approval of the

trustee's disclosure statement, his request to approve bidding procedures will also be

approved.

   An appropriate order shall be entered.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :     Chapter 11

READING BROADCASTING, INC.          :

                    Debtor              :     Bankruptcy No. 05-26563bif

................................................

ORDER

................................................

AND NOW, this 17th day of September 2007, it is hereby ordered as

follows:

The chapter 11 trustee is given leave to modify his second amended

disclosure statement in a manner consistent with the accompanying memorandum;

Philadelphia Television Network, Inc. is also given leave to modify its

amended disclosure statement in a manner consistent with the accompanying

memorandum.

All modified disclosure statements shall be filed (in both clean and black-

lined format) within fourteen (14) days from the date of this order.  If the modified

disclosure statements are consistent with the accompanying memorandum, they will be

approved without additional hearing.

Upon approval of the trustee's modified disclosure statement, an order

approving his proposed bidding procedures will also be entered.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Paul J. Winterhalter, Esq.
Law Offices of Paul J Winterhalter, P.C.
1717 Arch Street, Suite 4110
Philadelphia, PA 19103

Dave P. Adams, Esq.
United States Trustee
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Peter C. Hughes, Esq
Jennifer Maleski, Esq.
Dilworth Paxson LLP
1735 Market Street, 32nd Floor
3200 Mellon Bank Center
Philadelphia, PA 19103

Richard H. Glanton, Esq.
227 Delancey Street
Philadelphia, PA 19103

Henry F. Siedzikowski, Esq.
Brian R. Elias, Esq.
Elliott Greenleaf & Siedzikowski, P.C.
925 Harvest Drive
P.O. Box 3010
Blue Bell, PA 19422

Charles J. Phillips, Esq.
Leisawitz Heller Abramowitch Phillips, P.C.
2755 Century Blvd.
Wyomissing, PA 19610

Karen Lee Turner, Esq.
Ronald S. Gellert, Esq.
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th St., 22nd floor
Philadelphia, PA 19102

Kenneth E. Aaron, Esq.
Weir & Partners LLP
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107

Daniel A. DeMarco, Esq.
Hahn Loeser & Parks LLP
200 Public Square, Suite 3300
Cleveland, OH 44114