UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                            :        Chapter 11

READING BROADCASTING, INC.                       :

            Debtor                               :        Bankruptcy No. 05-26563bif

.................................................

MEMORANDUM

.................................................

In this chapter 11 case without a debtor in possession, two parties have

sought confirmation of chapter 11 plans.  The chapter 11 trustee, George L. Miller, seeks

confirmation of a proposed second amended plan of liquidation.  In addition, Philadelphia

Television Network (PTN) seeks confirmation of its proposed second amended chapter

11 plan of reorganization.  Various objections were filed to each of the plans.[1]  Creditors

---

[1]Those objections are as follows:  Gladstone Business Loans, LLC objected to
both plans to the extent its DIP loan obligations are not paid in full and in cash as of the Effective
Date of the plan.  Gladstone further objected to the plans to the extent any discharge or re-vesting
of estate assets occurred before payment of Gladstone's administrative claim.  At the
confirmation hearing, HLM Communications expressed similar concerns.
        The trustee and PTN both acknowledged that their intention was to pay these two
secured creditors, with interest, up to the effective date of the plan and that their liens need not be
extinguished until paid.  Any confirmation order can provide that the Gladstone and HLM liens
will not be extinguished until they are repaid as required under the plan, with interest, on the
effective date of the plan.  See In re Trans World Airlines, Inc., 185 B.R. 302, 323 (Bankr. E.D.
Mo. 1995).
        Michael Parker and Partel, Inc. objected to PTN's plan on feasibility grounds
pursuant to 11 U.S.C. § 1129(a)(11).  The arguments made by these parties were similar in
substance to those advanced by the trustee.
        S. Merrill Weiss, the purported owner of the patent entitled "Digital Signal
Transmitting Synchronization System," objected to PTN's plan on the ground that Weiss' patent
is integral to the transmission of  RBI's digital broadcast signal but PTN did not address rights of
Mr. Weiss in its plan, particularly as concerns the terms and conditions for the use of, and
compensation for, the Weiss patent.

and equity security holders have voted and some have expressed a preference for one plan

over the other.

An evidentiary hearing was held over three days to determine which, if

either, plan should be confirmed.  During this hearing, some objections to confirmation

were withdrawn.[2]  And at the conclusion of the hearing all parties in interest that were in

attendance (except PTN) expressed a preference for the trustee's proposed plan.[3]  See 11

U.S.C. § 1129(c) (even if both plans meet all statutory requirements under sections

1129(a) and (b), only one plan can be confirmed, with the preferences of parties in

interest a consideration).

For the reasons that follow, I shall enter an order confirming the second

amended plan of liquidation proposed by the chapter 11 trustee.


I.


I make the following factual findings in narrative format.


A.


The debtor, Reading Broadcasting, Inc. ("RBI"), owns and operates an

independent television station located in Reading, Pennsylvania.  Ex. T-14, at 8.  At the

---

[2]The objections of Michael Parker and Partel, Inc., and the objection of S. Merrill
Weiss, were withdrawn.

[3]The United States trustee took no position.  One creditor not at the hearing
expressed a preference for PTN's plan.

time of its bankruptcy filing on October 7, 2005, it operated WTVE-TV Channel 51 via analog signal.  Id.  It holds a broadcasting license issued by the Federal Communications Commission.  It is this license and the property connected with the operation of the television station that are the most valuable assets of the bankruptcy estate.

Prior to its bankruptcy filing, RBI was involved in a number of lawsuits.  It settled a lawsuit with Telemundo Networks, LLC for about $1 million.  Id., at 10.  And in July 2005, the Pennsylvania Court of Common Pleas entered an interlocutory order awarding about $8.5 million to PTN (with further damages to be assessed).  Id., at 11; Ex. T-15 (order estimating PTN's claim for plan voting purposes).  RBI filed its voluntary bankruptcy petition under chapter 11 before any further awards in favor of PTN were entered.

Shortly after RBI filed its bankruptcy petition an examiner was appointed.  Based upon the examiner's report, a chapter 11 trustee, Mr. Miller, was appointed under 11 U.S.C. § 1104.  The trustee has operated the television station since his appointment and has sought to sell the station for the highest price possible.  In order to do so, it was necessary for RBI to establish a digital system for broadcasting.  The FCC had set a deadline for stations, such as WTVE, to broadcast their signals digitally.  In order to broadcast its signal digitally, RBI needed to construct a new transmission tower.

RBI's prepetition attempt to build a large transmission tower near its Reading offices was thwarted by zoning restrictions.  Id., at 10.  The chapter 11 trustee was persuaded, and no party in interest disagreed, that the best alternative was to construct a multi-tower distributive transmission system (DTS).  The DTS transmission method is novel, and may not be in use at any other full-power station.  The system was

only completely installed and tested in September and October 2007.  Although the

testimony was less than clear, it is likely that the FCC has awarded RBI at least a

provisional license to use this new DTS broadcast method.

In May 2006, the trustee (with the consent of all creditors and parties in

interest) engaged SSG Capital Advisors, L.P. to assist the trustee in obtaining financing to

continue operating the television station and convert its analog signal to digital.  Ex. T-12.

SSG, which has frequently assisted chapter 11 debtors in financing and sales, was also

responsible for marketing the television station to potential purchasers.

SSG (now known as National City Investments) through its principal, J.

Scott Victor, testified that its initial marketing efforts in 2006 met with no success.

Although there were some expressions of interest, no entity made an offer to purchase

RBI's television station.  At some point, the trustee entered into negotiations with PTN

for the sale of the station assets, but the parties could not agree upon material terms.

In 2007, SSG again sought to market the station, communicating with more

than 100 potential buyers, and receiving nine expressions of interest.  Those interested

signed confidentiality agreements and were permitted to review RBI's financial records

and visit its operations.  As will be discussed, only two offers were made and one of them

was later withdrawn.

While these sale efforts were undertaken, the trustee initiated various

adversary proceedings in this bankruptcy case.  The largest claims have been lodged

against numerous former officers and shareholders of RBI.  This lawsuit, docketed at

Adv. No. 06-0643, seeks damages, inter alia, for breach of fiduciary duty, breach of duty

of loyalty through self-dealing, waste of corporate assets, and fraudulent conveyances.

4

Although the amended complaint demands $20 million in damages, the trustee recently

sought to settle this litigation for about $600,000 in cash (with other provisions).  The

request under Fed. R. Bankr. P. 9019(a) for court approval of that settlement agreement

was withdrawn when the defendants were unable to comply with certain material terms of

the agreement.

