# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| READING BROADCASTING, INC. | : | |
| Debtor | : | Bankruptcy No. 05-26563bif |

...................................................

## MEMORANDUM

...................................................

On January 17, 2008, an order was entered confirming the chapter 11 trustee's proposed second amended plan of liquidation and denying confirmation of the second amended plan of reorganization filed by the Philadelphia Television Network ("PTN"). The centerpiece of the trustee's confirmed plan was the conditional sale of the debtor's television station assets, including assignment of its FCC license, to WRNN-TV Associates Limited Partnership for $13.5 million, based upon an Asset Purchase Agreement, with the sale free and clear of liens and encumbrances pursuant to 11 U.S.C. § 1123(a)(5)(D), (b)(4).

On Monday, January 28, 2008, within ten days from the entry of this order, see Fed. R. Bankr. P. 9006(a) [Interim[1]], PTN filed a motion styled: "To Amend or Make Additional Findings of Fact Pertaining to the Order Dated January 17, 2008 Pursuant to B.R. 7052; To Alter or Amend and For a New Hearing on the Court's Order Pursuant to B.R. 9023; To Admit Newly Discovered Evidence or in the Alternative, to Reconsider the

---

[1] In light of the passage of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and until official procedural rules are adopted under the Rules Enabling Act, the Judicial Conference has recommended the adoption of "Interim" procedural rules. See In re Kibbe, 361 B.R. 302 (B.A.P. 1st Cir. 2007). This district has accepted that recommendation by order dated October 5, 2005. See Standing Order, Misc. No. 05-3008.

Court's Order Confirming the Trustee's Plan Pursuant to B.R. 9024." PTN

acknowledged in open court that its motion does not seek to revisit this court's ruling

denying confirmation of its own proposed plan.[2]  Instead, its motion contends that

erroneous factual conclusions were made in confirming the trustee's plan of liquidation,

and thus approving the asset sale to WRNN, which errors must be corrected to prevent

manifest injustice.  Furthermore, PTN asserts in its motion that it would present newly

discovered evidence that demonstrates the trustee's marketing efforts to sell the station

assets were flawed, because prospective bidders were precluded from participating in the

sale process.

    PTN's motion and the relief it seeks—vacating the order confirming the

trustee's proposed plan—is opposed by the trustee, by Gladstone Business Loan, LLC (a

secured creditor) and by WRNN, the purchaser of the debtor's assets under the terms of

the confirmed plan.  All of the objectors maintain, after an evidentiary hearing was held

on PTN's motion, that none of the factual findings previously made in connection with

the January 17th confirmation order were erroneous, that the legal conclusions

drawn—that the trustee's plan met all the requirements of 11 U.S.C. § 1129(b)—were

correct, that WRNN has agreed to pay fair value for the assets it is purchasing, that the

evidence offered by PTN does not constitute evidence "newly discovered," and, if it were

---

[2]See PTN's Post-hearing Memorandum, at 4 n.3.  Thus, I do not consider whether
the factual findings that collectively resulted in the conclusion that PTN's proposed plan was
infeasible were clearly erroneous.

newly discovered, that PTN did not present any evidence adversely reflecting on the

trustee's marketing of the station assets.[3]

Before considering the parties' numerous contentions and the evidence

presented at the hearing on the instant motion, a preliminary legal objection should be

addressed.

I.

A.

Fed. R. Bankr. P. 7052 incorporates Fed. R. Civ. P. 52. Rule 52(b) states

that "[o]n a party's motion filed no later than 10 days after the entry of judgment, the

court may amend its findings—or make additional findings—and may amend the

judgment accordingly. The motion may accompany a motion for a new trial under Rule

59." Thus, based upon a timely motion, factual findings may be altered or amended by

the trial judge without granting a new trial if the changes are warranted. See, e.g., U.S.

Gypsum Co. v. Schiavo Bros., Inc., 668 F.2d 172, 180 n.9 (3d Cir. 1981). The decision

whether to amend findings of fact or conclusions of law under Rule 52(b) is within the

discretion of the trial court. See Dash v. Chicago Insurance Co., 2004 WL 2337021, at *1

---

[3]The trustee suggests briefly that the desired relief of PTN is not simply to have a
new confirmation hearing of the trustee's proposed plan, with new evidence considered, but to
permit all parties, i.e., PTN, to submit a new plan and disclosure statement with a confirmation
hearing of this new plan to follow. Trustee's Posthearing Memorandum, at 5 n.1. For purposes
of resolving this motion, and given issues unexplored by the parties surrounding preconfirmation
modification of chapter 11 plans, see section 1127(a), I do not reach this concern.

3

(D. Mass. 2004).  In order to prevail under rule 52(b), "the movant must show that the motion is necessary to correct manifest errors of law or fact."  Edwards v. Wyatt, 2007 WL 136687, at *1 (E.D. Pa. 2007).  The trial record must support the requested alterations, otherwise the movant will not be entitled to the relief requested.  U.S. Gypsum Co., 668 F.2d at 180.

