UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                             :      Chapter 11

READING BROADCASTING, INC.                        :

                        Debtor                    :      Bankruptcy No. 05-26563bif

................................................

MEMORANDUM

................................................


Miller Coffey Tate, LLP ("MCT"), which firm serves as accountant to the

chapter 11 trustee, has filed a fee application covering the period from January 1, 2007

through June 30, 2007.  In this application, MCT seeks an allowance under 11 U.S.C. §

331[1] of fees in the amount of $163,027.00 and reimbursement of expenses totaling

$2,001.38.  This application is opposed by the Philadelphia Television Network, Inc.

("PTN"), which entity has filed the largest unsecured claim in this case.  PTN argues that

MCT should be allowed only $82,223.62 in fees and is not entitled to have any expenses

reimbursed.

A hearing was held to consider the application and the objection thereto.

Both parties were afforded the opportunity to offer evidence in support of their respective

positions.  Thereafter, they both submitted very thoughtful post-hearing memoranda.

Based upon the arguments made at the hearing and after review of their memoranda, it is

apparent that MCT and PTN have differing viewpoints regarding the proper scope of

MCT's engagement and thus the types of services appropriate for this accounting firm to

---

[1]Although the application refers to section 330, it is apparent that this second
application was not intended as a final one.

provide.  As with many disputes, I conclude, for the reasons that follow, that both parties

raise some meritorious positions and others that are less persuasive.


I.


This chapter 11 commenced on October 7, 2005, with the filing of a

voluntary chapter 11 petition.  Shortly thereafter, certain creditors (including PTN) filed

motions to appoint a chapter 11 trustee.  The United States trustee sought an examiner.

On November 9, 2005, an examiner was appointed.  The examiner then filed a report on

December 12, 2005, which report resulted in an order on January 13, 2006 granting the

pending motion to appoint a chapter 11 trustee.  On January 17, 2006, the United States

trustee selected George L. Miller as the trustee.  Mr. Miller is a certified public

accountant and a principal in the firm of Miller Coffey Tate, LLP.

Mr. Miller then sought to engage his own firm as "forensic accountants and

bankruptcy consultants."  His application explained the services that MCT would provide,

as well as those it would not:

> The Trustee requires the services of a Forensic Accountant
> and Bankruptcy Consultant to perform, but is not limited to,
> the following services:
>
> a. Assist in preparation and review of the Debtor's financial
> statements;
>
> b. Assist in preparation and review of the Debtor's Monthly
> Operating Guideline Reports;
>
> c. Review of short term cash flow forecasts, cash collateral
> budgets and financial projections;
>
> d. Assist the Trustee in proposed plans of reorganization.

2

e. Review and analyze the financial information for inclusion
in the Disclosure Statement to the Plan of Reorganization;

f. Prepare analyses of various causes of actions under
bankruptcy law, such as, preferences, fraudulent conveyances
and turnover actions;

g. Assist the Trustee in pursuing causes of action for the
benefit of the estate;

h. Attend meetings with the Trustee and Court hearings as
required;

1. Provide expert testimony on behalf of the Trustee;

j. Preparation of corporate income tax returns;

k. Perform such other accounting, tax or consulting services
as may be requested and authorized by the Trustee.

4. MCT will not perform the following services so as to
prevent duplication of professional services:

a. Perform an audit in accordance with generally accepted
auditing.

b. Perform business valuations.

c. Provide the Trustee with business advice regarding any DIP
financing or restructuring advice regarding reorganization.

d. Serve as business broker for any potential asset sales or sale
of the business.

Trustee's Application to Employ Miller Coffey Tate, LLP, ¶¶ 3-4.

The trustee's application also disclosed the hourly rates at which MCT

agreed to provide these services:

Applicant is informed that the normal hourly fees of MCT are
as follows:

a) Partners and Principals $270.00 - $400.00
b) Managers $200.00 - $265.00
c) Seniors $155.00 - $195.00

d) Staff $85.00 - $150.00

Id., ¶ 8.  This engagement request was not opposed by any party in interest and was

approved by this court on March 13, 2006.

The instant second fee application[2] reflects that services were provided by

five MCT employees: Daniel J. Coffey, CPA; William A. Homony; Megan J. Dumm;

Stephen D. Key; and Damon J. Karras.  Mr. Coffey was described as the partner

responsible for the engagement.  Mr. Homony was described as a senior accountant who

coordinated and supervised the other accountants and employees working on this

engagement.  Ms. Dumm and Messrs. Key and Karras were other senior and staff

accountants who provided services to the trustee.  Mr. Coffey's time is billed at an hourly

rate of $400 for 204.20 hours of services; Mr. Homony billed at $220 per hour for 312.40

hours; Ms. Dumm billed at $145 per hour for 74.70 hours; Mr. Key billed at $135 per

hour for 10 hours; and Mr. Karras billed at $125 per hour for 3.50 hours.

