UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                           :    Chapter 11

READING BROADCASTING, INC.                      :

                    Debtor                       :    Bankruptcy No. 05-26563bif

.................................................

MEMORANDUM

.................................................

Presently before me is an objection by the chapter 11 trustee, George L.

Miller, to the general, unsecured claim filed by Philadelphia Television Network, Inc.

(PTN).  PTN's proof of claim, dated November 29, 2005 and docketed as claim #4,

exhibit C-2, asserts that the debtor, Reading Broadcasting, Inc. (RBI), owes it

$20,217,889.85.  After an evidentiary hearing on the trustee's objection, PTN maintains

that the correct amount of its claim is $16,267,750.  See PTN's Memorandum, at 12.  The

trustee contends in his post-hearing memorandum that PTN's unsecured claim should be

allowed in the amount of $8,314,863.41.  Trustee's Memorandum, at 1.[1]

As identified in PTN's proof of claim, the claim consists of three

components.  Ex. C-2.  PTN and the trustee agree as to the first component, since that

portion had been fixed prepetition by an interlocutory state court order.  The trustee

contends, however, that the other two components asserted by PTN should be disallowed

---

[1] By order dated December 21, 2007, I estimated PTN's claim for chapter 11 plan voting purposes only at $11,463,039.  This estimation was done quickly as the confirmation hearing was near at hand, and was based upon limited evidence.  The allowance order in this dispute differs from my earlier estimation as I have considered additional evidence and analyzed earlier evidence in greater detail.

in toto.  PTN disagrees.  Only one of the disputed components was the primary focus of evidence in this court.

I.

Upon consideration of the testimony and documents offered into evidence, I make the following findings of fact.[2]

Prior to its bankruptcy filing in October 2005, RBI operated a full power television station based in Reading, Pennsylvania.  Ex. T-6, at 1-2.  PTN operated a low-power television station in the Philadelphia area.  Id., at 1.  In November 1999, these two parties entered into a Time Brokerage Agreement as well as a Stock Option Agreement. Id., at 5, 7.  Under the latter agreement, PTN agreed to option 40% of RBI's shares of stock, which option could be exercised after an FCC challenge to RBI's license was resolved.  Id., at 7.  PTN's proof of claim asserts, and the trustee does not dispute, that if PTN exercised its option it was to pay $5.24 per share for 512,043 shares.  Ex. C-2.

In August 2001, PTN sued RBI for breach of contract (as well as other claims) in the Court of Common Pleas of Philadelphia County, Pennsylvania, docketed at August Term 2001, No. 1663.  This civil action, assigned to the Honorable Albert W. Sheppard, Jr., was tried over a period of many days in 2004, and an interlocutory order was entered by the state trial court on July 14, 2005.  The order was accompanied by 81

---

[2] The factual findings under Fed. R. Bankr. P. 7052 will be made in narrative format.

pages of findings of fact, conclusions of law and an explanatory discussion of the issues.

<u>See</u> Exs. T-5, T-6.[3]

This July 14, 2005 ordered stated:

AND NOW, this 14th day of July 2005, upon consideration of
the evidence presented at a bench trial, the respective
proposed findings of fact and conclusions of law and
responses of the parties, the respective briefs and memoranda,
all matters of record, and in accord with the Findings of Fact,
Discussion and Conclusions of Law being filed
contemporaneously with this Order, it is ORDERED that:

1. Judgment is entered in favor of plaintiff, Philadelphia
Television Network, Inc. ("PTN"), and against defendant,
Reading Broadcasting, Inc. ("RBI"), on plaintiff's claim of
breach of the Time Brokerage Agreement ("TBA").

2. The breach of the TBA constituted a breach of the Option
Agreement.  Therefore, judgment is entered in favor of
plaintiff, PTN, and against defendant, RBI, on PTN's claim of
breach of the Option Agreement.

3. The court awards PTN damages resulting from the breach
of the TBA as follows:

a) $25,000.00 for payments made
to RBI employees from a
$500,000.00 advance, in violation
of the TBA,

b) $1,418,687.00, representing a
pro rata credit for the periods of
time that the court finds RBI
broadcast at below 50 percent
ERP, and

---

[3] The findings of fact made by Judge Sheppard encompass 28 pages of the
state court's decision.  <u>See</u> Ex. T-6.  As will be discussed <u>infra,</u> the interlocutory order entered
by the state court is binding in this contested matter.  Moreover, both parties expected that I
would consider the underlying factual findings of the state court either as binding, <u>see</u> <u>In re</u>
<u>Thomas</u>, 2007 WL 1655699, at *4 (Bankr. S.D.N.Y. 2007), or as a matter of cost efficiency, and
thus the factual findings were offered into evidence.

c) $6,938,224.00 in lost profits.

4. On PTN's claim for breach of the Option Agreement, the court Orders that each party choose an appraiser, and the two appraisers choose a neutral appraiser and that, among the three, a value of Station WTVE must be determined.  Once the station has been assigned a value, PTN is awarded the value of their options minus the second anniversary payment of $296,984.94.

5. Thc court declines to order specific performance - - that is, reinstatement of the TBA - - in that monetary damages can compensate PTN.