The trustee has been able to pay RBI operating expenses from revenues

generated by its television station, as well as remit post-bankruptcy financing obligations.

As of October 31, 2007, RBI had $986,511.33 in cash on hand.  Ex. PTN-5.  RBI,

however, has some unpaid administrative expenses owed to professionals and needs to

debit expenses associated with the DTS installation, which expenses are expected to

reduce available cash during the next few months.

B.

The trustee's proposed second amended plan of liquidation, dated October

1, 2007, states that it "provides for the liquidation and conversion of all of the Debtor's

assets to cash and the distribution of the net proceeds therefrom to holders of Claims

(and, if proceeds remain after paying all Claims in full, then to holders of Equity

Interests). . . ." T-1, at 6.  This plan has two liquidating components.  The chapter 11

trustee proposed to sell all of the station assets to the highest qualified bidder, preferably

via auction.  After that sale, he would prosecute outstanding litigation.  All sale and

litigation proceeds would be distributed as follows: first to allowed secured claims[4]; then
to allowed administrative and priority expenses; then to allowed unsecured claims; and
then to equity security holders.  See generally 11 U.S.C. §§ 725, 726.

Allowed secured claims are estimated to be $8.2 million at present.
Administrative expenses are uncertain, as various objections to fee applications are
pending.  The trustee estimated that, as of November 30, 2007, administrative expenses
totaled $2,646,500.  Ex. T-8.  Allowed unsecured claims exclusive of PTN's claim were
estimated at about $1.5 million.  PTN has filed an unsecured proof of claim, to which the
trustee has pending an objection, in an amount exceeding $20 million.[5]  The trustee
conceded at the confirmation hearing that it was unlikely that shareholders would receive
any distribution were his proposed plan confirmed.

The centerpiece of the trustee's proposed liquidation plan was the sale of
RBI's station assets.  (For reasons best known to the trustee, he elected that this sale take
place on the morning of the confirmation hearing.)  The trustee's bidding procedures
established a reserve price of $12 million, and all bidders were required to deposit
$200,000 at least five business days prior to the intended auction.  In order to participate
at this auction, all prospective bidders had to first submit a signed asset purchase
agreement without financing or due diligence contingencies.  All bidders were required to
present satisfactory evidence to the trustee of their financial ability to complete the sale

---

[4]The trustee, with the agreement of secured creditor HLM Communications,
proposes to pay 95% of its allowed claim.

[5]The trustee opposed my estimating this claim for confirmation purposes.  I
estimated PTN's claim for voting purposes at more than $11.4 million.  Ex. T-15.

and to perform under all executory contracts and leases that the bidder wished the trustee

to assume and assign to it under 11 U.S.C. § 1123(b)(2).

The trustee planned to hold an open auction if he received at least two

qualifying bids, with the highest written bid serving as the opening auction bid and any

subsequent bids made in increments of at least $100,000 in cash or equivalent value.

Initially, the trustee received two qualifying bids.  However, the night before the auction

was to occur, one of the bidders withdrew.  Therefore, instead of holding the auction, the

trustee negotiated and finalized an Asset Purchase Agreement with the remaining bidder,

WRNN-TV Associates Limited Partnership, for $13.5 million.  Ex. T-49.

The trustee's proposed plan specifies that this asset purchase agreement be

approved by the order confirming his plan.  See Plan, ¶ 9.1.  The effective date of the

plan, however, is conditioned upon the closing of the sale of the station assets.  Id., ¶

11.1(c).  And the sale closing is conditioned upon FCC approval of the license transfer to

WRNN.  Id., ¶ 9.1.  Indeed, that is one condition the buyer has imposed for closing this

sale.  Ex. T-49.  A second condition concerns a post-bankruptcy license agreement

between SOT, Inc. and the chapter 11 trustee on behalf of RBI.

This license agreement, dated July 27, 2006, permits RBI to use a

transmission tower owned by SOT.  Ex. T-38.  Although RBI's DTS broadcast method

uses numerous towers, SOT's tower was identified at the hearing as the most important

one.  While the SOT license agreement provides for a five-year term, with renewal

options up to 20 years, it also states: "Notwithstanding the foregoing, this Lease shall

expire upon the date upon which the analog signal must be surrendered in accordance

with regulations promulgated by the FCC."  Ex. T-38, ¶ 2.  Since RBI's license for an

7

analog signal is expected to expire in February 2008, the proposed purchaser has

conditioned the asset sale upon SOT's written modification of this license—so it is clear

that it does not terminate upon expiration of the analog signal—or the entry of a final

court order that voids that provision and permits the assignment of this license from RBI

to WRNN without penalty.  See Ex. T-49, ¶ 4.12.

Thus, the effective date of the trustee's proposed plan depends upon a

successful modification of the SOT tower lease as well as FCC approval of the license

transfer.  If those conditions are not met, the trustee's plan is nullified and the trustee may

either continue to operate the station and seek another sale, convert the case to chapter 7,

or seek some other form of reorganization.  Upon occurrence of an effective date, which

the trustee estimated would occur by March 31, 2008, there would be a distribution to

creditors from the sale proceeds.

The trustee's plan provides for him to continue to operate the debtor and

run its television station after confirmation, pending FCC approval of the license transfer.

After the effective date, the trustee intends to become the plan administrator, prosecute

any pending litigation, object to claims, and then distribute additional proceeds, if any.

WRNN, the proposed purchaser under the trustee's plan, presently operates

a full-power station out of Rye, New York, with an FCC license.  It had considered

purchasing RBI for a number of years and did extensive due diligence.  WRNN's

financial statements were not made part of the record, but Mr. Victor from SSG testified

credibly that he reviewed the audited 2006 statement and the unaudited 2007 statement

and is convinced the buyer is financially capable of completing the purchase if the two

conditions mentioned above are met.