Fed. R. Civ. P. 59 is incorporated by Fed. R. Bankr. 9023, and complements Rule 52(b).  U.S. Gypsum Co., 668 F.2d at 180.  Rule 59(e) allows the court to revisit a judgment to correct "manifest errors of law or fact or to present newly discovered evidence."  Blue Mountain Mushroom Co., Inc., v. Monterey Mushroom, Inc., 246 F. Supp. 2d 394, 398 (E.D. Pa. 2002) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)).  The standard for altering or amending a court's order to make additional findings of fact or conclusions of law under Rule 59(e) is virtually the same as under Rule 52(b).  See, e.g., FINOVA Capital Corp. v. Richard A. Arledge, Inc., 2007 WL 1965335, at *2 (D. Ariz. 2007) ("The standard for altering or amending a judgment under Rule 59(e) is nearly identical to the standard for granting similar relief under Rule 52."); In re Smith, 2006 WL 2709763, at *1 (holding that the same standard applies to motions to amend under rules 59 and 52(b)).  And as with Rule 52(b), relief under Rule 59(e) is committed to the trial court's discretion.  See Nutrition Management Services Co. v. Harborside Healthcare Corp., 181 Fed. Appx. 315, 318 (3d Cir 2006) (non-precedential); Adams v. Gould, Inc., 739 F.2d 858, 864 (3d Cir. 1984).

A motion under Rule 59(e) may be granted on one of three grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence that was

4

not available when the challenged judgment or order was entered; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice.  See, e.g., Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999); North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995).

Newly discovered evidence refers to evidence that: (1) is material and not merely cumulative; (2) was not discoverable before trial through the exercise of reasonable diligence; and (3) would probably have changed the outcome of the trial. Compass Technology, Inc. v. Tseng Laboratories, Inc., 71 F.3d 1125, 1130 (3d Cir. 1995).  The movant bears a "heavy burden," which requires "more than a showing of the potential significance of the new evidence."  Bohus v. Beloff, 950 F.2d 919, 930 (3d Cir. 1991) (quoting Plisco v. Union R. Co., 379 F.2d 15, 17 (3d Cir.1967), cert. denied, 389 U.S. 1014 (1967)).  Relief should only be granted when extraordinary justifying circumstances are present.  Id.

Fed. R. Civ. P. 60(b), incorporated by Fed. R. Bankr. P. 9024, also allows a party to seek relief from a judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud . . . , misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or

5

> otherwise vacated, or it is no longer equitable that the
> judgment should have prospective application; or
>
> (6) any other reason justifying relief from the operation of the
> judgment.

Fed. R. Civ. P. 60(b).  The purpose of Rule 60(b) is "to strike a proper balance between

the conflicting principles that litigation must be brought to an end and that justice must be

done."  Moss v. Potter, 2007 WL 1726519, at *1 (W.D. Pa. 2007) (quoting Boughner v.

Secretary of Health, Education, and Welfare, 572 F.2d 976, 977 (3d Cir. 1978)).  As with

motions made pursuant to Rules 52 and 59, the decision to grant or deny relief pursuant to

Rule 60(b) is committed to the discretion of the trial court.  Id.

The standards for relief from an order or judgment under rules 59(e) and

60(b) on the grounds of newly discovered evidence are the same.  See Compass

Technology, Inc. v. Tseng Laboratories, Inc., 71 F.3d 1125, 1130 (3d Cir. 1995); Banco

Central Del Paraguay v. Paraguay Humanitarian Foundation, Inc., 2007 WL 2493684, at

*3 n.2 (S.D.N.Y. 2007) ("Although the court in Fidelity Partners, Inc. was citing to the

requirements for reconsideration on the grounds of new evidence under Rule 60(b)(2), the

standard for newly discovered evidence under Rule 59(e) is identical.").  These two

procedural rules differ, however, in that Rule 59 motions must be filed within 10 days

from the date the judgment was rendered.  Additionally, Rule 60(b)(2) dictates that if a

party is moving for reconsideration based upon newly discovered evidence, the evidence

must not have been discoverable in time to move for a new trial pursuant to Rule 59(b).

Rule 60(b) provides additional grounds for relief that are not provided for

pursuant to Rule 59, which grounds are not at issue in this contested matter.  More

relevant to PTN's motion is that, like its counterpart under Rule 59, a timely Rule 9023

6

motion extends the time to file an appeal.  See Fed. R. Bankr. P. 8002(b); In re Griffin,

310 B.R. 610, 616-17 (B.A.P. 8th Cir. 2004); Marta Group, Inc. v. County Appliance Co.

Inc., 79 B.R. 200, 203 (E.D. Pa. 1987); Creative Data Forms, Inc. v. Pennsylvania

Minority Business Development Authority, 72 B.R. 619,  621-22 (E.D. Pa. 1985).  It does

so because "[a] timely motion under Rule 59 destroys the finality of the judgment . . . ."