The services rendered by these five accounting professionals were

categorized by MCT in its fee application as follows:

| SERVICES RENDERED | AMOUNT |
|---|---|
| Claims Analysis | $10,674.50 |
| Post-petition Financing | 20,670.50 |
| General | 13,151.00 |
| Litigation | 80,553.00 |
| Operating Reports | 12,030.00 |
| Plan of Liquidation | 18,340.00 |
| Asset Sales | 6,222.00 |
| Tax | 1,386.00 |
| Total | $163,027.00 |

---

[2]The first fee application covered the period from January 24, 2006 until
December 31, 2006.  It received no objections and was allowed in large measure.

4

Claims analysis involved review of the proofs of claims filed, along with analysis of the debtor's records for corroboration. The application refers in particular to assisting the trustee in challenging claims filed by creditors PTN and HLM Communications, LLC. The majority of the time spent was by Mr. Coffey. Postpetition Financing activities concerned preparation of monthly, quarterly and annual reports submitted to Gladstone, the postpetition lender, and an outside independent accounting firm. The majority of these services were performed by Mr. Homony. The General category included services that "assist[ed] the Trustee in the construction and implementation phases of the [Digital Transmission System] and preparation of the first fee application submitted by MCT." Application, Ex. A-6. Mr. Homony provided the majority of these services.

Litigation services, which comprise about one-half of the fee sought with Mr. Homony spending the majority of time followed by Mr. Coffey, involved "investigation and compilation of data and information from the Debtor's records and analysis of transactions with insider entities and former directors and officers of the Debtor from 1991 to 2006." Application, Ex. A-7. This information and analysis were communicated to the trustee's counsel for use in an adversary proceeding filed and docketed at Adv. No. 06-0643. In addition, services were provided in connection with a discovery request concerning an administrative claim filed by SOT, Inc. Id. MCT also provided services concerning possible preference actions and to assist the trustee in compliance with a subpoena from the local United States Attorney. Other services, to be discussed below, were also provided in this category.

5

MCT's services in connection with the trustee's proposed liquidating chapter 11 plan were described in the application as follows:

> Services rendered in this category represent review and analysis of financial data and information of the Debtor and assistance provided to the Trustee and counsel in connection with the preparation of the Trustee's Plan of Liquidation and Disclosure Statement and subsequent amendments. Such services included the review and analysis of creditors and amounts by class, the preparation of a liquidation analysis, and assistance with the preparation of information and treatment of creditors included in the Plan and Disclosure Statement.
>
> Philadelphia Television Network, Inc. filed a Plan of Reorganization which required review and challenge by the Trustee. Assistance was provided in formulating objections to the proposed Plan of Reorganization.

Ex. A-9. Only Messrs. Coffey and Homony provided these services, with Mr. Homony providing the majority of the time spent.

The trustee's proposed chapter 11 plan (which plan was confirmed after this fee application was filed) contained a provision to sell the debtor's television station assets. In that regard, MCT (through Messrs. Homony and Coffey) offered certain limited assistance to another professional engaged by the trustee:

> Services rendered in this category include the preparation and compilation of financial and nonfinancial data to assist the Trustee's investment banker in marketing the Debtor's business and responding to information requests by potential buyers.

Application, Ex. A-10.

PTN's objection to MCT's fee application is based upon numerous grounds. First, it maintains that Mr. Coffey's hourly rate for services should be reduced from $400 per hour to $300 per hour. It also contends that numerous services were unnecessary, not

beneficial, were outside the scope of MCT's duties, were duplicative and excessive, or were not sufficiently detailed to permit allowance.  Those objections are detailed in PTN's posthearing memorandum and can be summarized as follows:

1. Time Spent on Items not Beneficial to the Estate– $25,074.00
2. Time Spent on Items Within the Duty of the Trustee– $11,678.00
3. Time Spent on Fee Application– $7,780.00
4. Time Spent on Duplicative Items– $13,053.00
5. Time Spent on Items That Was Excessive– $3,871.00
6. Time Spent on Items Accompanied By Vague Descriptions– $6,366.00
7. Hourly Rate Reduction– $10,980.00

PTN's Posthearing Memorandum, Ex. H.  PTN also seeks disallowance of all expenses, arguing that they are insufficiently detailed to warrant reimbursement.

Before addressing these objections and MCT's responses thereto, certain generally accepted principles regarding the allowance of professional fees under sections 330 and 331 and will be outlined.

## II.

Section 331 of the Bankruptcy Code permits any professional engaged by a trustee under section 327, such as an accountant, to receive interim compensation as permitted by section 330.  Section 330(a)(1)(A) provides that a professional engaged by a trustee can be awarded "reasonable compensation for actual, necessary services rendered."  Furthermore, section 330(a)(3)[3] provides:

---

[3] As this bankruptcy case pre-dates the effective date of BAPCPA, the earlier version of section 330 is relevant.  See In re Goucher, 378 B.R. 445, 447 (Bankr. M.D. Pa. 2007); In re Holland, 374 B.R. 409 (Bankr. D. Mass. 2007).

> In determining the amount of reasonable compensation to be
> awarded, the court shall consider the nature, the extent, and
> the value of such services, taking into account all relevant
> factors, including–
>
> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the
> administration of, or beneficial at the time at
> which the service was rendered toward the
> completion of, a case under this title;
>
> (D) whether the services were performed within
> a reasonable amount of time commensurate with
> the complexity, importance, and nature of the
> problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable
> based on the customary compensation charged
> by comparably skilled practitioners in cases
> other than cases under this title.