6. With regard to alleged overpayments made by PTN, the court awards PTN:

a) $1,171.00 for the reimbursement of professional association dues, which amount was improperly billed to, and paid by PTN,

b) $80,238.36 for payments made by PTN for the legal services of the Holland & Knight law firm rendered prior to the TBA,

7. The court denies: (a) PTN's claim for alleged payroll overstatements and health insurance charges, (b) PTN's c1aim for "non-reimbursable" expenses of Michael Parker, Frank McCracken, George Mattmiller and Tom Root, (c) PTN's claim for charges related to a "non-reimbursable" car, (d) PTN's claim for reimbursement of a $10,000.00 retainer for legal services, (e) PTN's claim for $60,000.00 owed to Verizon, and (f) PTN's claim for reimbursement of the $500,000 advance.

8. Judgment is entered in favor of RBI, and against PTN, on PTN's claim for fraud and deceit.

9. A hearing will be scheduled to permit the parties to present evidence related to the issue of the propriety of pre-judgment interest.

Thus, PTN was awarded damages by an interlocutory order of the state court on July 14, 2005 totaling $8,463,320.36[4] for breach of the Time Brokerage Agreement, with a further determination to follow regarding pre-judgment interest and assessment of damages for the debtor's breach of the Stock Option Agreement.  Prior to any further state court rulings, however, the debtor filed a voluntary petition in bankruptcy thereby triggering the bankruptcy stay under 11 U.S.C. § 362(a).[5]

Before I consider the two damage issues left open by the state court adjudication, I note (and the parties do not disagree) that in this circuit the Rooker-Feldman doctrine, which precludes federal court review of prior state court orders, applies to interlocutory as well as final orders.  See Port Authority Police Benevolent Association v. Port Authority Police Department, 973 F.2d 169, 177-78 (3d Cir. 1992); In re 421 Willow Corp., 2003 WL 22318022, at *6 n.6 (E.D. Pa. 2003); In re Freehand H.J., Inc., 2007 WL 2071877, at *3 (Bankr. E.D. Pa. 2007); see also Campbell v. Greisberger, 80 F.3d 703, 707 (2d Cir. 1996) ("It cannot be the meaning of Rooker-Feldman that, while the inferior federal courts are barred from reviewing final decisions of state courts, they are free to review interlocutory orders."); cf. In re Brown, 951 F.2d 564, 569 (3d Cir. 1991) ("[T]he order of the state court granting summary judgment on liability was not final for purposes of appeal, but that does not deny it preclusive effect in the bankruptcy court.").

---

[4]The conclusions of law expressly offset the total damages by $148,456.95.  See Ex. T-6 at 80-81 (#27).  The order itself, however, does not refer to this offset. Ex. T-5.  I assume that this was inadvertent and would have been corrected by Judge Sheppard had the bankruptcy stay not intervened.

[5]No party in interest sought to terminate the bankruptcy stay and have the state court conclude the remaining two parts of the state court civil action.

Accordingly, the interlocutory state court determination of liability of the

debtor for its prepetition breach of the Time Brokerage Agreement and its assessment of

damages in the amount of $8,314,863.41[6] will be treated as binding and represents at least

a portion of PTN's allowed unsecured claim.[7]


II.


Before addressing the two disputed components of PTN's unsecured claim,

one should recognize the parties' respective evidentiary burdens of production and

persuasion.

Allowance of a proof of claim is governed by 11 U.S.C. § 502(a), which

provides in relevant part: "A claim or interest, proof of which is filed under section 501 of

this title, is deemed allowed, unless a party in interest . . . objects."  See generally In re

Harrison, 987 F.2d 677, 680 (10th Cir. 1993).  Moreover, pursuant to Fed. R. Bankr. P.

3001(f), "[a] proof of claim executed and filed in accordance with these rules shall

constitute prima facie evidence of the validity and amount of the claim."  See generally In

---

[6]This allowance assumes that the state court would have modified its damage
assessment to be consistent with its express legal conclusions.

[7]PTN's proof of claim also asserts that the interlocutory judgment is res judicata
on the issue of damages for breach of the Time Brokerage Agreement, citing Greenleaf v.
Garlock, Inc., 174 F.3d 352, 357-60 (3d Cir. 1999).  Ex. C-2.  As a federal court must always be
concerned at the outset with its subject matter jurisdiction, generally a court will consider the
Rooker-Feldman issue prior to any preclusion challenges.  See Long v. Shorebank Development
Corp., 182 F.3d 548, 554-55 (7th Cir. 1999) ("Because the Rooker-Feldman doctrine is
jurisdictional in nature, its applicability must be determined before considering the defendants'
arguments regarding the applicability of res judicata.").  Because I have found that the Rooker-
Feldman doctrine precludes my reviewing the judgment, I need not consider the doctrine of res
judicata.

re Innovative Software Designs, Inc., 253 B.R. 40, 44 (B.A.P. 8th Cir. 2000); In re

Brinson, 153 B.R. 952, 954 (Bankr. M.D. Fla. 1993).

       The Third Circuit Court of Appeals has instructed that a shifting evidentiary

burden arises when an objection has been filed to a proof of claim.  In re Allegheny

International, Inc., 954 F.2d 167, 173 (3d Cir. 1992); In re Graboyes, 371 B.R. 113

(Bankr. E.D. Pa. 2007).  That shifting burden was explained recently in In re Kincaid,

2008 WL 2278895, at *2 (Bankr. E.D. Pa. 2008):

> Bankruptcy Rule of Procedure 3001(f) provides that a proof
> of claim executed and filed in accordance with the rules of
> procedure constitutes prima facie evidence of the validity and
> amount of the claim. . . .  Even if there is an objection filed to
> the claim, the evidentiary effect of Rule 3001(f) remains in
> force. . . .  The objecting party carries the burden of going
> forward with evidence in support of its objection which must
> be of probative force equal to that of the allegations of the
> creditor's proof of claim. . . .  "[T]he objector must produce
> evidence which, if believed, would refute at least one of the
> allegations that is essential to the claim's legal sufficiency."
> In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3d
> Cir. 1992).  If the objecting party succeeds in overcoming the
> prima facie effect of the proof of claim, the ultimate burden of
> persuasion then rests on the Claimant.  Id. at 174.