Also offered in evidence is a "commitment letter" to WRNN dated December 21, 2007, from Goldman Sachs Specialty Lending Group, L.P.  Ex. T-48. WRNN currently has credit availability from Goldman Sachs of $1.5 million.  The commitment letter would increase the credit availability to $16.5 million.  Id.  This loan commitment is subject to a number of conditions, including: negotiation and execution of acceptable loan documents; due diligence concerning RBI; no material adverse changes; and negotiation and execution of the RBI purchase on terms acceptable to the lender.  Id., at 2.[6]

---

[6]The specific terms of the commitment letter are:

(i) negotiation, execution and delivery of definitive documentation evidencing the consummation of the Acquisition on terms acceptable to GSSLG;

(ii) completion of a due diligence review of the assets, liabilities (including contingent liabilities) and business subject to the Acquisition and any related transactions . . . in scope and with results satisfactory to GSSLG in its sole and absolute discretion;

(iii) no occurrence, development or change that shall have occurred after the date hereof, and no information becoming known after the date hereof, that, in our judgment, has had or could be reasonably expected to have a Material Adverse Effect;

(iv) there shall not have been any disruption, adverse change or condition in the financial, lending or capital markets generally;

(v) the accuracy and completeness of all representations that the Company and its affiliates made to GSSLG and the Company's compliance with the terms of this Commitment Letter; and

(vi) the satisfactory negotiation, execution and delivery of appropriate loan documents relating to the Amended Credit Facilities . . . .

Ex. T - 48, at 2.  The commitment letter further states that:

(continued...)

9

If the trustee's plan were confirmed and the sale to WRNN approved, the buyer would forfeit to the estate its $200,000 deposit were it unable to complete the sale due to a lack of funding from Goldman Sachs.  Ex. T-4, ¶ 2(vii).

C.

The amended plan proffered by PTN, Ex. T-13, calls for this creditor to pay in full the allowed secured claim of Gladstone, as well as all allowed unsecured claims (except PTN's own claim) with interest at 6% on the effective date of its plan.  Moreover, the plan proposes to pay all allowed administrative expenses in full as of the effective date.  The secured claim of HLM would be paid 95% on the effective date.  All leases and executory contracts assumed by the reorganized debtor at confirmation would be paid pursuant to contract terms and any arrearage cured on the effective date of the plan.  Unlike the trustee's proposed plan, PTN's plan does not expressly provide for any escrow for claims still disputed on the effective date.[7]

---

[6](...continued)
The terms of this Commitment Letter are intended as an outline of certain of the material terms of the Amended Credit Facilities, but do not include all of the terms, conditions, covenants, representations, warranties, default clauses and other provisions that will be contained in the Loan Amendment Documents.  The Loan Amendment Documents shall include, in addition, provisions that are customary or typical for amendments of this type.

Id.

[7]PTN's officers, however, testified that they would be agreeable to the imposition of such an escrow provision.

10

PTN's proposed plan further provides that all shareholder interests in the debtor will be extinguished and PTN (or its nominee), as plan proponent, would hold all newly issued shares in the reorganized debtor. The plan is conditioned upon the trustee's successful completion of the DTS installation (which has occurred), the existence of a valid loan commitment sufficient to fund PTN's plan obligations, and a confirmation order in a form satisfactory to PTN. Id., at 14-15. Post-confirmation conditions which must be met by the plan's effective date include FCC consent to a license transfer, and plan funding from PTN's lender. Id., at 15-16. If these various conditions are not met, PTN has no obligation to comply with its proposed plan.

PTN estimates that it will need $11,889,500 to effectuate all funding commitments under its proposed plan, based upon an anticipated effective date of March 31, 2008. Ex. PTN-2. This estimate includes repayment of $630,000 in liens held by creditors of PTN, because PTN's commitment letter (to be discussed below) requires that its lender hold a first lien on all PTN as well as RBI assets.[8] The trustee's estimate of PTN's plan funding requirements is much higher: almost $13,800,000. See Exs. PTN-2; T-16, T-19. The difference involves the latter's higher projections for administrative expenses, allowed unsecured claims, lease rejection claims, and satisfaction of liens against PTN.[9]

_____

[8]Actually, PTN estimates its liens at $580,000 and total plan funding at $11,839,500. Ex. PTN-2. At the hearing, however, PTN's officers conceded that PTN would need to pay $50,000 more than its original estimate to one of its creditors, Sony Financial, in order to satisfy that lien.

[9]Not included in these three exhibits are other exhibits reflecting PTN obligations. While PTN testified that certain lien creditors will accept payoffs at discounts, the trustee uses the non-discounted amounts.

11

Between the date PTN's plan is confirmed and the effective date, PTN proposes that the chapter 11 trustee continue to operate the debtor, and provide PTN with monthly reports. On the effective date, all pending causes of action or claims of the debtor, as well as cash on hand, would vest in the reorganized debtor. PTN's plan allows for at least 12 months between the confirmation date and the effective date of the plan, with PTN empowered to seek an extension of the effective date. If the effective date conditions are not met, PTN has no obligation to fund its plan.

Finally, PTN's plan calls for the rejection of the prepetition lease with SOT but the assumption of all postpetition leases and contracts. Ex. T-13, at 27. It does not address the possible extinguishment of the July 2007 SOT licensing agreement mentioned above. Nonetheless, under the commitment letter received by PTN, its lender reserved the right to review all material agreements prior to closing. Therefore, the SOT license issue that concerns WRNN is likely to surface were PTN's plan confirmed, and would have to be resolved before PTN would receive any funds from its lender.

D.

Both plan proponents submitted reports of plan voting in compliance with the orders approving their respective disclosure statements. Under the trustee's plan, three classes were impaired and entitled to vote: Class 3—comprised only of the secured claim of HLM Communications; Class 5—comprised of all allowed unsecured claims; and Class 6—consisting of all shareholder interests. Under PTN's plan, only Class

III—the secured claim of HLM Communications—was considered impaired and entitled to vote.[10]

Parties eligible to vote were also asked to indicate whether they preferred the trustee's or PTN's plan. HLM Communications voted in favor of both plans. It did not express a preference for either plan. According to the trustee's report of plan voting, Class 5 unsecured creditors voted against the trustee's plan. Ex. T-3. This was predominantly due to PTN's rejecting ballot. Three unsecured creditors indicated a preference for the trustee's plan, while three other creditors preferred PTN's plan (a 50/50 split).[11] Id. Class 6 equity interest holdings overwhelmingly voted in favor of the trustee's plan. Of 12 votes received, 10 preferred the trustee's plan over the PTN plan. Id.