Coquillette, et al., 12 Moore's Federal Practice, § 59.12 [1] at 59-38 (3d ed. 2007).  As

explained by one court:

> A judgment is said to be final if it conclusively determines the
> rights of the parties to the litigation and leaves nothing for the
> court to do but execute the order . . . or resolve collateral
> issues. . . .  However, certain types of postjudgment motions
> interrupt the judgment's finality because judicial efficiency is
> improved by postponing appellate review of the judgment
> "until the District Court has had an opportunity to dispose of
> all motions that seek to amend or alter what otherwise might
> appear to be a final judgment," Osterneck v. Ernst &
> Whinney, 489 U.S. 169, 174. . . .  The timely filing of a
> postjudgment motion pursuant to Fed. R. Civ. P. 50(b), 52(b),
> or 59 automatically "affect[s] the finality of the judgment,"
> Fed. R. Civ. P. 59 Advisory Committee Note (1995), because
> such a motion seeks to alter the judgment or reverse decisions
> embodied in it.  See, e.g., Browder v. Director, Department of
> Corrections, 434 U.S. 257, 267, 98 S. Ct. 556, 54 L. Ed. 2d
> 521 (1978) ("A timely petition for rehearing tolls the running
> of the [appeal] period because it operates to suspend the
> finality of the . . . court's judgment, pending the court's
> further determination whether the judgment should be
> modified so as to alter its adjudication of the rights of the
> parties." (internal quotation marks omitted)); 12 Moore's
> Federal Practice § 59.12[1], at 59-38 (3d ed.1999) (a "timely
> motion under Rule 59 destroys the finality of the judgment").
>
> A judgment's finality is restored upon the resolution of the
> last of any postjudgment motions that operated to suspend
> finality. See, e.g., Fed. R. App. P. 4(a)(4)(A) (if a party has
> timely filed a motion for judgment as a matter of law under
> Rule 50(b), or for amended or additional findings under Rule
> 52(b), or for alteration or amendment of the judgment under

Rule 59(e), "the time to file an appeal runs . . . from the entry
of the order disposing of the last such remaining motion").

Weyant v. Okst, 198 F.3d 311, 314 -15 (2d Cir. 1999) (citations omitted).

Therefore, a timely filed motion under Rule 9023 acts to suspend the

finality of the challenged order or judgment.  If the motion is denied, the finality of the

order or judgment is reinstated and is then appealable.  Miltimore Sales, Inc. v.

International Rectifier, Inc., 412 F.3d 685, 688 (6th Cir. 2005).  If the motion is granted,

the prior judgment or order is vacated and a new one is entered.  Id., at 690.[4]

Because of this issue of finality, a motion filed within ten days of the entry

of an order or judgment that seeks trial court reconsideration or a new trial is treated as a

motion under Rule 59 rather than Rule 60(b) regardless of its title.  See Law Offices of

William W. McVay v. Szeg, 2006 WL 2850627, at *4 (W.D. Pa. 2006) ("[A]ny

post-judgment motion served within ten days after the entry of judgment, other than a

motion to correct clerical errors, 'is within the unrestricted scope of Rule 59(e) and must,

however designated by the movant, be considered as a Rule 59(e) motion . . . .'" (quoting

Harcon Barge Co., Inc. v. D & G Boat Rentals, Inc., 784 F.2d 665, 668 (5th Cir. 1986));

In re Earle Industries, Inc., 86 B.R. 386, 387 (E.D. Pa. 1988); Creative Data Forms, Inc.

v. Pennsylvania Minority Business Development Authority, 72 B.R. at 621-22.

---

[4]In re Markowitz, 190 F.3d 455 (6th Cir. 1999) (discussing the effect of filing a
notice of appeal under Fed. R. Bankr. P. 8002 when a Rule 9023 motion is pending).

B.

The distinction between motions under Rule 9023 (<u>viz.</u>, Rule 59) and Rule 9024 (<u>viz.</u>, Rule 60) is relevant to this contested matter, because WRNN (alone of the objectors to PTN's motion) challenges this court's power to grant any relief to PTN. WRNN asserts that, in a chapter 11 case such as this, 11 U.S.C. § 1144—which permits a chapter 11 confirmation order to be revoked only for reasons of fraud, and only if revocation is sought within 180 days of entry of confirmation, <u>see</u>, <u>e.g.</u>, <u>Mickowski v. Visi-Trak Worldwide, LLC</u>, 415 F.3d 501, 508 (6th Cir. 2005)—is the sole basis for relief from an order confirming a plan.  As PTN does not maintain that the confirmation order of January 17th was procured by fraud, WRNN contends that no relief is possible for newly discovered evidence or even manifest injustice.  For the following reasons, I disagree with WRNN's contention that this court has no authority to grant relief under Rule 9023, even if no fraud is alleged.

WRNN relies upon decisions such as <u>In re Fesq</u>, 153 F.3d 113 (3d Cir. 1998), which held, in light of section 1330(a)—the chapter 13 counterpart to section 1144—that a prior confirmation order could not be revoked under Rule 9024 (incorporating rule 60(b)) based upon a creditor's showing of excusable neglect.  In so holding, the Third Circuit explained:

> Revoking a confirmation order is a measure that upsets the
> legitimate expectations of both debtors and creditors.
> Interpreting Section 1330(a) as a limiting provision permits
> such disruption in only a very narrow category of egregious
> cases.  Branchburg's approach, on the other hand, would open
> the courtroom doors to a large number of post-confirmation
> attacks.  Those added challenges could seriously undermine
> the integrity of the Chapter 13 proceedings, as dissatisfied

9

> creditors could seek to drag out the litigation by bringing
> themselves under Rule 60(b)'s broader rubric in an attempt to
> extract concessions.