Allowance of reasonable fees under section 330(a) for a professional such as an accountant is determined using the lodestar approach.  See, e.g., In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 849, 856 (3d Cir. 1994); In re Macrophage, Inc., 2007 WL 708926, at *3 (D.N.J. 2007).  The lodestar method involves the multiplication of a prevailing market hourly rate, taking into account the experience of the professional and the nature of the professional services provided, by the number of hours reasonably expended in providing those services.  See, e.g., In re Busy Beaver Building Centers, Inc., 19 F.3d at 849 n.21 ("Under the lodestar analysis, a court first establishes a reasonable hourly rate (corresponding to the value of the services and the cost of comparable services in § 330(a)(1)) for each set of compensable services (corresponding to the nature of the services in § 330(a)(1)), and then multiplies each rate by the reasonable number of hours

8

of compensable work included in each respective set (corresponding to the time and

extent of the services in § 330(a)(1))”); <u>see also</u> <u>Pennsylvania Environmental Defense</u>

<u>Foundation v. Canon-McMillan School District</u>, 152 F.3d 228, 231-32 (3d Cir. 1998).

      In applying section 330(a), a bankruptcy court must consider the benefit

achieved by the services rendered.  <u>See</u>, <u>e.g.</u>, <u>In re Engel</u>, 124 F.3d 567, 573 (3d Cir.

1997).  Indeed, the Third Circuit Court of Appeals noted that there is an “express mandate

of ‘benefit-to-the-estate’ imposed by § 330.”  <u>Id.</u> at 577.  The language of section

330(a)(3), however, only requires that the services be reasonably likely to yield a benefit

to the estate at the time they were provided; not that they actually do so:

> This duty placed Aimen under an obligation to his client, the
> debtor’s estate, to abandon the preference suit once it became
> reasonably obvious that further litigation would cost more
> than it was likely to bring into the estate.  We emphasize the
> words “reasonably obvious.”  The standard is an objective
> one: did a time come when a reasonable lawyer in Aimen’s
> position would have abandoned the suit?  And it allows room
> for differences in judgment.  When abandonment is not the
> obviously right course, when reasonable professionals could
> differ over the right course, the professional is not to be
> penalized, just as a trustee is not to be surcharged for a
> discretionary judgment that later proves to have been
> mistaken.

<u>Matter of Taxman Clothing Co.</u>, 49 F.3d 310, 315 (7th Cir. 1995) (citation omitted);

<u>accord</u> <u>In re Ames Department Stores, Inc.</u>, 76 F.3d 66, 71-72 (2d Cir. 1996), <u>abrogated</u>

<u>in part on other grounds by</u> <u>Lamie v. U.S. Trustee</u>, 540 U.S. 526 (2004):

> In enacting section 330, Congress departed somewhat from
> this doctrine of strict review, taking the position that
> “compensation in bankruptcy matters be commensurate with
> the fees awarded for comparable services in non-bankruptcy
> cases.”  <u>In the Matter of UNR Indus., Inc.</u>, 986 F.2d 207,
> 208-09 (7th Cir. 1993).  With the 1994 amendments of section
> 330, Congress made another move towards greater equity in
> estate management.  It provided that an award for fees might

9

> be made for services that were "beneficial at the time at which
> the service was rendered," § 330(a)(3)(C), and, by inverse
> construction, "reasonably likely to benefit the debtor's estate."
> Id. (a)(4)(A)(ii)(I). . . .
>
> As reasoned in Collier, if the services of a debtor's attorney
> "are reasonably likely to benefit the debtor's estate, they
> should be compensable." 2 Collier ¶ 330.04 at 330-43. Upon
> remand, this is the test the bankruptcy court should apply in
> an objective manner, based upon what services a reasonable
> lawyer or legal firm would have performed in the same
> circumstances. See In the Matter of Taxman Clothing Co., 49
> F.3d 310, 315 (7th Cir. 1995).

See, e.g., In re Mednet, 251 B.R. 103, 108 (B.A.P. 9th Cir. 2000); In re Auto Parts Club,

Inc., 211 B.R. 29, 35 (B.A.P. 9th Cir. 1997) (Standard under section 330(a) "is an

objective one as to whether the fees were reasonable and necessary at the time they were

incurred. . . .  The policy behind § 330 is not one based on hindsight, but rather one based

on an objective determination at the time services were rendered.").  Where accounting

services rendered on behalf of the trustee were clearly not necessary for the

administration of the bankruptcy case, compensation will not be awarded.  See In re Das

A. Borden & Co., 131 F.3d 1459, 1463-64 (11th Cir. 1997).

In addition, in determining the reasonableness of professional fees under

section 330(a) in a chapter 11 case, accountants' fees are considered under the same

standard as attorneys' fees.  See, e.g., In re Adventist Living Centers, Inc., 137 B.R. 692,