(citations omitted).

       Here, PTN filed a proof of claim, docketed on the claim register as #4,

which meets the requirements of Fed. R. Bankr. P. 3001.  Thus, the proof of claim itself

constitutes "prima facie evidence of the validity and amount of the claim."  The burden of

production shifts to the trustee, as objector, to negate the validity of PTN's proof of claim.

If the trustee meets this burden, then PTN has the ultimate burden of persuasion to

demonstrate the validity of its claim by the preponderance standard.  In re Allegheny

International, Inc., 954 F.2d at 174.

III.

The principal focus of the trustee's evidence at the claim objection hearing, and PTN's rejoinder, was upon the component of the unsecured claim asserting damages for breach of the stock options contract. I turn to that disputed issue next.[8]

During the state court trial, PTN sought specific performance of a contract that allowed it to purchase 40% of outstanding common stock at some future time (viz., resolution of the challenge to the debtor's FCC license renewal, ex. T-6, at 5, 41 n.42, which condition occurred in March 2004, well-after the lawsuit was filed; ex. T-6, at 7-8 (¶¶ 38-40)). The state court found that the debtor had breached this Stock Option Agreement when it breached the Time Brokerage Agreement, and excused PTN from further performance, id., at 46 (but not from the monetary costs associated with the exercise of the stock option), but refused to compel specific performance as PTN had demanded. Instead, the state court held that "a monetary damage award can compensate PTN for the value of the options it is entitled to." Id., at 72.

The state court did not fix the monetary value of the options contract breached by the debtor. Instead, the state court directed a procedure for determining the value of the debtor corporation, using three appraisers, and, by some method unspecified in its opinion, then determining the value of an option for a 40% stock interest. Moreover, the state court did not address in its discussion, ex. T-6, or its order, ex. T-5, the appropriate point at which the value of RBI was germane.

---

[8]While the trustee's objection asserted that any damages awarded to PTN due to RBI's breach of a stock option agreement should be subordinated under 11 U.S.C. § 510(b), the trustee orally withdrew that issue at the hearing held on his objection. N.T., at 3.

There are two possibly relevant dates for valuation.  First would be 2001, which is when the court held RBI breached the Time Brokerage and Stock Option Agreements (and when PTN brought suit in state court).  Second would be 2004, which is when the FCC challenge to RBI's broadcast license was finally concluded and PTN could exercise its stock option, had RBI not breached the agreement.  See generally Scully v. US WATS, Inc., 238 F.3d 497, 509-12 (3d Cir. 2001).

In Scully, a diversity case that was adjudicated consistent with Pennsylvania law, see id., 238 F.3d at 507, the Third Circuit affirmed a district court damage computation for breach of an employee stock option agreement that used a contract approach and therefore calculated damages as of the date the breach occurred.  See id., 238 F.3d at 512 (3d Cir. 2001) ("In this case, the District Court adhered to the general breach of contract rule by calculating damages as of the date of breach.  The Court's decision is consistent with the view that a failure to deliver securities or stock options, pursuant to a legally binding agreement, constitutes a breach of contract."); see also First National Mortgage Company v. Federal Realty Investment Trust, 2005 WL 2206698, at *6-*7 (N.D. Cal. 2005) (analyzing damages for breach of an option to purchase real estate as of the date the breach occurred).

In entering its July 2005 order, the state court held that the Time Brokerage Agreement and Stock Option Agreement "represented one single transaction," ex. T-6 at 45, and the breach of the former was, in effect, a breach of the latter.  Id., at 38-39, 45. As the breach of the brokerage agreement occurred on or before August 2001, the state court apparently found that the options agreement was also breached at that time.  PTN elected to sue on that breach in 2001; therefore, for purposes of determining PTN's

9

allowed unsecured claim, I agree with the trustee (and PTN may not disagree, see N.T. at 70-71) that to the extent the value of the stock options agreement is a function of the value of RBI, 2001 is the relevant date for valuing RBI.[9]

No evidence was presented that RBI's shares were publicly traded in 2001. Nor was there any public market for RBI stock options. When stock shares are not publicly traded, there may be more than one methodology for calculating the fair market value of shares of a privately-held corporation. See, e.g., Slaughter v. Philadelphia Nat'l Bank, 417 F.2d 21, 33 n.20 (3d Cir. 1969); In re Fund Raiser Prods. Co., 163 B.R. 744, 750 (Bankr. E.D. Pa. 1994); In re Harper, 157 B.R. 858, 863 (Bankr. E.D. Ark. 1993); see also 12 B William M. Fletcher, Fletcher Cyclopedia of the Law of Corporations, § 5906.120 (supp. 2007) ("Stock of closely held corporations cannot reasonably be valued by application of any inflexible formula; one tailored to the particular case must be found.").