---

[10] PTN placed its own unsecured claim in Class VIII and equity holders in Class IX. While both of these classes were impaired, they were to receive no distribution based upon their claims or interests. Both classes were deemed to reject the plan under section 1126(g) and thus any votes cast were irrelevant. See In re Insilco Technologies, Inc., 480 F.3d 212, 215 n.4 (3d Cir. 2007) ("Equity holders are an eighth class in the Plan, but it provides for the cancellation of equity interests upon confirmation of the Plan. Thus, equity holders were not entitled to vote on the Plan, 11 U.S.C. § 1126(g). . . ."); In re Walnut Equipment Leasing Co., Inc., 1999 WL 1068448, at *2 (Bankr. E.D. Pa. 1999) ("A class that is to receive nothing under a plan is deemed to reject the plan and is not entitled to vote.").

[11] As will be discussed below, at the conclusion of the confirmation hearing, counsel for Helene Associates indicated that his client no longer preferred PTN's plan over the trustee's proposal.

13

II.


A.


Before addressing whether either or both plan proponents met the confirmation requirements of section 1129 and, if so, which plan should be confirmed, I must review certain facts regarding PTN's plan funding that are germane to those issues.

Although WRNN expects to obtain funding for its purchase of RBI's station assets from Goldman Sachs, neither its offer nor the trustee's plan is so conditioned. Conversely, PTN's plan is expressly contingent on obtaining plan funding. That funding source is Wells Fargo Foothill, Inc., which issued a commitment letter dated August 2, 2007. Ex. PTN-1.

In this document Wells Fargo commits to provide up to $15.5 million to PTN with conditions similar to those in the Goldman Sachs commitment letter discussed earlier: acceptable loan documentation; due diligence; and no material adverse change. Id., at 2. However, the term sheet attached to the commitment letter, id., at 7-17, contains conditions not included in the Goldman Sachs commitment to WRNN. It is those additional conditions that give rise to many of the feasibility objections to PTN's plan.

Under the Wells Fargo term sheet, there would be two loans: a term loan not to exceed $13 million; and a revolver line of credit not to exceed $2.5 million. Ex. PTN-1, at 7-8. On the loan closing date, PTN could receive a term loan of no more than 52% of the "stic[k] value" of the RBI station assets. This value is defined in the term sheet as the "fair market value . . . as a start-up station that is sold on an as-is-where-is

14

basis in a compressed time frame" based upon an appraisal to be conducted after confirmation but prior to the loan closing. Id., at 7-8, 14. One-sixtieth of the term loan principal must be repaid every 3 months, and this loan matures in five years. Id., at 8, 10. PTN "would be required to maintain minimum levels of EBITDA, [and] a minimum fixed charge coverage ratio[.]" Id., at 11. Express conditions precedent to the loan closing include "business, legal, and collateral due diligence . . . satisfactory to [Wells Fargo]"; a confirmed chapter 13 plan and order satisfactory to the lender; review of all "material agreements;" PTN's business plan satisfactory to the lender; minimum cash availability to PTN at closing of not less than $2 million; assignment of RBI's FCC license "to a special purpose subsidiary" of PTN; and PTN and its subsidiaries (which would include RBI) generating "trailing twelve month EBITDA . . . of not less than $1,000,000 for the most recent reporting period prior to the Closing Date." Id., at 11-14.

PTN presently operates a low-power television station. The income from that station barely covers operating expenses. Thus, PTN has borrowed from its shareholders to pay corporate expenses. Its present liabilities far exceed its assets (exclusive of its claim against RBI). Ex. T-23. Through October 31, 2007, RBI's finances and PTN's finances, taken together could meet the trailing twelve month EBITDA condition in the Wells Fargo commitment letter. But Mr. Victor (for SSG) and Mr. Coffey (an accountant engaged by the trustee) testified that inclusion of the DTS expenses beginning November 2007 would not meet this loan condition. They also opined that present income from RBI and PTN could not repay the maximum term loan under the requirements of the Wells Fargo term sheet.

PTN offered the testimony of Mr. Geoff Anfuso, an underwriter with Wells Fargo, who was familiar with the PTN loan application and commitment letter. His testimony had three salient points. At the time the loan commitment letter was issued, Wells Fargo had no reason to believe that PTN would not qualify for the maximum two loans. Wells Fargo was unwilling to agree that any of the term sheet conditions or other provisions in the loan commitment would be modified in favor of PTN. They may or they may not be so altered; Mr. Anfuso (who appeared with counsel) was non-committal. Furthermore, Wells Fargo may need 90 days or more from the date PTN's plan was confirmed before it would complete its due diligence, document and appraisal reviews, and decide whether and how much of a loan PTN would receive.

B.

Before analyzing each proposed chapter 11 plan for purposes of confirmation, it is also relevant to note that on October 24, 2005, former counsel to RBI obtained an appraisal of the station assets using a "fair market compressed stick basis" of $27 million. Ex. PTN-7:

> A "compressed stick value considers the disposition of the station on an accelerated timeframe. Specifically, the 'compressed stick value' approximates an orderly liquidation of the businesses [sic] over a period of three to six months from listing to signed letter of intent with escrow deposit.

Id., at 1.

In the state court litigation PTN brought against RBI, the parties offered in evidence "stick" appraisals of $17,898,772 and $33,750,000. Ex. T-15, at 13-14. Those

16

appraisals were not offered in this contested matter.  Indeed, Wells Fargo obtained an

appraisal prior to issuance of its commitment letter, but was unwilling to disclose its

terms and no party in interest sought to compel that release.

   And, as mentioned earlier, the trustee marketed the station assets through

SSG for more than one year, with the highest offer obtained being $13.5 million.

No creditor or other party in interest opposed using SSG to sell the station assets, nor has

any party offered evidence that the marketing was inappropriate.


III.


   Confirmation of a chapter 11 plan requires that the plan proponent meet all

the requirements of section 1129(a), see, e.g., In re Dupell 2000 WL 192972, at *3

(Bankr. E.D. Pa. 2000); In re Future Energy Corp., 83 B.R. 470, 481 (Bankr. S.D. Ohio

1988), except that of 1129(a)(8) (requiring every impaired class of claims or interests to

accept the plan).  If all the provisions of section 1129(a) are established, save that of

section 1129(a)(8), then the plan proponent can seek confirmation under section 1129(b).

See 7 Collier on Bankruptcy, ¶ 1129.03[8], at 1129-58 (15th ed. rev. 2007) ("The

condition set forth in section 1129(a)(8) is the only condition precedent which is not

absolutely necessary for confirmation.  If a plan satisfies the confirmation criteria set

forth in section 1129(a), including the requirement that if a class of claims is impaired, at

least one impaired class of claims accepts the plan, the plan may be confirmed

notwithstanding the opposition of one or more impaired classes of claims or interests,

provided the plan satisfies section 1129(b).").