In re Fesq, 153 F.3d at 120 (footnote omitted).  The Fesq court echoed an earlier

observation about the importance to the bankruptcy process of vacating final confirmation

orders only in very narrow circumstances:

> [T]he purpose of bankruptcy law and the provisions of
> reorganization could not be realized if the discharge of
> debtors were not complete and absolute; that if courts should
> relax provisions of the law and facilitate the assertion of old
> claims against discharged and reorganized debtors, the policy
> of the law would be defeated; that creditors would not
> participate in reorganization if they could not feel that the
> plan was final, and that it would be unjust and unfair to those
> who had accepted and acted upon a reorganization plan if the
> court were thereafter to reopen the plan and change the
> conditions which constituted the basis of its earlier
> acceptance.

Id., 153 F.3d at 119 (quoting In re Penn Central Transp. Co., 771 F.2d 762, 767 (3rd Cir.

1985)).

These concerns, emphasizing the importance of finality of confirmation

orders, are not undermined by a bankruptcy court's altering or amending a confirmation

order based upon a timely Rule 9023 motion.

An appellate court will review an order confirming a plan by applying the

traditional standards of de novo analysis of legal conclusions and acceptance of factual

findings unless clearly erroneous.  See, e.g., Sarasota, Inc. v. Weaver, 2004 WL 2514290,

at *1 (E.D. Pa. 2004).  As just noted, the pendency of a Rule 9023 motion suspends

finality for purposes of appeal.  Thus, WRNN's counterintuitive position is that a

bankruptcy court can vacate a confirmation order only upon a showing of fraud under

section 1144, even in the context of a timely Rule 9023 motion to alter or amend or for a

new trial, and even if it were persuaded that its factual findings are clearly erroneous;

however, after the bankruptcy court's mandatory denial of the Rule 9023 motion based

upon section 1144, an appellate court has the power to vacate the confirmation order

based upon clearly erroneous findings.  WRNN's contention would counteract one of the

purposes of Rule 59: to "provide[] an efficient mechanism by which the trial court can

correct [an] otherwise erroneous judgment without implicating the appellate process,"

Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1249 (9th

Cir. 1982); see also United States v. Dieter, 429 U.S. 6, 8 (1976); Weyant v. Okst, 198

F.3d 314.

          In other words, it is the absence of finality and thus reliance, along with

efficiency, that differentiates motions under Rule 9023 from Rule 9024 in reevaluating

the propriety of a confirmation order.  Indeed, to the extent that Rule 9023 motions have

been raised in a confirmation context, most courts have determined those motions without

limiting such review to issues of fraud.  See In re Catfish Galley, Inc., 69 F.3d 541

(Table), 1995 WL 629038 (8th Cir. 1995) (section 1144 does not preclude a motion under

Rule 9023); In re Miller, 16 F.3d 240 (8th Cir. 1994) (section 1230, the chapter 12

counterpart to section 1144, does not preclude a motion under Rule 9023); see also In re

Wojda, 371 B.R. 656, 659 (Bankr. W.D.N.Y. 2007) (section 1330 does not preclude

consideration of a Rule 9023 motion); In re Cook, 205 B.R. 617 (Bankr. N.D. Ala. 1996)

(granting reconsideration of a chapter 13 confirmation order); contra In re Bulson, 327

B.R. 830, 848 (Bankr. W.D. Mich. 2005) (section 1330 restricts review of Rule 9023

motions to fraud).

11

Accordingly, despite the protestations of WRNN, I can address the merits of PTN's motion, which motion will be considered as seeking relief under Rule 9023.[5]

## II.

PTN concedes that there has been no intervening change in controlling law. See PTN's Posthearing Memorandum, at 7.  Therefore, it bases its request for relief by arguing that this court made clearly erroneous factual findings that, if not corrected, would create a manifest injustice; and that it has newly discovered evidence demonstrating that the trustee's sale of the debtor's station assets was fatally tainted.  See id.

I shall consider these assertions in the order presented.

## A.

In approving the trustee's proposed second amended plan of liquidation—which plan provided for the sale of the debtor's station assets for no less than $12 million, and which assets the trustee, at confirmation, agreed to sell to WRNN for $13.5 million —I determined that three statutory confirmation requirements were most relevant: section 1129(a)(7) (best interest of creditors test); section 1129(a)(11) (feasibility) and 1129(b)

---

[5]WRNN does not contend that its purchase of the debtor's assets has been consummated so that equitable mootness or section 363(m) precludes relief.

12

(fair and equitable standard).[6]  See January 17th Memorandum, at 18.  I also concluded

that the estimated "compressed stick value"[7] of the station assets proposed to be sold by

the trustee under his plan was relevant to all three statutory provisions.  Id., at 20.