696 (Bankr. N.D. Ill. 1991).  As would apply with a fee request made by counsel to a

chapter 11 debtor in possession, billing judgment, staffing, and interoffice conference

time and the nature of the services provided must be carefully reviewed to determine a

proper allowance under sections 330(a) and 331:

> In order to receive compensation for services rendered to a
> Chapter 11 debtor-in-possession, counsel is not required to

10

have achieved confirmation. . . .  Nevertheless, attorneys' fees must measure up to the standards of reasonableness contained in 11 U.S.C. § 330 before they may be allowed as an expense to be borne by the bankruptcy estate.  The time spent on tasks performed must not be excessive, and it is incumbent upon attorneys seeking approval of compensation from the bankruptcy estate to exercise billing judgment. . . .  Clerical work is part of office overhead and is subsumed in an attorney's hourly rate; consequently it is not compensable from the bankruptcy estate. . . .  Similarly, excessive time spent by an attorney in instructing or delegating primarily ministerial tasks to a paralegal is part of a law firm's intra-office administration and will, therefore, be disallowed as unnecessary.  Cf. In re New Boston Coke Corp., 299 B.R. 432, 445 (Bankr. E.D. Mich. 2003) (noting that "[g]enerally, holding an intra-office conference for the purpose of training attorneys is not compensable.").

In re Potter, 2007 WL 1672142, at *4 (Bankr. D.N.M. 2007) (citations omitted); see also In re Adventist Living Centers, Inc., 137 B.R. at 697; In re American International Airways, Inc., 69 B.R. 396 (Bankr. E.D. Pa. 1987).

Furthermore, bankruptcy courts should insure that professionals do not unfairly receive compensation for overstaffing cases or having senior professionals perform services that a less senior professional could provide, see In re Adventist Living Centers, Inc., 137 B.R. at 698,  and bill only for reasonable time expended.  See In re Jefsaba, Inc.,172 B.R. 786 (Bankr. E.D. Pa. 1994); Kenneth Leventhal & Co. v. Spurgeon Holding Corp., 152 B.R. 511, 516 (N.D. Ill. 1993); In re Chas. A. Stevens & Co., 109 B.R. 853, 854, 856 (Bankr. N.D. Ill. 1990).

Finally, professionals engaged by a trustee, including accountants, should not perform services that are outside the scope of their engagement.  See In re Bicoastal Corp., 122 B.R. 140, 147-48 (Bankr. M.D. Fla. 1990).  If the professional services provided are within the scope of the court-approved engagement, they will be

11

compensable if reasonable in duration and staffed appropriately, unless they were clearly

of no benefit at the time they were rendered.  See generally Killoren v. Boyd, Cronk &

Co., 119 F.2d 1 (8th Cir. 1941) (accounting firm was compensated under the former

Bankruptcy Act for services rendered at the trustee's request and within the scope of its

engagement).  Conversely, if the services rendered were outside of the scope of the

professional's engagement, then such services likely were either of no benefit to the estate

or were duplicated by another professional whose scope included such services.  See

generally In re Computer Learning Centers, Inc., 285 B.R. 191, 205-06 (Bankr. E.D. Va.

2002) (discussing narrow exceptions to this principle).


III.


A.


As mentioned earlier, calculation of fees allowed under 11 U.S.C. § 330

involves computation of the appropriate "lodestar."  As explained by the Third Circuit

Court of Appeals:

> The most familiar formula courts in this circuit use to
> calculate attorneys' fees is undoubtedly the "lodestar"
> approach, an approach with its roots in common fund cases
> and fee-shifting statutes.  Under the lodestar analysis, a court
> first establishes a reasonable hourly rate (corresponding to the
> value of the services and the cost of comparable services in §
> 330(a)(1)) for each set of compensable services
> (corresponding to the nature of the services in § 330(a)(1)),
> and then multiplies each rate by the reasonable number of
> hours of compensable work included in each respective set
> (corresponding to the time and extent of the services in §
> 330(a)(1)).

12

In re Busy Beaver Building Centers, Inc., 19 F.3d 833, 849 n.21 (3d Cir. 1994).

To determine the appropriate hourly rate, a court should look to the market rate for such services. Id. at 849. A determination of the relevant market rate considers the experience of the individual professional who provided the services. See, e.g., In re Cendant Corp. PRIDES Litigation, 243 F.3d 722, 732 n.11 (3d Cir.), cert. denied sub nom., Kirby McInerney & Squire, LLP v. Joanne A. Aboff Family Trust, 534 U.S. 889 (2001); Lake v. First Nationwide Bank, 900 F. Supp. 726, 735 (E.D. Pa. 1995); In re Paster, 119 B.R. 468, 469 (E.D. Pa. 1990) ("[R]easonable hourly rate is set by the court based upon a number of factors, 'including the difficulty of the task, the prevailing market rate for counsel of petitioner's experience, counsel's normal billing rate, and the rates awarded by other courts in similar circumstances'") (quoting Jungkurth v. Eastern Financial Services, Inc., 87 B.R. 333, 337 (E.D. Pa. 1988)).