In general, courts may consider a variety of factors in valuing shares in a closely held corporation, including:

(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

---

[9]Indeed, PTN sought specific performance in its state court lawsuit. Ex. T-6, at 72. At the time trial commenced, the state court observed that the FCC license challenge had not concluded and so PTN was not permitted to exercise its option. Ex. T-6, at 8 (¶ 41). By seeking specific performance, PTN was insisting that its option be enforced as of the date the lawsuit was commenced: i.e., in 2001.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks or corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over the counter.

See In re Frezzo, 217 B.R. 985, 989-90 (Bankr. E.D. Pa. 1998) (citing In re Fund Raiser

Prods. Co., 163 B.R. at 750).

Similarly, "given the myriad factors that might arise in each case, we doubt

that any single universal damage theory could properly value stock options in all

situations." Scully v. US WATS, Inc., 238 F.3d at 512.

In this instance, both RBI and PTN presented expert reports to the state

court that attempted to compute a value of the assets of RBI.  Both experts used a "stick

value" methodology, which "refers to the value of a television station without measurable

market share, as the value of the station equals the value of its license and physical

assets."  Ex. T-6, at 70; exs. C-1, T-1, T-2.  Once the value of RBI's assets was

determined, then typically, "in the absence of sales showing a market value for stock in a

closely held corporation, the value of the stock is predicated upon the market value of the

assets of the company after deducting its liabilities."  Pabich v. Kellar, 71 S.W.3d 500,

509 (Tex. App. 2002); see generally Jack Daniel Distillery v. United States, 180 Ct. Cl.

308, 577 n.10 (1967) ("The stock was purchased for $18 million, which price reflects the

11

value of assets less liabilities.").[10]  And once the value of RBI's stock is established, one

must compute the value of a 40% stock option.

The trustee, through his expert, Mrs. Susan Patrick, presented evidence at

the hearing objecting to PTN's proof of claim that the stick value of RBI, i.e., the value of

all its assets, as of December 31, 2001 was approximately $18 million.  See N.T., at 13;

ex. T-1, at 10.  This figure was partially based on an appraisal prepared by Patrick

Communications, LLC on behalf of RBI during the state court proceedings.  See ex. T-1.

The value was obtained using a market-based pricing approach.  N.T., at 13.  Essentially,

the number of households within RBI's broadcast area (calculated at 695,398) was

multiplied by a "price paid per household" of $25.74.  See Ex. T-1, at 10.  The price paid

per household was derived from information produced by Kagan World Media, an

organization that publishes empirical data and summary statistics on television sales, and

is generally accepted in the industry.  See Ex. T-1, at 5, 10.[11]

---

[10]PTN contends that the "stick value" methodology already includes a deduction
for liabilities.  PTN's Memorandum, at 10 n.3.  I have reviewed the three expert reports offered
into evidence, and none make reference to RBI's liabilities in their approach.  The book value of
the stock typically is the value of the company's assets less its liabilities.  See generally Sun Ins.
Marketing Network, Inc. v. AIG Life Ins. Co., 254 F.Supp. 2d 1239, 1245 (M.D. Fla. 2003); Hill
Medical Corp. v. Wycoff, 86 Cal. App. 4th 895, 899 (2001).

[11]In further support of this valuation, the trustee also offered into evidence an
"addendum" from Mrs. Patrick that valued the assets of RBI as of March 2004 in the amount of
$14,275,905.  Ex. T-2.  The same methodology was used: the number of television households
reached by RBI was multiplied by price paid per household.  As the number of television
households was considered as unchanged between 2001 and 2004, the lower valuation in 2004
was due to a reduced price per household of $20.53.  Ex. T-2, at 4.
Mrs. Patrick explained that between 2001 and 2004, there was a downward sales
trend in the television industry, due to economic factors and new ownership rules promulgated by
the FCC.  As a result, there were fewer sales of television stations and the sale prices were
reduced.  See N.T., at 20-21.  She opined that this decline in prices resulted from or caused a
reduction in price paid per household.

In addition to this expert asset valuation opinion, the trustee offered
evidence that the liabilities of RBI in December 2001 were $3,653,000, not including
PTN's claims.  Ex. T-7.  If PTN's breach of contract claim for the time brokerage
agreement is about $8.3 million, as noted above, in 2001 total liabilities would equal
about $12 million.  If RBI's assets were worth about $18 million in 2001, the
approximate value of corporate equity, or its stock, would be roughly $6 million.  An
entity owning 40% of that stock would have an equity value of $2.4 million in 2001.[12]