17

Here, both the plans of PTN and the trustee had an impaired class, consisting solely of the secured claim held by HLM Communications, which class voted in favor of both proposed plans.  Each plan proponent also had an impaired class that either did not vote in favor of its plan or was deemed to reject it.  Therefore, if confirmation of either plan is warranted, it can only be under 11 U.S.C. § 1129(b).

In considering whether the trustee's plan or PTN's plan is confirmable, three provisions of section 1129 are paramount based upon the evidence presented in this contested matter: section 1129(a)(7) (best interest of creditors test); section 1129(a)(11) (feasibility) and 1129(b) (fair and equitable standard).

Section 1129(a)(7)(A)(ii) requires that if a class of claims or interests rejects a proposed plan, that class receives under the chapter 11 plan at least as much as it would receive in a chapter 7 liquidation.  See, e.g., In re Owens Corning, 419 F.3d 195, 208 n.14 (3d Cir. 2005); In re Combustion Engineering, Inc., 391 F.3d 190, 212 (3d Cir. 2004).  The application of this provision is relevant to unsecured creditors under the trustee's proposed plan and to equity security holders under PTN's proposed plan.

In addition, every chapter 11 plan must be "feasible" by virtue of section 1129(a)(11):

> Section 1129(a)(11) codifies the feasibility requirement and requires that confirmation of the plan is not likely to be followed by liquidation or the need for further financial reorganization, unless such liquidation or reorganization is proposed in the plan.  11 U.S.C. § 1129(a)(11).  To allow confirmation, the bankruptcy court must make a specific finding that the plan as proposed is feasible. . . .  The standard of proof required by the debtor to prove a Chapter 11 plan's feasibility is by a preponderance of the evidence . . . and we review the bankruptcy court's finding that a debtor's plan is feasible under the clearly erroneous standard . . . .

18

> In determining whether a debtor's Chapter 11 plan of
> reorganization is feasible, we noted in Briscoe that "the
> [bankruptcy] court need not require a guarantee of success . . .
> [o]nly a reasonable assurance of commercial viability is
> required." Id. at 1165-66. . . . All the bankruptcy court must
> find is that the plan offer "a reasonable probability of
> success." In re Landing Assoc., Ltd., 157 B.R. 791, 820
> (Bankr. W.D.Tex. 1993).

Matter of T-H New Orleans Ltd. Partnership, 116 F.3d 790, 801 (5th Cir. 1997) (citations

omitted).

> More recently, the Eighth Circuit Court of Appeals explained:

> While a reorganization plan's "[s]uccess need not be
> guaranteed," In re Monnier Brothers, 755 F.2d at 1341, the
> bankruptcy court cannot approve a plan unless it has at least a
> reasonable prospect for success. See id. . . . The debtors bear
> the burden of establishing the feasibility of their plans by a
> preponderance of the evidence.

In re Danny Thomas Properties II Ltd. Partnership, 241 F.3d 959, 963 (8th Cir. 2001).

Thus, the chapter 11 feasibility requirement prevents confirmation of

"visionary schemes." See Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir.

1985); 7 Collier on Bankruptcy, ¶ 1129.03[11] (15th ed. rev. 2007). Although section

1129(a)(11) does not require that compliance with proposed plan terms be guaranteed,

there must be a "reasonable prospect of success" and the plan must be "workable." 7

Collier on Bankruptcy, ¶ 1129.03[11], at 1129-74 to 74.1; see, e.g., In re Pikes Peak

Water Co., 779 F.2d 1456, 1460 (10th Cir. 1985); In re Clarkson, 767 F.2d 417, 420 (8th

Cir. 1985); In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985); In re Woodmere

Investors Ltd. Partnership, 178 B.R. 346, 361 (Bankr. S.D.N.Y. 1995); In re Orlando

Investors, L.P., 103 B.R. 593, 600-01 (Bankr. E.D. Pa. 1989).

Therefore, in this chapter 11 case, each plan proponent had the burden to demonstrate that there is a reasonable likelihood that he or it can fulfill the promises made by their proposed plan.  Sincerity and belief in one's ability to do so are insufficient to meet this burden:

> Feasibility, as noted in the case of In re Bergman . . . contemplates "the probability of actual performance of the provisions of the plan.  Sincerity, honesty and willingness are not sufficient to make the plan feasible, and neither are visionary promises.  The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."

In re Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985) (quoting In re Bergman, 585 F.2d 1171 (2d Cir. 1978)); see also In re Walker, 165 B.R. 994, 1004 (E.D. Va. 1994).

The trustee challenges PTN's plan as not feasible because its funding commitment from Wells Fargo is too speculative for numerous reasons.  Similarly, one must consider whether the trustee's proposal to sell the station assets to WRNN is feasible.

Finally, to confirm a plan under section 1129(b) it must be "fair and equitable."  Typically, the issue arises from the application of the "absolute priority rule." See generally In re Armstrong World Industries, Inc., 432 F.3d 507 (3d Cir. 2005). Neither plan implicates that issue in this dispute.  However, "technical compliance with all the requirements in § 1129(b)(2) does not assure that the plan is 'fair and equitable.'" Matter of D & F Const. Inc., 865 F.2d 673, 675 (5th Cir. 1989); see, e.g., Matter of Sandy Ridge Development Corp., 881 F.2d 1346, 1352 (5th Cir. 1989).

In this contested matter, the compressed stick value of the station assets is implicated in all three statutory provisions.

If RBI's station assets are "worth" roughly $13.5 million as a compressed stick value (based upon WRNN's bid) then PTN's plan is infeasible.  Given the present commitment to loan up to 52% of the value of the station assets, PTN would not obtain sufficient funding from Wells Fargo to effectuate its plan which, PTN concedes, would require at least $11.9 million for funding.  Since $2 million must be set aside for operations under the commitment letter then (assuming as testified that a PTN shareholder would lend $500,000, see also Ex. PTN-2, n.3), PTN must obtain at least $13.4 million from Wells Fargo to effectuate its plan.  At 52% loan to value ratio, it means that the station assets would require a compressed stick value of at least $25.77 million.[12]

Based upon the evidence presented at the confirmation hearing, it is purely speculative that Wells Fargo would materially alter its loan commitment terms and lend at a more favorable loan to value ratio, or lessen its $2 million cash availability requirement. (Wells Fargo would make no such promise.)  See, e.g., In re Repurchase Corp., 332 B.R. 336, 343 (Bankr. N.D. Ill. 2005) ("Allowing Debtor's confirmation to be based on a 'hope against hope that the financing [would] actually materialize' post-confirmation without some form of corroboration would go against a bankruptcy judge's duties of ensuring that the Plan complies with the provisions of the Bankruptcy Code."); In re Ralph C. Tyler, P.E., P.S., Inc., 156 B.R. 995, 997 (Bankr. N.D. Ohio 1993) ("Without evidence of a firm commitment of financing, this Plan does not meet the feasibility requirement."); In re Stratford Associates Ltd. Partnership, 145 B.R. 689, 699 (Bankr. D.