In its present motion under Rule 9023 (and Rules 7052 and 9024), PTN

contends that my finding, based upon the evidence presented at the confirmation hearing,

that the approximate value of the station assets to be sold to WRNN did not exceed $18

million was clearly erroneous.  This valuation finding was based upon a number of

components: a prior appraisal of the station assets for $17,898,772 offered by the debtor

in prepetition state court litigation; the discounting of a subsequent appraisal

commissioned by PTN, valuing these assets at $27 million, as this latter appraisal was

based, in part, upon unrealistic income projections and also failed to consider: the adverse

effects of the debtor's novel digital transmission system; the patent claim by a creditor

involving that new transmission system as well as a dispute over a key tower license;[8] the

amount of postpetition secured lending that the trustee had obtained; and the results of

extensive marketing of the assets by the trustee's investment banker and financial advisor,

SSG Capital.

SSG Capital (now known as National City Investments) testified that it had

twice sought to market the debtor's station assets, and in doing so communicated with

---

[6]Section 1129(b) applied because not every impaired class of creditors voted in favor of the trustee's proposed plan.

[7]This is the measurement of value that all parties suggested is germane.

[8]The trustee had reached an accord regarding the patent claim and the tower lessor, through counsel for one of its shareholders, orally expressed confidence at the confirmation hearing that an agreement regarding future usage would be reached, either with the trustee or with WRNN.

13

more than 100 potential buyers.  It received nine serious responses and two actual bids, had one bid withdrawn on the eve of confirmation, and assisted in negotiations with WRNN, the sole remaining bidder, for a purchase price of $13.5 million.  While this price was much lower than PTN's expert had anticipated, there was no evidence at confirmation that challenged the reasonableness of SSG's marketing efforts. Furthermore, I found the results of an actual sale after adequate marketing more persuasive than the predictions of a hypothetical sale (i.e., an appraisal) by an expert.  See In re BTS Inc., 166 F.3d 346 (Table), 1998 WL 788829, at *1 (10th Cir. 1998); Matter of Excello Press, Inc., 890 F.2d 896, 905 (7th Cir. 1989); see also Bryn Mawr Trust Co. v. Healy, 667 A.2d 719, 723 (Pa. Super. Ct. 1995); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149 (3d Cir. 1986); Calvin v. Washington Properties, Inc., 121 F.2d 19, 27 (D.C. Cir. 1941).

Indeed, prior to the confirmation hearing, PTN had itself anticipated that the trustee would have difficulty finding a buyer willing to pay even $12 million for the debtor's station assets.  PTN filed an objection to the trustee's request for court approval to set bidding procedures for the station assets, which procedures proposed a minimum bid of $12 million.  PTN argued in its objection, dated August 17, 2007, that the trustee had not found any interested purchaser to date and was unlikely to find a bidder offering $12 million.  Therefore, PTN opined in its objection that the trustee should abandon his sale efforts as futile.  PTN supported its objection with the following explanation:

> DTS is a new technology which was only recently authorized
> by the Federal Communications Commission.  The sole prior
> approval of the technology was for an experimental license
> issued to a university.  The RBI [debtor] plan for
> implementation of DTS requires the use of eight
> transmissions sites to broadcast the station's signal to viewers

in contrast to a traditional single transmission broadcast
location.  Of the several hundred television broadcasters
throughout the nation who were required to make the
conversion from analog to digital, RBI is the only commercial
installation of this high risk and costly approach to a digital
conversion.  The initial construction costs associated with the
multi-location process will be at least $2,000,000 more than
the cost of a single transmission location for RBI.  The annual
operating costs of the DTS system will be $750,000 more than
would be incurred had there been a traditional single location
transmission site.  DTS's uniqueness, high risk
implementation, projected costly operation, and lack of a
comparative installed base, has undoubtedly resulted in the
Chapter 11 Trustee not being able to obtain an offer for the
assets.

PTN's Response to Trustee's Motion for Approval of Bidding Procedures, at 8 (see

docket entry #562).

Although the trustee did find a buyer willing to pay more than $12 million,

my valuation finding essentially agreed with PTN's previous concerns: that the novelty

and expense of the debtor's DTS system would be a relevant factor in valuing the station

assets.  Thus, I cannot now agree with PTN that my earlier finding as to estimated value,

based upon the evidence presented at the confirmation hearing, was clearly erroneous.[9]

Also not in error was my finding that the trustee's proposed plan was

feasible, in that WRNN would probably complete the sale process.  PTN now challenges

that finding as clearly erroneous by arguing that there was insufficient evidence to

---

[9]In this motion PTN does not appear to challenge my January 17th conclusion that
a bankruptcy trustee obtains fair value for estate property if he obtains at least 75% of the fair
market value of the assets.  "Traditionally, courts have held that '[f]air and valuable
consideration is given in a bankruptcy sale when the purchaser pays 75% of the appraised value
of the assets.'"  In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d at 149 (quoting In re Rock
Industries Machinery Corp., 572 F.2d 1195, 1197 n.1 (7th Cir. 1978)); see, e.g., In re Colony Hill
Associates, 111 F.3d 269, 276 (2d Cir. 1997); Ready v. Rice, 2006 WL 4550188, at *3 (D. Md.
2006).  Thus, a purchase price of $13.5 million is fair value for assets worth not more than $18
million.

15

demonstrate that WRNN has sufficient funds to close the sale.  In raising this challenge,

PTN asserts that I improperly relied solely upon the testimony of SSG's employee, J.