A bankruptcy judge may use his own knowledge of the market and of the professional's experience to determine the appropriate hourly rate. See, e.g., In re Recycling Industries, Inc., 243 B.R. 396, 404 n.6 (Bankr. D. Colo. 2000); see also In re Busy Beaver Building Centers, Inc., 19 F.3d at 854 ("Although this case does not present us with a pressing need to define precisely how a bankruptcy court should verify the market rates, if any, for select clerical services, we observe that certainly a bankruptcy judge's experience with fee petitions and his or her expert judgment pertaining to appropriate billing practices, founded on an understanding of the legal profession, will be the starting point for any analysis.").

In this contested matter, PTN challenges the hourly rate sought by MCT for the services provided by Mr. Coffey.  Instead of $400 per hour, PTN maintains that his market rate should be $300.

According to Mr. Coffey's Curriculum Vitae, he is a 1972 college graduate, has been licensed as a certified public accountant since 1977, and has been a certified fraud examiner since 1996 and a forensic certified public accountant since 2007.  Ex. MCT-1.  Mr. Coffey has been associated with MCT since 1987, and with Windsor Communication Group, Inc. and Touche Ross & Co. prior to that date.  He has provided services to numerous chapter 11 debtors in possession, as well as various bankruptcy trustees, and has testified frequently in bankruptcy related matters.  Id.  He has also provided services to the local United States Attorney in a criminal matter, as well as for a non-bankruptcy court receiver.  Id.

One of my colleagues awarded MCT fees in the Drexel Industries, LLC bankruptcy case, which included an hourly rate of $330 for Mr. Coffey for services rendered in 2003.  Mr. Coffey also averred that partners in accounting firms providing services in bankruptcy cases outside this district requested compensation at hourly rates from $330 to $800.  Application, Ex. B.  Finally, MCT represented that Mr. Coffey's hourly rate in this case is the same as the firm charges in its non-bankruptcy engagements.

Based upon this evidence, as well as my knowledge of rates charged by accounting firms for bankruptcy work in this district, I agree with MCT that the market value for services provided by someone with Mr. Coffey's experience and credentials is $400 per hour.  Thus, PTN's objection on this point will be denied.

14

B.

PTN objects to the time spent by MCT in preparing and reviewing monthly

operating reports submitted by the trustee.  In this chapter 11 case, the trustee has been

operating the debtor's business, a television station.  PTN argues that the trustee is a

certified public accountant and so was capable of preparing his own reports.  PTN

calculates that Messrs. Coffey and Homony spent $11,678 in connection with these

reports, which services fell within the trustee's duty to perform.  PTN's Post-hearing

Memorandum, Ex. B.

As observed by one commentator, the trustee's accounting firm will

typically prepare monthly reports for chapter 11 operating entities:

> In most jurisdictions, the debtor in possession or the operating
> trustee will be required to file monthly financial statements,
> especially profit and loss statements, so that the United States
> trustee will be able to monitor the economic performance of
> the business.  These statements will generally be prepared by
> an accounting firm, familiar with the deviations from
> generally accepted accounting principles that are expected in
> the preparation of operating statements in bankruptcy cases.

Bernstein, Collier Compensation, Employment & Appointment of Trustees &

Professionals in Bankruptcy Cases, ¶ 1.10 (2004).

Even though the trustee is himself an accountant, it is permissible to

delegate that function when the trustee is operating a business and preparation of monthly

reports will be time-consuming, for the same reasons that a trustee who is an attorney can

engage his own law firm and delegate legal issues to that firm.  See, e.g., In re

Interamericas, Ltd., 321 B.R. 830 (Bankr. S.D. Tex. 2005); In re Kieffer, 306 B.R. 197

(Bankr. N.D. Ohio 2004).  Moreover, the trustee's approved application to engage MCT

15

expressly referred to the latter's role in preparing and reviewing monthly operating reports.

As PTN does not argue that the time spent by MCT in connection with these operating reports is excessive, and my review supports this implicit position, its objection on this issue will also be denied.

## C.

PTN further objects, as not beneficial to the estate, to services provided by MCT that were primarily categorized by the applicant as litigation support. Indeed, compensation for services rendered in this category is perhaps the chief dispute between PTN and MCT. The objector states:

> Accountants employed by MCT billed excessive amounts of
> time for performing work outside the scope of their
> employment by spending hours upon hours reviewing
> deposition and hearing transcripts, pleadings, and researching
> criminal matters. It is unfathomable to PTN why MCT, in
> their employment as certified public and forensic accountants,
> would be required to perform the duties of an attorney, when
> two law firms have already been retained by the Trustee in
> this bankruptcy proceeding.

PTN's Memorandum, at 1.[4]  The objector seeks to reduce allowed compensation by $25,074 for services it views as outside the scope of MCT's engagement as well as its expertise.  See PTN's Memorandum, Ex. A.

---

[4]The trustee has been represented by two law firms as general bankruptcy counsel; albeit, not at the same time. The first law firm ceased operations and was replaced by present counsel in April 2007.