---

[12]Mrs. Patrick testified that, in her opinion, the value of 40% of the shares of a
closely held corporation should also be discounted by 30%, reflecting the limited rights of
minority ownership.  N.T., at 23-24; see also ex. T-2, at 6 (Mrs. Patrick's Addendum Report).
A minority ownership discount is "'a reduction in the value of a closely held business's shares
that are owned by someone who has only a minority interest in the business.  The premise
underlying a minority discount is recognition that controlling shares—those owned by someone
who can control the business—are worth more in the market than noncontrolling shares.'"
Haentjens v. Haentjens, 860 A.2d 1056, 1059 (Pa. Super. 2004) (quoting Black's Law Dictionary
1017 (8th ed. 2004)).  The value of a minority interest holder's shares are discounted, then, to
reflect his inability to manage and direct the corporation.
         Whether to apply a minority discount is dependent upon the circumstances of each
particular dispute and, as such, is within the discretion of the trier of fact.  See Estate of Godley
v. C.I.R., 286 F.3d 210, 214 (4th Cir. 2002); Estate of Ford v. Comm'r, 53 F.3d 924, 926 (8th
Cir. 1995); Laserage Technology Corp. v. Laserage Laboratories, Inc., 972 F.2d 799 (7th Cir.
1992); Ahmanson Foundation v. United States, 674 F.2d 761, 770 (9th Cir. 1981).
         Mrs. Patrick offered no market data to support the application of a 30% minority
discount in these circumstances.  Nor was such a discount mentioned in the 2001 appraisal
prepared by her firm, as it addressed only stick value.  Ex. T-1.  Furthermore, some courts have
noted that application of valuation discounts is inappropriate when no actual transfer of shares is
to occur.  See Colmen Capital Advisors, Inc. v. Polar Plastics, Inc., 2005 WL 1793539, at *5
(E.D. Pa. 2005) ("Because no actual transfer of shares was contemplated by the parties, minority
and marketability discounts are not appropriate."); Denike v. Cupo, 926 A.2d 869, 884 (N.J.
Super. 2007) ("Morrison's valuation of the interest without applying marketability and minority
discounts was consistent with the general rule that marketability and minority discounts are not
applied in valuation proceedings where there will be no actual transfer of shares and a sale of the
entire business appears unlikely.").  Here, damages are being measured without any transfer of
shares, thus raising the issue whether a discount in value is warranted.
         Furthermore, in Scully v. US WATS, Inc., the Third Circuit affirmed the refusal
of the trial court to discount the value of a stock option, even though the optioned shares were
restricted.  Id., 238 F.3d at 514.  It was reasonable for the trial court to balance the restrictive

                                                                          (continued...)

13

Using a contract theory of damages, see Scully v. US WATS, Inc.,

"damages are calculated by taking the difference between a stock option's exercise price

and the market price of the same stock at the time of breach. . . .  This measurement

produces the option's 'intrinsic value,' which is the difference between an option's

exercise price and the market price for the same stock."  Id., 238 F.3d at 510; see, e.g.,

Hermanowski v. Acton Corp., 729 F.2d 921, 922 (2d Cir. 1984) ("The proper measure of

damages is the difference between the market value of the stock and the option price.");

MacKinley v. Messerschmidt, 814 A.2d 680, 683 n.2 (Pa. Super. 2002); see also Scarfo v.

Cabletron Systems, Inc., 54 F.3d 931, 956 (1st Cir. 1995).

As found by the state court, the cost to PTN of preserving the stock option

was $296,984.96.  Ex. T-6, at 73.  Furthermore, in its proof of claim, PTN concedes that

the cost of exercising the stock option at $5.24 per share for 512,043 shares, ex. C-2,

would have been $2,683,05.32.  Thus, the trustee has presented evidence that the cost of

exercising the option in 2001 was greater than the value of the stock PTN would own via

this option.  In so doing, the trustee has met his initial burden of production that the

breach of the stock option agreement in 2001 caused PTN no damage.

As mentioned earlier, upon meeting his burden of production, the trustee

shifts the burden of persuasion in establishing damages for breach of the stock option

agreement to PTN.  To meet its evidentiary burden, PTN attempted to refute the trustee's

---

[12](...continued)
nature of the stock against the potential for a future increase in share price.  Id.
      For all these reasons, I find unpersuasive the trustee's evidence that the value of
PTN's stock option, measured on a contract basis as of the date of the breach, should be
discounted due to its minority shareholder position.

14

evidence regarding the stick value of RBI's assets.  The higher the stick value, the greater

the value of RBI's stock and so the greater the value of PTN's stock option.

First, PTN refers to the court findings and discussion of the evidence

offered at the state court trial held in 2004.  See ex. T-6.  There was expert testimony at

the state court trial from Mr. William Redpath, id., at 27 (¶ 149), that valued RBI's assets

at the time of trial to be $33,750,000.  Ex. T-6, at 27 (¶ 151), 70.  From the state court's

discussion, in a number of respects the method of valuation differed from that offered by

RBI at that trial, and by the trustee in this contested matter.

Rather than value the station assets as simply a function of the number of

households reached, PTN's state court expert in 2004 sought to compare RBI to other

television stations sold between November 1999 and 2004, thus using a comparable sales

approach to value.  Id., at 27 (¶ 149), 70.  In so doing, this expert opined that RBI's

broadcast signal reached more television households than RBI's expert had concluded;

furthermore, PTN's state court expert anticipated that RBI's broadcast antenna soon

would be increased in size and power to increase the number of households capable of

receiving the signal.  Id., at 70.  The state court, noted however, that no evidence had

been presented at trial demonstrating that RBI had received any permit by the time of trial

to increase its antenna size or power.  Id., at 71-72.  Thus, at the 2004 state court trial

there was no evidence of an increase in signal strength.

This state court expert report for 2004 was not offered into evidence at the

claims objection hearing.  Thus, I am unable to review and evaluate its various

assumptions; nor was its author subject to cross-examination by the chapter 11 trustee.