---

[12]If the trustee's estimate of allowed administrative, unsecured and rejection claims is more accurate, the value of the assets must far exceed $25.77 million.

Kan. 1992) ("Generally, without proper funding in place or a firm commitment of such

funding, the Court cannot find the plan feasible."); In re Haardt, 65 B.R. 697, 702 (Bankr.

E.D. Pa. 1986) (lack of refinancing commitment rendered plan infeasible); see also In re

Made in Detroit, Inc., 299 B.R. 170, 176-77 (Bankr. E.D. Mich. 2003) (refinancing too

speculative for confirmation); In re Kovalchick, 1995 WL 118171, at *9 (Bankr. E.D. Pa.

1995) (same).  Compare In re Global Ocean Carriers Ltd., 251 B.R. 31, 46 (Bankr. D.

Del. 2000) (refinancing is feasible under section 1129(a)(11) where lenders "have issued

a commitment letter and/or agreed to term sheets which are detailed and contingent only

upon final documentation, confirmation of the Modified Plan, and no materially adverse

changes occurring.").  Accordingly, if the station assets have a compressed stick value

less than $25.77 million, PTN's plan would be too speculative to approve.

      If the station assets are worth roughly $30 million as a compressed stick

value, as PTN's plan implies,[13] then unsecured creditors under the trustee's plan would

not receive an amount equal to their dividend in a chapter 7 liquidation, unless PTN's $20

million proof of claim was allowed.  See In re River Village Associates, 1993 WL

243897, at *4 (Bankr. E.D. Pa. 1993).  Although section 1129(a)(7) is concerned with

liquidation value, see Matter of Sound Radio, Inc., 93 B.R. 849, 854-55 (Bankr. D.N.J.

1988), a forced sale liquidation of assets may be comparable to a compressed stick value.

      Similarly, PTN's plan may not provide equity security holders an amount

equal to a chapter 7 liquidation, unless PTN's $20 million proof of claim was allowed.  If

PTN's allowed claim is reduced to $11.4 million (as estimated for voting purposes) and

---

[13]Fifty-two percent of $30 million is about $15.5 million: the ceiling mentioned in
Wells Fargo's loan commitment.  PTN projects, in Ex. PTN-2, that it will receive the maximum
loan proceeds.

allowed secured and administrative claims total just under $11 million as PTN estimates,

and other unsecured creditors hold allowed claims of about $1.5 million, as PTN

estimates, then the liquidation in chapter 7 of assets with a compressed stick value of $30

million could yield a dividend to shareholders.

And if the station assets had a compressed stick value of roughly $30

million, the trustee's plan proposal to sell them for $13.5 million may not be fair and

equitable.  See generally Protective Committee for Independent Stockholders of TMT

Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 441, (1968) ("Whether a plan of

reorganization excluding junior interests is fair and equitable depends upon the value of

the reorganized company."); Matter of King Resources Co., 651 F.2d 1326, 1339 (10th

Cir. 1980) ("[A]ny determination that a plan is fair and equitable requires a valuation of

the debtor's property."); In re Exide Technologies, 303 B.R. 48, 60-61 (Bankr. D. Del.

2003).  PTN's plan proposal—under which it would obtain all of the debtor's assets,

including station assets, cash on hand, and litigation claims, for a payment estimated

between $12 million and $14 million—could have a similar problem, unless PTN's $20

million proof of claim were allowed.

Thus, it is necessary for me at least to estimate the compressed stick value

of RBI's station assets for purposes of determining this confirmation dispute.  See Matter

of Williams, 850 F.2d 250, 253 (5th Cir. 1988) (to determine compliance with section

1129(b), the bankruptcy court properly considered the value of the assets).  And, as in

many valuation disputes, the evidence is less than clear.

Although the actual appraisals were not introduced into evidence at

confirmation, during a trial in state court which took place in 2004, RBI offered a stick

23

value appraisal of $17,898,772.  Ex. T-15, at 13.  PTN offered an appraisal during that same trial valuing the station assets at $33,750,000.  Id., at 14.  I do not know whether these appraisals represented compressed stick value.

Then, in 2005, RBI's counsel obtained a compressed stick value appraisal of $27 million as of June 1, 2005.  Ex. PTN-7.  In reviewing this appraisal, I note that it is based, in part, upon revenue projections for years 2005 to 2012.  Id., at 23 (Appendix Table 1).  The appraisal projected that net revenues would be $1.926 million in 2005 and increase at an average compound annual growth rate of 27.5%.  Id.  At least part of this growth assumed that RBI's digital signal would be available to many more households in its broadcast region than could receive its analog signal.  However, RBI's October 2007 monthly operating report, Ex. PTN-5, which contains a cumulative column of net revenues since its bankruptcy filing in October 2005, discloses that RBI's actual revenues for 2006 and 2007 fell far short of the projected net revenues found in this 2005 appraisal.

The digital signal was just made operational a few months ago.  Whether an appraiser would now project similar rapid net revenue growth is not known.  Moreover, this 2005 appraisal does not consider the novelty of RBI's DTS broadcast method, the patent claim asserted against RBI by S. Merrill Weiss, see docket entry #771, nor the SOT tower license issue.[14]  These factors may reduce the value of the assets.

---

[14]Mr. Weiss objected to both the PTN and the trustee's plan, in that neither provided for his alleged patent rights concerning the "Digital Signal Transmitting Synchronization System," purported granted on September 19, 2006.  At the confirmation hearing, his attorney reached an accord with the trustee on this issue.  PTN acknowledged that it would have to accommodate any legitimate patent rights, but did not reach a settlement with Mr. Weiss.