Scott Victor, Esquire, and that Mr. Victor had never been qualified as an expert to

provide opinion testimony under Fed. R. Evid. 702.

On the issue of plan feasibility under section 1129(a)(11), I reasoned in the

January 17th memorandum as follows:

> As for feasibility, I appreciate that there is no guarantee that
> WRNN will close on this transaction.  In addition to the buyer
> tendering $13.5 million, there needs to be FCC approval of
> the license transfer and an agreement with SOT regarding the
> tower license.  FCC counsel opined during the hearing that
> WRNN's present license renders FCC approval of an
> additional license more likely.  The Goldman Sachs
> commitment letter is far less contingent than that issued by
> Wells Fargo to PTN.  See In re Global Ocean Carriers Ltd.,
> 251 B.R. at 46.  Moreover, SSG testified that WRNN is a
> more financially established entity than PTN (which opinion
> is consistent with the description of WRNN's full-power
> station in Rye New York compared with PTN's low-power
> station).  And counsel for a SOT shareholder at the conclusion
> of the hearing represented that SOT would likely be able to
> reach an accommodation with the trustee and WRNN.
> (Indeed, it was willing to enter into a postpetition lease with
> the trustee.)  Furthermore, counsel for S. Merrill Weiss stated
> in open court that an agreement with the trustee for the use of
> any patented system had been reached in connection with this
> sale.  Additionally, the chief engineer at RBI, whose services
> may be needed to operate the new DTS system, endorsed the
> trustee's sale to WRNN.
>
> Therefore, no party (other than PTN) contends that the
> trustee's proposed sale is speculative.  Indeed, both secured
> creditors—whose claims are treated similarly under both
> plans—strongly favor the trustee's proposal.
>
> I thus conclude it is likely that WRNN will fulfill its station
> asset purchase agreement, thereby rendering the trustee's plan
> feasible.

January 17th Memorandum, at 28-29.

PTN is correct that my feasibility determination did rely (albeit not entirely) upon the testimony of Mr. Victor from SSG (testimony that PTN either elicited itself or to which it never objected ).  SSG had been engaged by the trustee, in part, to assist him in selling the station assets due to its expertise.  See Trustee's Application to Employ SSG, filed March 27, 2006 (Docket Entry #262).  PTN initially objected to such engagement arguing, inter alia, that a broker specializing in the broadcast field would be less expensive and may have more expertise in marketing the debtor's assets than SSG.  See Docket entry #272.  PTN subsequently withdrew that objection after the compensation portion of the agreement with SSG had been restructured.  See Consent Order dated April 26, 2007, docket entry # 283.  Thus, SSG's expertise in marketing the station assets was considered sufficient by all interested parties, including PTN.

At the confirmation hearing, Mr. Victor testified as to his experience in obtaining financing for chapter 11 companies and his involvement in chapter 11 asset sales.  On behalf of the trustee, and prior to the confirmation hearing, he reviewed WRNN's audited financial statement of 2006 and unaudited statement for 2007 and considered the buyer qualified to pay $13.5 million on terms consistent with its asset purchase agreement.

In addition to Mr. Victor's testimony though, I also considered WRNN's existing $1.5 million credit facility with Goldman Sachs, its commitment letter from Goldman Sachs to arrange lending up to $16.5 million, WRNN's deposit of $200,000 with the trustee, which deposit was not refundable if WRNN were not able close the sale for financial reasons, WRNN's status as the owner of a full-power television station out

17

of Rye, New York with an FCC license, as well as its long-standing interest in the

debtor's television station, with ample opportunity for due diligence.

While I acknowledge that there is no guarantee that WRNN will complete

the purchase of the station assets from the trustee, section 1129(a)(11) does not impose

such a high standard. Rather, I concluded on January 17th that the evidence at the

confirmation hearing was sufficient to demonstrate that the sale had a probability of

closing and that the trustee's plan would be consummated. This finding was not clearly

erroneous.

III.

PTN's last contention was the subject of the evidence offered at the hearing

held on its instant motion. As noted earlier, a central component of my approval of the

trustee's proposed plan was my estimate of the value of the station assets as not exceeding

$18 million. If the assets were worth far more, as PTN argues, then the trustee's plan to

sell these assets to WRNN for $13.5 million would neither be fair and equitable under

section 1129(b), nor be in the best interests of creditors as required by section 1129(a)(7).

An important factor in this valuation determination was my finding that the

trustee's marketing efforts for these assets was reasonable, and thus the bidding results

were material evidence of actual value. PTN now maintains that it has newly discovered

evidence to demonstrate that the trustee's marketing efforts were tainted. The alleged

taint, however, does not arise from any actions or inactions taken by the trustee, by SSG

or by any agent engaged by the trustee, or by any bidders for the assets. Instead, the

18

asserted taint stemmed from the unsuccessful efforts of a former officer and current

shareholder of the debtor, Mr. Michael Parker, to purchase the station assets from the

trustee at the auction sale.

PTN presented evidence from Ms. Karen A. Robinson, president and chief

executive officer of the Kinnamon Group, Inc.  Ms. Robinson testified that Mr. Parker

approached her firm for assistance in obtaining financing in order to bid on the debtor's

station assets.  In so doing, Mr. Parker provided Kinnamon with documents and

information that Mr. Parker had obtained about the debtor and its assets, and which

Kinnamon could use in its efforts to find a third party willing to lend funds to or invest

with Mr. Parker in his desired asset purchase.