MCT acknowledges that some of the services for which it now seeks an allowance involved Messrs. Coffey and Homony reviewing pleadings filed, including drafts of pleadings, along with deposition and hearing transcripts that arose in this chapter 11 case as well as in a separate district court civil action.  See, e.g., entries of 1/2/07; 2/9/07; 3/7/07; 3/28/07; 4/17/07; 4/18/07; 5/3/07; 6/1/07; 6/6/07; 6/22/07; 6/25/07; 6/28/07.  During the hearing, Mr. Coffey explained his reasons for some of the reviews undertaken by him or Mr. Homony:

> Well, if I may go back to the myriad of hearings to obtain a Trustee -- and I did read those transcripts.  I know it's been criticized but that was, to me, a source of free discovery on a lot of items that were challenged with insiders principally SOT, there's a big issue with tower ownership, there's an issue of whether millions of dollars had been misappropriated by these insiders.
>
> There was questions about loans at 29% interest rates to insiders, et cetera.  We reviewed those transcripts.  The Judge addressed those in his order appointing the Trustee to look into insider transactions.  And our scope of employment was to assist the Trustee with any and all causes of action for recovery of assets to the Estate.
>
> &ast;&ast;&ast;
>
> I reviewed transcripts as a fertile ground for free discovery because these -- there were six, I believe, hearings over the course of the time frame to obtain a Trustee.  In addition there were depositions taken during this period of insiders, I believe Mr. Root, Mr. Matt Miller, Mr. Cohen and they focused and included issues that were very important for following the insider transactions and developing the complaint that ultimately was made for recovery against those individuals.
>
> There was testimony regarding tower ownership and things of that nature that just expedited into review and where to look for things.  So that's why it was very important to understand people's positions taken in those sworn testimony.
>
> Q. Okay.  Well, how does this -- how did this benefit in your view the Estate and the Creditors -- the performance of these services?

17

A. It assisted us in preparing the complaints.  It was like –
taking interviews of people to find out information.  A lot of
these -- this data was prosecuted by PTN's counsel to obtain a
Trustee.

They had done research, they had assisted us in getting the job
done.  So we got a head start on it by reviewing these
transcripts.

N.T. at 86, 110-11.

In addition to reviewing transcripts for discovery purposes, MCT reviewed,

inter alia, pleadings such as objections to settlements and to the fee application filed by

the trustee's former counsel, 4/17/07, a criminal information filed against a former debtor

officer, 6/27/07, and a memorandum of law filed in opposition to judgment on the

pleadings, 6/25/07; conducted research concerning a criminal referral by the trustee to the

local United States Attorney, 3/8/07; advised trustee's counsel regarding "grand jury

issues," 5/4/07; and assisted in physically escorting a fired debtor employee off the

premises, 5/7/07.

As for its litigation services, MCT argues in its memorandum that they were

all necessary and beneficial to the estate:

Applicant reviewed pleadings and transcripts, that is,
documents that can be characterized as legal in nature rather
than clearly a financial record, for multiple purposes. . . .
First, Applicant reviewed these documents in order to acquire
information of self-dealing, fraud and other misconduct for
causes of action against insiders.  Also, this information was
useful in understanding the operations of the Debtor and the
history of the Debtor which in turn better equipped Applicant
to compile the necessary financial information with respect to
the sale, the plan and litigation and to otherwise assist the
Trustee.  In addition, review of these documents assisted Mr.
Coffey in his preparation as a witness at depositions and in
court.

MCT's Memorandum, at 19.

18

More generally, MCT also justifies its actions by observing that the trustee is operating a business and there were few employees of the debtor available to assist him in so doing.  Furthermore, the trustee is charged with asserting claims, collecting assets and making criminal referrals.  Thus, MCT considered that the scope of its engagement was to undertake any actions that might assist the trustee in the performance of his duties: as its employees, "from an administrative standpoint [were] the strongest [viz, most capable, most reliable] people involved in that organization . . . so when he needed something done, he called us."  N.T. at 85.  Such actions, in MCT's view, included reviewing all pleadings, transcripts and documents as they could have some bearing on the trustee's ability to recover assets, confirm a plan, and administer this case for the benefit of creditors.

Although I appreciate that MCT's goal in providing the challenged services was to investigate thoroughly and assist the trustee in any manner possible, I agree with PTN in part and find that MCT's engagement and approved role in this chapter 11 case were less broad, and so some of its services were outside the scope of forensic accounting or consulting.

As one commentator has observed, it is the chapter 11 trustee, not his accountant, who is the central actor in the case:

> The chapter 11 trustee, when appointed or elected, replaces the debtor in possession and becomes the fulcrum around which the reorganization process takes place.  The trustee takes possession of the property of the estate.  The trustee initiates or maintains all appropriate legal actions.  The trustee operates the debtor's business.  The trustee investigates.  The trustee reports.  The trustee meets with the debtor and the creditors' committee.  The trustee disseminates information.  The trustee files the reorganization plan and the disclosure statement.  The trustee secures court approval of the

19

disclosure statement.  The trustee solicits consents and obtains
court confirmation of the plan.  The trustee implements the
plan, vests the assets in the reorganized entity, and sees to the
closing up of the case.

Sulmeyer, Collier Handbook for Trustees & Debtors in Possession, ¶ 7.01 (2007).