PTN's second evidentiary offering in response to the trustee's objection was the testimony of an expert, Mr. Peter Bowman.[13]  Mr. Bowman opined that the stick value of RBI's assets was $29 million in May 2007.  N.T. at 64; ex. c-1.[14]  In his report, written in letter format for Wells Fargo Foothill Specialty Finance, he mentioned that he had appraised these same assets in 2005 for $27 million.[15]

Mr. Bowman's report to Wells Fargo acknowledges that RBI's revenues in 2007 "were stuck at about $3.4 million."  Ex. C-1, at 9.  He expected greater future revenues, though, because beginning in 2006, RBI's signal was carried by EchoStar and DirecTV, although by 2007 this additional "carriage had not been monetized to any degree. . . ."  Id., at 9-10.  Mr. Bowman's letter report also assumed that RBI's television signal would reach many more households due to its unique digital transmission system, which system had just received FCC approval but had not yet been completed.  Id., at 10-11.  Indeed, where Mrs. Patrick's valuation assumed that RBI's station signal was available in 695,368 television households, Mr. Bowman's 2007 valuation is based upon RBI's signal reaching 2.5 million to 3 million households.  N.T., at 56.

Mr. Bowman's May 2007 valuation assumed that RBI's digital transmission system was fully operational.  N.T., at 59.  Projecting RBI's annual revenue growth from 2007 through 2014 at about 4.4% compounded annually, with a discount rate of 13.2%,

---

[13]The trustee challenged Mr. Bowman's ability to testify, but that objection was overruled for reasons stated in open court.  N.T., at 44-52.

[14]This valuation included the value of PTN's own low power station.  Ex. C-1, at 7-9.  That station had an approximate value of $1 million.  Id., at 9; N.T., at 65.  Thus, RBI's assets were actually valued by Mr. Bowman in 2007 at $28 million.  N.T., at 64.

[15]I assume that his valuation of RBI's assets in 2005 would have been $26 million, by deducting the value of PTN's own television station.

and an operating profit multiplier of 13, Mr. Bowman computed the value of RBI's assets

at $27,773,000 using a discounted cash flow analysis. Ex. C-1, table 1. Furthermore, this

discounted income analysis assumed that gross revenues would increase from

approximately $2 million in 2007 to about $4.6 million in 2008, roughly $7.5 million in

2009, $11 million in 2010, $14 million in 2011, and approximately $15.5 million in 2012

(and then remain somewhat static through 2014); this would represent a 600% increase in

revenues during that five year period. Id. Also Mr. Bowman projected that RBI's profit

margin would increase from negative 25.7% to positive 42.7% by 2012.

The Bowman report also lists other television station sales between May

1999 and July 2006, id., table 2, and values the RBI assets at $31.5 million using a

comparable sales approach. This comparison assumes that RBI operates in the greater

Philadelphia region marketplace, N.T., at 58, with extensive household coverage and

revenues equivalent to WGTW (channel 48 analog), which sold for $48 million in

October 2004. Id.[16]

Currently, RBI transmits both an analog and digital television signal. In

2001, it transmitted an analog signal out of Reading Pennsylvania, with a smaller

coverage area. N.T., at 74.

Mrs. Patrick challenged Mr. Bowman's assertion that RBI should be

considered a greater Philadelphia marketplace station. N.T. at 91-92. She also rejected

Mr. Bowman's projected revenue increases for RBI as "superhuman." N.T., at 93. In her

opinion, no prospective purchaser of RBI's station assets would add value to potential

---

[16]Although the Bowman report uses WGTW as a comparative station with RBI, he
does note that the former station has programing that competes with RBI's and is prevailing in
this competition for revenues. Ex. C-1, at 9.

market size increase without historical data to support the increase, and without must-carry status from cable providers, which RBI does not presently have.  N.T., at 92.

As I noted at the hearing, an appraisal of property effective May 2007 is of limited use in determining the value of that property in 2001.  See, e.g., In re Greater Southeast Community Hospital Corp. I, 2008 WL 2037592, at *13 n.21 (Bankr. D. Dist. Col. 2008); State ex rel. Henrich v. Town of Lyons, 1996 WL 557601, at *2 (Wis. App. 1996) ("It was reasonable to conclude that the 1991 purchase and the 1992 appraisal were too remote in time for purposes of assessing the property in 1994."); Brosky v. Brosky, 1989 WL 646256, at *3 (Va. Cir. Ct. 1989).  Indeed, there was no evidence presented that a key premise of Mr. Bowman's appraisal—a future functioning digital transmission system that would significantly increase the range of households that can obtain RBI's television signal in 2007 and beyond—would have added any value to the station assets in 2001.  Furthermore, Mr. Bowman's 2007 valuation includes future revenue assumptions for which there was no support offered.

If RBI had about $12 million in liabilities in 2001 (including PTN's pending claim for breach of the Time Brokerage Agreement), and if the cost of preserving and exercising PTN's stock option totaled almost $3 million, then it would be economical to preserve and exercise this option only if the value of RBI's assets exceeded $19.5 million.  Only then would 40% of the corporate equity exceed the cost of obtaining that equity interest.

Given that PTN had the burden of persuasion on this issue, I cannot conclude that it presented evidence supporting such an asset valuation as of 2001.  Therefore, to the extent RBI breached the Stock Option Agreement in 2001, there was

insufficient evidence that PTN suffered monetary damages thereby.  Accordingly, that

portion of its unsecured claim shall be disallowed.


IV.


The final component to be considered is PTN's entitlement to pre-

bankruptcy, prejudgment interest.

Pennsylvania law permits prejudgment interest to be awarded for successful

breach of contract litigation.  See Benefit Trust Life Ins. Co. v. Union Nat'l Bank of

Pittsburgh, 776 F.2d 1174, 1178 (3d Cir. 1985).  "[I]n a breach of contract action,

pre-judgment interest is the appropriate vehicle to secure monies for the delay of relief."