Prior to August 2007, a precommitment appraisal was done for Wells Fargo, presumably supporting a $15.5 million loan with a loan to asset ratio of 52% using compressed stick valuation of the station assets. The methodology and assumptions of this appraisal were not offered in evidence. Moreover, Wells Fargo will require another appraisal before actually lending any funds. And both the lender and Mr. Bowman (who conducted the 2005 and 2007 appraisals) acknowledged in court that consideration would have to be given to the results of the trustee's marketing efforts that yielded, as the highest offer, WRNN's bid.

Those marketing efforts where undertaken by SSG over many months. SSG testified that it had extensive marketing experience involving companies in chapter 11, and no party in interest offered evidence challenging the sufficiency of its efforts to obtain the highest price for the station assets. Indeed, the order approving SSG's retention provided, in effect, for this entity to receive a 2% commission of sales between $20 million and $30 million, with a 4% commission for sales greater than $30 million. A sale generated by SSG for less than $20 million resulted in a flat fee. Ex. T-12, at 2. Thus, SSG had a financial incentive to obtain a price consistent with PTN's implicit valuation. The result of SSG's marketing resulted in the highest offer for the station assets of $13.5 million.

In attempting to determine the fair market value of property, appraisals represent expert predictions about the amount that an arms-length, commercially reasonable sales transaction would yield in the future. See Matter of Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989). Thus, they are generally probative of value. However, an appraisal is not as persuasive as "[a] commercially reasonable sale of an asset [which

25

conclusively] establishes the market value of that asset." In re BTS Inc., 166 F.3d 346 (Table), 1998 WL 788829, at *1 (10th Cir. 1998). Appraisals should be relied upon, "only when the price of such a sale cannot be got at directly." Matter of Excello Press, Inc., 890 F.2d at 905; see also Bryn Mawr Trust Co. v. Healy, 667 A.2d 719, 723 (Pa. Super. Ct. 1995) (adopting sale price over sale offers and an appraisal as more indicative of fair market value). Indeed, "[g]enerally speaking, an auction may be sufficient to establish that one has paid 'value' for the assets of a bankrupt." In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986).

    I am not convinced that WRNN's bid represents the precise compressed stick value for the station assets, especially in light of the post-bankruptcy loan made by Gladstone. The willingness of Gladstone Business Loan, LLC to enter into a March 2006 postpetition first lien financing facility of $7,775,000, assuming a 52% loan to value ratio, would implicitly value the assets at about $15 million, before installation of the DTS system. Nonetheless, I find that the trustee's marketing efforts were reasonable (indeed, there was no evidence to the contrary), see generally Ready v. Rice, 2006 WL 4550188, at *3 (D. Md. 2006), and that, given all the factors mentioned above, the present compressed stick value of the station assets does not exceed $18 million.

    With this valuation, PTN would not receive sufficient funding from Wells Fargo to effectuate its proposed chapter 11 plan. Accordingly, without addressing any other objections, its plan proposal is not feasible and cannot be confirmed. Indeed, no party in interest appearing at the confirmation hearing, besides PTN, concluded, after listening to all of the evidence, that there was sufficient likelihood that this creditor's plan

would be effectuated.  Given that PTN's proposed plan offered a superior dividend to unsecured creditors, this absence of support at the hearing is relevant.

As for the trustee's plan, only PTN's objections to confirmation remain. All other objections were withdrawn at the hearing.

The Third Circuit Court of Appeals recognized that a sale of an asset by a bankruptcy trustee will rarely yield the same value as an asset sold privately, with no time or other constraints and without any compulsion to sell.  Thus, it observed: "Traditionally, courts have held that '[f]air and valuable consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value of the assets.'"  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1197 n.1 (7th Cir. 1978)); see, e.g., In re Colony Hill Associates, 111 F.3d 269, 276 (2d Cir. 1997); Ready v. Rice, 2006 WL 4550188, at *3.  Where a bankruptcy trustee is under some constraints to sell estate property, the value obtained is likely to reflect those constraints:

> [M]arket value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value.  "The market value of . . . a piece of property is the price which it might be expected to bring if offered for sale in a fair market; not the price which might be obtained on a sale at public auction or a sale forced by the necessities of the owner, but such a price as would be fixed by negotiation and mutual agreement, after ample time to find a purchaser, as between a vendor who is willing (but not compelled) to sell and a purchaser who desires to buy but is not compelled to take the particular . . . piece of property."

BFP v. Resolution Trust Corp., 511 U.S. 531, 537-38 (1994) (quoting Black's Law Dictionary 971 (6th ed. 1990)).

Were this case pending under chapter 7, I conclude that a bankruptcy trustee reasonably marketing the station assets would accept in good faith an offer of $13.5 million, which is fair value for an asset valued at $18 million or less.[15] See, e.g., Ready v. Rice, 2006 WL 4550188, at *3 (bid of $4.75 million is fair value for assets possibly worth $6 million). Thus, the trustee's plan is both fair and equitable and meets the best interests of creditors test.

As for feasibility, I appreciate that there is no guarantee that WRNN will close on this transaction. In addition to the buyer tendering $13.5 million, there needs to be FCC approval of the license transfer and an agreement with SOT regarding the tower license. FCC counsel opined during the hearing that WRNN's present license renders FCC approval of an additional license more likely. The Goldman Sachs commitment letter is far less contingent than that issued by Wells Fargo to PTN. See In re Global Ocean Carriers Ltd., 251 B.R. at 46. Moreover, SSG testified that WRNN is a more financially established entity than PTN (which opinion is consistent with the description of WRNN's full-power station in Rye New York compared with PTN's low-power station). And counsel for a SOT shareholder at the conclusion of the hearing represented that SOT would likely be able to reach an accommodation with the trustee and WRNN. (Indeed, it was willing to enter into a postpetition lease with the trustee.) Furthermore, counsel for S. Merrill Weiss stated in open court that an agreement with the trustee for the use of any patented system had been reached in connection with this sale. Additionally,

---

[15]Seventy five percent of the value of assets with a fair market value of $18 million is $13.5 million.

the chief engineer at RBI, whose services may be needed to operate the new DTS system, endorsed the trustee's sale to WRNN.

Therefore, no party (other than PTN) contends that the trustee's proposed sale is speculative. Indeed, both secured creditors—whose claims are treated similarly under both plans—strongly favor the trustee's proposal.

I thus conclude it is likely that WRNN will fulfill its station asset purchase agreement, thereby rendering the trustee's plan feasible.

IV.