Although Kinnamon had no written agreement with Mr. Parker, it

anticipated payment for its services if a lender or investor could be found.  To help

protect this contingent compensation, Kinnamon routinely uses a "mutual

nondisclosure/non-circumvent agreement," which it requests that third parties sign before

providing such parties with detailed information about an investment or loan opportunity.

In this instance, Kinnamon intended to use this agreement before revealing to third parties

the information provided to it by Mr. Parker concerning the debtor's station assets

(referred to as WTVE-TV51).  Ex. PTN-1.

Ms. Robinson revealed that one such agreement was signed by ATS

Enterprise LLC.  Id.  ATS was not itself a potential lender, but another intermediary.

Presumably ATS intended to use this information from Kinnamon to solicit interest from

a potential lender or investor with Mr. Parker.  The nondisclosure/non-circumvent

agreement prevented ATS from disclosing the "confidential information" obtained from

19

Kinnamon to any third party without Kinnamon's consent. It also prevented ATS from using this information except to evaluate a possible "business relationship" with Kinnamon. Ex. PTN-1, ¶ 3. This agreement, however, did not bar ATS, or anyone dealing with ATS, from obtaining information about the debtor or its station assets from other, non-confidential sources. Id., ¶ 4.

Kinnamon only entered into one such agreement. And from this one agreement, PTN extrapolates that Mr. Parker probably engaged other entities to seek funding for his purchase attempt, and these entities then must have used similar agreements in their efforts on his behalf. PTN further opines that multiple such agreements had been signed, and that the signors would have consisted of those entities most likely to bid on the station assets. Finally, it maintains that those signing the agreements were precluded from bidding without Mr. Parker's consent. Thus, in PTN's view, the trustee's auction attempt was doomed to fail.

The objectors to PTN's motion challenge all of these assertions as unfounded. They emphasize that only one nondisclosure/non-circumvent agreement was offered in evidence.[10] This agreement, which was signed by an entity that was not a prospective purchaser or lender, would not preclude an interested, potential purchaser

---

[10]Mr. Parker did not testify at this hearing, although he was aware of PTN's motion. (Indeed, his attorney attended the hearing on the motion.) PTN requested that the hearing be adjourned to afford Mr. Parker the opportunity to attend. This request was opposed and I sustained the objections to a postponement as PTN provided no persuasive reason for Mr. Parker's non-attendance.

Indeed, later in the hearing, it was revealed that Mr. Parker would not appear and testify as to his efforts to obtain funding, unless PTN first entered into an agreement with him concerning his obtaining an ownership interest in the station assets, should PTN later become the purchaser. PTN apparently reached such an agreement with Mr. Parker but only on the morning of the hearing, which provided insufficient time for Mr. Parker to be present.

from obtaining due diligence information from the trustee, trustee's professionals or SSG, if it so desired.  Nor would the agreement, as Ms. Robinson acknowledged, bar a signatory to the agreement from bidding on the assets based upon information not obtained from Kinnamon.  SSG and the trustee had prepared a due diligence packet of materials for interested, prospective purchasers, and at least nine such prospects surfaced and obtained those materials.  Of those nine, only two were sufficiently interested to offer minimum bids.

The objectors also argue that PTN's evidence does not fall within the sphere of "newly discovered," because PTN could have learned of Mr. Parker's activities prior to the confirmation hearing.  They note that Mr. Parker's interest in purchasing the station assets from the trustee was known to all interested parties from a pleading filed by the trustee in an adversary proceeding brought against Mr. Parker and others, which pleading detailing the terms of a potential settlement agreement.  (That settlement agreement was later withdrawn by the trustee.)

If I assume arguendo that the evidence proferred by PTN falls within the category of newly discovered, I agree with the objectors that this limited evidence does not demonstrate that the trustee's efforts to market the station assets were so flawed as to warrant retracting the sale to WRNN by vacating the order confirming the trustee's plan.

In general, the purpose of a bankruptcy sale is to obtain the highest and best price for the estate and thus for its creditors and equity holders.  See Matter of Chung King, Inc., 753 F.2d 547, 549 (7th Cir. 1985).  Courts have long concluded that the ability to achieve the highest price would be undermined if bankruptcy sales were not considered final at the conclusion of an auction, unless clear evidence of impropriety in the sale

21

process has been demonstrated.  To easily reopen the bidding process would chill future

interest in purchasing property from a bankruptcy estate, since bidders could not feel

secure at the conclusion of an auction, In re The Charter Co., 829 F.2d 1054, 1055 n.1

(11th Cir. 1987), cert. denied sub nom. Cargill, Inc. v. Charter Intern. Oil Co., 485 U.S.