Section 327(a) authorizes the chapter 11 trustee, with court approval, to

engage professionals, such as attorneys and accountants, to assist the trustee in the

performance of his duties when professional assistance is necessary and of benefit to the

bankruptcy estate.  These professionals do not replace the trustee; and their assistance is

limited to the professional's sphere of expertise.

Here, although MCT was authorized to "assist the Trustee in pursuing

causes of action for the benefit of the estate," it was not engaged to provide legal advice

or to determine which potential claims are supported by existing facts.  The trustee hired

competent bankruptcy counsel for that role; nor was MCT engaged to recommend to the

trustee whether the legal advice given should be followed.  Bankruptcy counsel is

engaged to take discovery if necessary, review transcripts with an eye toward potential

claims, and draft and review pleadings.  There can be instances in which counsel or the

trustee properly seeks assistance from his accountants to evaluate certain data, prepare for

hearings and even participate in the preparation of pleadings.  In this contested matter,

however, my review of the fee application and the testimony presented shows that MCT

in some instances acted in ways that overlapped with the functions of the trustee and

trustee's counsel, rather than merely assisting them.

In In re Computer Learning Centers, Inc., 285 B.R. at 202-08, the court

discussed whether an accounting firm should be compensated when the services provided

exceeded the scope of its engagement.  The bankruptcy court analogized such a request to

20

the retroactive enlargement of the engagement order, which can be permitted only in very

limited circumstances:

> At the hearing on the accountant's fourth fee application, the
> trustee orally requested that the accountant's scope of
> employment be expanded so that the accounting firm could be
> paid for all the services it performed.  This is similar to
> approving the employment of an attorney retroactively.  In
> order to obtain a retroactive enlargement of the scope of
> employment, the trustee must show that the employment
> would have been approved originally, that there is no
> prejudice to the estate or the creditors and that there is good
> cause for the delayed request.

Id., 285 B.R. at 206; see also Matter of Arkansas Co., Inc., 798 F.2d 645, 650 (3d Cir.

1986) ("[T]he bankruptcy court may grant retroactive approval only if it finds, after a

hearing, that it would have granted prior approval, which entails a determination that the

applicant satisfied the statutory requirements of 11 U.S.C. §§ 327(a) and 1103(a) that the

applicant be disinterested and not have an adverse interest, and that the services

performed were necessary under the circumstances.").

In this chapter 11 case, had MCT originally sought court approval to

undertake broad transcript and pleadings review, prepare criminal referrals, or other types

of duties normally undertaken by the trustee himself or his bankruptcy counsel, such a

broad request would have elicited objections and would have been denied.  Parties in

interest would have anticipated (and indeed this occurred) that certain of the litigation

services undertaken by MCT would duplicate services provided by special litigation

counsel (who filed the first complaint against the debtor's former officers and directors)

and by former and current bankruptcy counsel (who prepared the amended complaint).

Indeed, these attorneys collectively had, by June 30, 2007, billed the estate more than

$200,000 for litigation related services.

21

Thus, some disallowance of MCT's requested compensation associated with the litigation category is warranted.  Upon review of services rendered by Messrs. Coffey and Homony in this category, I find that a reduction of $16,900 is justified.  I have allowed compensation for services provided to the trustee or to bankruptcy counsel that were within MCT's expertise and were necessary to assist them without duplication.

## D.

PTN also objects to an allowance for services that it considers not sufficiently described, duplicative services provided by multiple MCT employees (i.e., interoffice conferences, see generally In re Adventist Living Centers, Inc., 137 B.R. at 697) and time considered excessive in light of the nature of the service and the experience of the professional who rendered it.  MCT concedes that its fee application inadvertently includes identical entries for 2.7 hours of Mr. Coffey's time.

In analyzing the numerous time entries, I agree with PTN in part: $12,409.50 of the value of the services performed should not be awarded.  See Kenneth Leventhal & Co. v. Spurgeon Holding Corp., 152 B.R. 511 (N.D. Ill. 1993); see generally In re Das A. Borden & Co., 131 F.3d 1459 (11th Cir. 1997) (accounting services disallowed that are not beneficial to the estate).

## E.

22

PTN also objects to MCT's request to be compensated for time spent in preparing its initial fee application.  It calculates that 27.1 hours of the present application, valued at $7,780, concern services devoted exclusively to that task.

Section 330(a)(6), added to the Bankruptcy Code in 1994, provides:

> Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application.

Therefore, this court is empowered to allow compensation for time spent by a professional in preparing a fee application in appropriate circumstances.  See, e.g., In re Computer Learning Centers, Inc., 285 B.R. at 219.  As with all compensation requests, services for which an award is made should be performed within a reasonable amount of time given the nature of the services rendered.  11 U.S.C. § 330(a)(3)(D).