Touloumes v. E.S.C. Inc., 587 Pa. 287, 297 (2006).  Prejudgment interest, if awarded,

accrues at the legal rate, which in Pennsylvania is 6% simple interest.  See 41 P.S. § 202;

Fortney v. Tennekoon, 1998 WL 159047, at *15 (E.D. Pa. 1998).

As early as 1955, the Pennsylvania Supreme Court concluded that the

payment of prejudgment interest in contract actions was a component of common law in

this state:

> Plaintiffs were entitled to interest at the rate of 6% per annum
> from the time when they should have been paid for the
> services rendered by them.  In all cases of contract interest is
> allowable at the legal rate from the time payment is withheld
> after it has become the duty of the debtor to make such
> payment; allowance of such interest does not depend upon
> discretion but is a legal right. . . .  It is a right which arises
> upon breach or discontinuance of the contract provided the
> damages are then ascertainable by computation and even
> though a bona fide dispute exists as to the amount of the
> indebtedness.

19

<u>Palmgreen v. Palmer's Garage, Inc.</u>, 383 Pa. 105, 108 (1955) (citations omitted).  This

entitlement to prejudgment interest follows acceptance by Pennsylvania courts of the

provisions of the Restatement of Contracts § 337, later Restatement (Second) of Contracts

§ 354 (1979).  <u>See</u>, <u>e.g.</u>, <u>Penneys v. Pennsylvania R. Co.</u>, 408 Pa. 276, 280 (1962);

<u>Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.</u>, 454 Pa. Super. 188,

202 (1996).

  After the <u>Palmgreen</u> decision, the mid-level state appellate court explained

the nature of prejudgment interest in slightly less mandatory terms:

> It is well established that in contract cases, prejudgment
> interest is awardable as of right. . . .  Our courts have
> generally regarded the award of prejudgment interest as not
> only a legal right, but also as an equitable remedy awarded to
> an injured party at the discretion of the trial court.  <u>Daset Min.</u>
> <u>Corp. v. Industrial Fuels Corp.</u>, 326 Pa. Super. 14, 473 A.2d
> 584 (1984).  "In claims that arise out of a contractual right,
> interest has been allowed at the legal rate from the date that
> payment was <u>wrongfully</u> withheld, where the damages are
> liquidated and certain, and the interest is readily ascertainable
> through computation."  <u>Id.</u> at 35, 473 A.2d at 595 (emphasis
> added).  The basic premise underlying the award of
> prejudgment interest to a party centers upon the fact that the
> breaching party has deprived the injured party of using
> interest accrued on money which was rightfully due and
> owing to the injured party.

<u>Somerset Community Hosp. v. Allan B. Mitchell & Associates, Inc.</u>, 454 Pa. Super. at

201; <u>accord</u> <u>Fortney v. Tennekoon</u>, 1998 WL 159047, at *15; <u>see also</u> <u>In re Blatstein</u>, 260

B.R. 698, 721-22 (E.D. Pa. 2001).

  In <u>Frank B. Bozzo, Inc. v. Electric Weld Div. of Fort Pitt Div. of Spang</u>

<u>Industries, Inc.</u>, 345 Pa. Super. 423 (1985), the Pennsylvania Superior Court explained

that prejudgment interest is awarded as of right in those breach of contract cases where

"the breach was a failure to pay either a fixed sum or a sum mathematically ascertainable

. . . . [T]his is true even if there was a bona fide dispute as to the amount of the debt."

Id., at 429-30.  Where, however, the "contract action is to recover an amount that is

neither liquidated nor ascertainable," id., at 430, then the award of prejudgment interest is

discretionary, to be allowed as "justice requires."  Id., at 430-33; see also Busy Bee, Inc.

v. Wachovia Bank, N.A., 2006 WL 723487, at *65-71 (C.P., Lack. Co. 2006), aff'd, 932

A.2d 248 (Pa. Super. 2007) (Table).

        More recently, the Superior Court held: "It is well established that in

contract cases, prejudgment interest is awardable as of right. . . .  Moreover, there is no

requirement that the damages be liquidated and no exception to the right to prejudgment

interest has been recognized simply because the amount of damages must be determined

at trial."  Widmer Engineering, Inc. v. Dufalla, 837 A.2d 459, 469 (Pa. Super. 2003).

        Federal courts in this circuit have awarded pre-judgment interest under

Pennsylvania law in breach of contract cases, including those involving an award of lost

profits.  See Brisbin v. Superior Valve Co., 398 F.3d 279, 294 (3d Cir. 2005)[17]; American

Demolition, Inc. v. Richard I. Rubin, Co., 1994 WL 105530, at *4 (E.D. Pa. 1994).  To

the extent that state law would render an award of prejudgment interest discretionary

when lost profits are involved, see Busy Bee, Inc. v. Wachovia Bank, N.A., 2006 WL

723487, at *69, there was no evidence to justify a denial of such an award in this instance.

Id., at *69-*70.

---

[17]The state court decision Busy Bee, Inc. v. Wachovia Bank, N.A., 2006 WL
723487, at *67 cites favorably to the Brisbin holding on this point.