As trustee's counsel acknowledged, a transfer of RBI's assets to PTN whereby all allowed claims would be paid in full would be very likely to yield a greater dividend than a sale of the station assets to WRNN for $13.5 million, even with the trustee retaining all other estate property, including litigation claims. And PTN has long sought to control RBI, and has made a sincere plan proposal. As a result, there were a number of parties hoping that PTN could meet its burden under section 1129. Unfortunately, the evidence is sufficiently clear that PTN would not obtain all the funding necessary to effectuate its plan under the terms of the loan commitment offered by Wells Fargo. This renders its plan proposal not viable.

It would be months before creditors would know for certain whether PTN could comply with its plan promises. And when it could not, as the evidentiary record makes very likely, its plan would be nullified without penalty to PTN. During this waiting period, the trustee's post-bankruptcy financing agreement with Gladstone would

mature (to be extended if possible only at some cost), and operating expenses would

increase, as would administrative expense claims.  See generally In re Lady H Coal Co.,

Inc., 199 B.R. 595, 601 (S.D. W.Va. 1996) (a delayed sale of assets could reduce their

value), aff'd, In re Leckie Smokeless Coal Co., 99 F.3d 573 (4th Cir. 1996), cert. denied,

United Mine Workers of America 1992 Ben. Plan v. Leckie Smokeless Coal Co., 520

U.S. 1118 (1997).

       The trustee's proposed sale to WRNN, while offering a smaller dividend,

appears to those creditors attending the confirmation hearing as far less risky: an

assessment with which the hearing evidence supports.  As the purchase price is fair, and

as the trustee's plan has sufficient support and meets the statutory requirements of section

1129(b), I shall enter an appropriate order confirming the trustee's plan.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :      Chapter 11

READING BROADCASTING, INC.        :

                Debtor                    :      Bankruptcy No. 05-26563bif

.................................................

ORDER

.................................................

AND NOW, this 17th day of January 2008, a confirmation hearing having

been held in the above-captioned case on the chapter 11 trustee's proposed second

amended plan of liquidation, dated October 1, 2007, and the proposed second amended

plan of reorganization filed by the Philadelphia Television Network ("PTN"), dated

September 28, 2007,

And each plan proponent having filed a report of plan voting that states that

an impaired class of claims voted in favor of its proposed plan,

And two disclosure statements under 11 U.S.C. § 1125 having been sent to

all creditors and interest holders,

And for the reasons stated in the memorandum accompanying this order,

it is hereby ordered that confirmation of PTN's second amended plan of reorganization is

denied for failure to meet its burden under 11 U.S.C. § 1129(a)(11).

It is further ordered that the various objections to confirmation to the

trustee's second amended plan are overruled and the plan is confirmed pursuant to 11

U.S.C. § 1129(b),

And it is further ordered that this court will retain subject matter jurisdiction of postconfirmation disputes only to the extent allowed by federal bankruptcy law, any language in the confirmed plan notwithstanding,

It is also ordered that the debtor does not receive a discharge, pursuant to 11 U.S.C. § 1141(d)(3),

It is further ordered that the chapter 11 trustee and/or plan administrator shall file monthly reports required by Local Bankr. R. 3021.1 until the case is closed and shall serve those reports upon the Office of the United States Trustee and upon any party in interest who requests such service,

And it is also ordered that:

1. The effective date of the plan shall occur pursuant to Article XI of the trustee's second amended chapter 11 plan of liquidation **except** that the effective date shall not be later than May 16, 2008, unless further extended by this court for cause shown;

2. The sale of station assets to WRNN-TV Associates Limited Partnership, for $13.5 million, based upon the Asset Purchase Agreement, Ex. T-49, free and clear of liens and encumbrances is approved pursuant to 11 U.S.C. § 1123(a)(5)(D), (b)(4). This purchaser is buying in good faith and for fair value;

3. The terms of the settlement between S. Merrill Weiss and the chapter 11 trustee, placed upon the record in open court at the confirmation hearing, are incorporated into the trustee's confirmed plan;

4. Allowed secured claims are not released or satisfied until the secured creditor is paid, with interest as of the effective date, as required by the terms of the confirmed plan;

5.  Except as otherwise specifically provided in the Asset Purchase Agreement, WRNN shall not be liable for any claims against the debtor or any of its predecessors or affiliates arising prior to the Closing, other than the liabilities assumed in the Asset Purchase Agreement;

6. The provisions of 11 U.S.C. § 1146(c)[16] apply to the transfer, issuance, or exchange of security, or the making or delivery of an instrument of transfer under the trustee's confirmed plan; and

7.  All applications for payment of administrative expenses incurred prior to the date of this confirmation order shall be filed and served upon all parties in interest within **sixty days** from the date of this order.

It is also directed that the chapter 11 trustee shall forthwith send notice of this order as required by Fed. R. Bankr. P. 2002(f)(7).

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

Paul J. Winterhalter, Esq.
Law Offices of Paul J Winterhalter, P.C.
1717 Arch Street, Suite 4110
Philadelphia, PA 19103

Kevin Callahan, Esq.
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

---

[16]Now codified as section 1146(a).

Peter C. Hughes, Esq
Jennifer Maleski, Esq.
Dilworth Paxson LLP
1735 Market Street, 32nd Floor
3200 Mellon Bank Center
Philadelphia, PA 19103

Richard H. Glanton, Esq.
227 Delancey Street
Philadelphia, PA 19103

Henry F. Siedzikowski, Esq.
Brian R. Elias, Esq.
Elliott Greenleaf & Siedzikowski, P.C.
925 Harvest Drive
P.O. Box 3010
Blue Bell, PA 19422

Charles J. Phillips, Esq.
Leisawitz Heller Abramowitch Phillips, P.C.
2755 Century Blvd.
Wyomissing, PA 19610

Karen Lee Turner, Esq.
Ronald S. Gellert, Esq.
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th St., 22nd floor
Philadelphia, PA 19102

Kenneth E. Aaron, Esq.
Weir & Partners LLP
1339 Chestnut Street, Suite 500
Philadelphia, PA 19107

Daniel A. DeMarco, Esq.
Hahn Loeser & Parks LLP
200 Public Square, Suite 3300
Cleveland, OH 44114

Mr. S. Merrill Weiss
227 Central Avenue
Metuchen, New Jersey

Robert A. Kargen, Esq.
White and Williams LLP
1800 One Liberty Place
Philadelphia, PA 19103

Craig Martin, Esq.
Stuart M. Brown, Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street, Suite 1500
Wilmington, DE 19801