1014 (1988), thereby driving down the market value of the bankruptcy estate property in

general.  See In re Northern Star Industries, Inc., 38 B.R. 1019, 1022 (E.D.N.Y. 1984).  If

parties are to be encouraged to bid at trustee-conducted bankruptcy sales "there must be

stability in such sales and a time must come when a fair bid is accepted and the

proceedings are ended."  In re Webcor, Inc., 392 F.2d 893, 899 (7th Cir. 1968); see, e.g.,

In re Food Barn Stores, Inc., 107 F.3d 558, 564 (8th Cir. 1997) ("Finality and regularity

of proceedings are significant factors whenever the courts are involved in a sale of

property, for devotion to those principles encourages fervent bidding and ensures that

interested parties will sincerely extend their best and highest offers at the auction itself.");

In re Stanley Engineering Corp., 164 F.2d 316, 319 (3d Cir. 1947) ("Public policy

requires stability in such sales. . . .  To induce bidding at such sales and reliance upon

them, the purpose of the law is that they shall be final . . . they are not to be disturbed

except for substantial reasons.").

         Typically, evidence justifying vacating a trustee's sale of assets will involve

collusion between bidders, or between sellers and bidders, or some type of fraudulent

behavior.  See, e.g., In re Made in Detroit, Inc., 414 F.3d 576, 581 (6th Cir. 2005); In re

Colony Hill Associates, 111 F.3d 269, 276 (2d Cir. 1997); In re Abbotts Dairies of

Pennsylvania, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986); In re Beck Industries, Inc., 605

F.2d 624 (2d Cir. 1979) (holding that collusion between bidding parties resulted in

22

chilling auction price); In re Hat, 310 B.R. 752 (Bankr. E.D. Cal. 2004) (setting aside sale because price was chilled by an agreement between would-be bidder and non-bidding party with right of first refusal); In re Tri-Cran, Inc., 98 B.R. 609 (Bankr. D. Mass. 1989) (setting aside sale because purchaser colluded in order to obtain lowest possible sale price).

       Here, PTN acknowledges that there was no improper conduct by the trustee or any of his agents in seeking the highest auction price for the station assets.  Nor was there any evidence of collusion involving potential bidders.  PTN offers no evidence that a qualified, interested bidder was prevented or discouraged from submitting an offer. Instead, PTN merely speculates that efforts by a shareholder to obtain funds to bid on the assets, which efforts yielded one (or conceivably more) nondisclosure/non-circumvent agreements by intermediaries in the funding efforts, must have chilled the bidding.

       Not only is such speculation unproven and insufficient to warrant a new confirmation hearing on the trustee's plan, with reopened bidding, see In re Temtechco, Inc., 1998 WL 887256 (Bankr. D. Del. 1998) (holding that movant failed to produce new evidence under Rule 60(b) that sale price was the result of collusion between buyer and insider, bid chilling through lock-up agreement, and discouragement of potential investors), but the speculation itself seems to be the product of problematic deductive reasoning.

       PTN appears convinced that the station assets of the debtor are worth at least $30 million.  If an auction of those assets yields a high bid of only $13.5 million, the sale process must have been seriously flawed.  A flawed sale process requires either fraud or collusion involving the seller or bidders, or some impropriety in the auction process

itself.  Since there was no evidence of fraud or collusion, then the auction process must have been flawed.  And the only alleged impropriety that PTN could uncover concerns Mr. Parker's efforts to obtain purchase funding through intermediaries.  Since the trustee's auction yielded such a low offer, PTN reasons that Mr. Parker must have chilled the bidding.

Not only did PTN not present evidence of chilled bidding, but its syllogism is based entirely upon the premise that the station value assets were worth at least $30 million.  There has been no persuasive evidence offered to support that premise.  Instead, as discussed earlier, and as PTN opined when it reviewed the trustee's proposed auction procedures, there is support for a much lower valuation.

Accordingly, for all of these reasons, PTN has not sustained its burden to demonstrate relief under Rule 9023 (or 7052 or 9024).  An order shall be entered denying its motion.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                          :        Chapter 11

READING BROADCASTING, INC.            :

                Debtor                    :        Bankruptcy No. 05-26563bif

................................................

ORDER

................................................

        AND NOW, this 12th day of March 2008, for the reasons stated in the

accompanying memorandum, it is hereby ordered that the motion of the Philadelphia

Television Network, Inc. "To Amend or Make Additional Findings of Fact Pertaining to

the Order Dated January 17, 2008 Pursuant to B.R.7052; To Alter or Amend and For a

New Hearing on the Court's Order Pursuant to B.R. 9023; To Admit Newly Discovered

Evidence or in the Alternative, to Reconsider the Court's Order Confirming the Trustee's

Plan Pursuant to B.R. 9024" is denied.

_____
            BRUCE FOX
    United States Bankruptcy Judge

copies to:

Paul J. Winterhalter, Esq.
Law Offices of Paul J Winterhalter, P.C.
1717 Arch Street, Suite 4110
Philadelphia, PA 19103

Peter C. Hughes, Esq
Jennifer Maleski, Esq.
Dilworth Paxson LLP
1735 Market Street, 32nd Floor
3200 Mellon Bank Center
Philadelphia, PA 19103

Stuart M. Brown, Esq.
Edwards Angell Palmer & Dodge LLP
919 North Market Street, Suite 1500
Wilmington, DE 19801

John D. Demmy, Esq.
Stevens & Lee, P.C.
1105 North Market Street, 7th Floor
Wilmington, DE 19801