Here, MCT spent 27.1 hours involving Messrs. Coffey and Homony in preparing the firm's first interim fee application.  Mr. Coffey stated that the first fee application in a case such as this requires extra administrative time to set up the classifications for services and background support.  Even so, the time spent is excessive given the experience of those involved,  and so should not have required all of the 10.1 hours of Mr. Coffey's services billed plus an additional 17 hours of Mr. Homony's time. Accordingly, a deduction of $3,300 is warranted.  See generally In re Fibermark, Inc., 349 B.R. 385, 410 (Bankr. D. Vt. 2006); In re Computer Learning Centers, Inc., 285 B.R. at 224-25.

23

F.

In addition, and not included in its fee application, MCT now seeks reimbursement of the time its counsel spent in litigating PTN's objection to its fee application.  Courts are divided over whether Congress, in enacting section 330(a)(6), intended for professionals to charge the estate for the expense of engaging counsel to defend a challenge to a fee application, as well as for the preparation of the application itself.  See generally 3 Collier on Bankruptcy, ¶ 330.04[5][a] (15th ed. rev. 2008).

In general, the "American Rule" regarding attorney's fees in federal court cases, see generally, Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240 (1975), is applicable to bankruptcy litigation.  See, e.g., Matter of Pro-Snax Distributors, Inc., 157 F.3d 414, 419 (5th Cir. 1998); In re Computer Learning Centers, Inc., 285 B.R. at 222; In re Jessee, 77 B.R. 59, 61-62 (Bankr. W.D. Va. 1987).  Thus, each party in a federal court dispute, including bankruptcy disputes, typically must pay its own counsel fees, regardless of the outcome.  Here, MCT does not seek reimbursement of counsel fees from PTN; rather, it seeks an administrative expense charged to the bankruptcy estate.

Some courts conclude that an award of counsel fees for defending against an objection to a fee request, in the absence of a specific congressional directive, is inappropriate.  See In re St. Rita's Associates Private Placement, L.P., 260 B.R. 650, 652 (Bankr. W.D.N.Y. 2001).  Other courts hold that such an award is possible in appropriate circumstances, especially when the objections have little or no merit.  See In re Riverside-Linden Inv. Co., 945 F.2d 320, 323 (9th Cir. 1991).

24

If I assume <u>arguendo</u> that section 330(a)(6) does permit including the legal fees expended in defending a fee application, I conclude that such an award is unjustified in this instance.  As noted above, PTN's objections were not frivolous or posed in bad faith.  The objector holds an unsecured claim and its dividend in this chapter 11 case would be diminished by the allowance of administrative expenses under section 330(a).  The challenge to the proper scope of MCT's engagement was legitimate; moreover, some other objections have been sustained in part.  Therefore, MCT and PTN should each have to bear the expense of litigation in this contested matter.  <u>See</u> <u>In re Computer Learning Centers, Inc.</u>, 285 B.R. at 225-26.

G.

Finally, PTN objects to reimbursement of any of the expenses, contending that none are sufficiently described.  On this point I disagree in large part.  While greater detail would have been helpful, I can conclude that reimbursement of MCT's listed expenses is appropriate except for the category of mileage.  Other than the identity of the employee traveling and the date of travel, one cannot determine the destination, purpose or even the mileage rate charged.  Accordingly, $589.32 in expenses will be disallowed.  <u>See</u> <u>In re Fibermark, Inc.</u>, 349 B.R. at 410; <u>In re Chas. A. Stevens & Co.</u>, 109 B.R. 853, 856 (N.D. Ill. 1990).

25

An appropriate order will be entered under section 331.[5]

_____

[5]The United States trustee expressed concern at the fee hearing that payment of any interim award could adversely affect the trustee's ability to operate the debtor.  This concern pre-dates the confirmation of the trustee's liquidation plan.  Given the terms of that plan, and the trustee's understanding of his need to have sufficient funds to operate until closing of the station assets sale, as well as the need to treat all administrative expenses equally, I shall not preclude the trustee from exercising his judgment regarding the timing of payment of this interim award.

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :      Chapter 11

READING BROADCASTING, INC.          :

              Debtor                    :      Bankruptcy No. 05-26563bif

..................................................

ORDER

..................................................

AND NOW, this 3rd day of April 2008, upon consideration of the second

interim fee application filed by Miller Coffey Tate, LLP (MCT), which firm serves as

accountant to the chapter 11 trustee, for services provided and expenses incurred during

the period from January 1, 2007 through June 30, 2007,

And upon consideration of the objections thereto filed by the Philadelphia

Television Network, Inc.,

And for the reasons stated in the accompanying memorandum, it is hereby

ordered that the application is granted in part pursuant to 11 U.S.C. § 331.  MCT is

awarded $130,417.50 in fees and $1,412.06 in reimbursement of expenses.

_____
BRUCE FOX
United States Bankruptcy Judge

copies to:

George L. Miller
Miller Coffey Tate, LLP
8 Penn Center, Suite 950
1628 JFK Blvd
Philadelphia, PA 19103

Paul J. Winterhalter, Esq.
Corinne M. Samler, Esq.
Law Offices of Paul J Winterhalter, P.C.
1717 Arch Street, Suite 4110
Philadelphia, PA 19103

Daniel Astin, Esq.
Magdalena Schardt, Esq.
Fox Rothschild, LLP
2000 Market Street, 10th Floor
Philadelphia, PA 19103