Although section 502(b)(2) only precludes PTN from receiving post-bankruptcy interest on its claim, see, e.g., Leeper v. Pennsylvania Higher Educ. Assistance Agency, 49 F.3d 98, 100-101 (3d Cir. 1995); see generally Bruning v. United States, 376 U.S. 358, 361-62 (1964),[18] the trustee nonetheless maintains that, as a matter of equity and fairness, PTN should be denied pre-bankruptcy interest even if Pennsylvania law would authorize it, and cites to In re A.H. Robins, Co., Inc., 216 B.R. 175, 185 (E.D. Va. 1997).

The A.H. Robins decision, 216 B.R. at 185-86, relied upon Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1946), to support its conclusion that the equitable powers of a bankruptcy court permit it to disallow a portion of a claim for pre-bankruptcy interest, even if such interest were authorized by relevant state law.  In Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15 (2000), the Supreme Court explained that Vanston did not authorize bankruptcy courts to disallow claims that were valid in accordance with state law under the guise of equity, unless there is statutory authority to do so (i.e., 11 U.S.C. § 510).  Id., 530 U.S. at 24-25 ("Bankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides.").  That principle was reinforced recently in Travelers Casualty & Surety Co. v. Pacific Gas & Electric Co., 127 S. Ct. 1199, 1204-05 (2007).

---

[18]Unsecured creditors can be awarded postpetition interest when the debtor's estate is solvent.  See In re Lapworth, 1998 WL 767456, at *3 (Bankr. E.D. Pa. 1998).  That exception does not apply in this chapter 11 case, and PTN's proof of claim implicitly acknowledges this principle.  Ex. C-2.

Not only does the trustee imbue this court with equitable powers beyond those which Congress authorized, see generally United States v. Pepperman, 976 F.2d 123, 131 (3d Cir. 1992), but the only equitable grounds he offers—decreasing PTN's claim could increase distributions to other unsecured creditors—is unpersuasive.

In this instance, PTN's breach of contract claim, including damages for lost profits, was mathematically ascertainable from evidence offered at the state court trial and so PTN's claim should include prejudgment interest as permitted by Pennsylvania law. See In re Groggel, 333 B.R. 261, 299-300 (Bankr. W.D. Pa. 2005).[19]

In its discussion of the various claims of PTN, the state court stated that PTN was entitled to $85,121 in pre-judgment interest on a portion of its contract damage claim: the portion totaling $1,418,687 in damages awarded for "pro rata credit."  Ex. T-6,

---

[19]In this contested matter, the trustee also complains that PTN has not met its burden to present evidence of the precise amount of prejudgment interest to which it may be entitled.

In general, Pennsylvania law provides that "mere uncertainty as to the amount of damages will not bar recovery where it is clear that the damages were the certain result of the defendant's conduct."  Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1257 (Pa. Super. 1983) (citing Pugh v. Holmes, 486 Pa. 272 (1979)).  Indeed, state law does not require that damages be proven with absolute precision:

> Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages.  The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

Omicron Systems, Inc. v. Weiner, 860 A.2d 554, 565 (Pa. Super. 2004) (citation omitted).

If damages can be awarded, although the exact amount is somewhat uncertain, then interest on such damages may also be awarded on the same reasonable basis.  Here, there was enough evidence presented for me to do so.

at 60-61.  In its proof of claim, PTN refers to this portion of its claim as "credit for power."  This interest ruling was not included in the court's July 2005 order, which omission was likely unintentional.[20]  To the extent that PTN's proof of claim seeks greater interest, it is bound by the state court determination and is entitled only to additional interest from July 2005 (the date of the state court's ruling), until October 7, 2005 (the date of the bankruptcy filing).  At 6% annual simple interest, an additional $19,877.21 is warranted.

The lost profits awarded by the state court in July 2005 contained two additional components: profits lost through December 31, 2003 totaling $3,271,499; and damages in lieu of reinstatement of the contract, consisting of lost profits from January 1, 2004 until November 30, 2006 when the contract expired, and which totaled $3,666,775.[21]  Ex. T-6, at 69.  As to the first component, PTN's proof of claim asserts that prejudgment interest in the amount of $523,982.71 is due.  Ex. C-2.  The mathematical calculation is correct, and the lost profits for the period do correspond with the state court award for this time period.  Thus, this amount of prejudgment interest sought by PTN will be allowed as part of its unsecured claim.

Finally, as to the state court award for lost profits after December 31, 2003, the award of lost future profits was not discounted to present value, and thus already

---

[20]The state court probably did not include this interest determination in its July 2007 ruling due to the court's election to delay ruling on prejudgment interest for all aspects of the damage awards.

[21]This latter figure was computed by finding that PTN had lost or would lose profits of $104,765 per month from January 2004 until November 2006 due to the debtor's contract breach.  Ex. T-6, at 69 n.64.  The legal interest rate of 6% on each month of lost profits yields $523.83.

contains an interest component for all months after July 14, 2005.  In December 2007, I

estimated that the lack of discount to present value roughly offset any prejudgment

interest due for the months before July 14, 2005.  A more precise calculation yields

additional prejudgment interest due PTN of $20,429.18.

Total prejudgment interest allowed under state law as a component of

PTN's proof of claim is therefore $649,410.10.  This is offset by $10,534 in prejudgment

interest owed by PTN to RBI based upon the state court award.  See ex. C-2.  And so the

unsecured claim held by PTN will be allowed in the amount of $8,953,739.51.

An appropriate order will be entered.

_____
        BRUCE FOX
United States Bankruptcy Judge

Dated:  July 8, 2008

25